UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Norfolk Division

NAN VOLLETTE, *et al.,*

       Plaintiffs,

v.

                                      CASE NO. 2:12-cv-231

BILL WATSON, *et al.*,

       Defendants.

## RESPONSE TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Without any opportunity for discovery and on disputed facts, the defendants ask the Court to grant them summary judgment and deny plaintiffs' the opportunity to present their claims to a jury.  The defendants' claim for summary judgment on plaintiffs' Fourth Amendment claim must be denied because it is based on disputed facts and, even were the facts as defendants presents them, the defendants' violated plaintiffs' clearly established rights by strip-searching them without reasonable suspicion.  Likewise, summary judgment must be denied on plaintiffs' First Amendment claim, because under clearly established law, plaintiffs had their security clearances revoked because they filed a lawsuit on a matter of public concern, and defendant Watson offers no plausible reason why such action was necessary to maintain security at the jail. Moreover, summary judgment must be denied as to plaintiffs' state law claims because plaintiffs have stated claims for which relief may be granted, and genuine issues of material fact remain as to those claims.

## RESPONSE TO STATEMENT OF UNDISPUTED MATERIAL FACTS.

1. Plaintiffs do not dispute the allegations contained in paragraph 1 of the Statement.

2. Plaintiffs do not dispute the allegations contained in paragraph 2 of the Statement.

3.   Plaintiffs do not dispute the  allegations contained in paragraph 3 of the Statement, except that Sheriff Watson's right to determine who obtains security clearance to enter the jail is subject to the requirements of the Virginia and United States Constitutions

4.   With respect to the allegations contained in paragraph 4 of the Statement, plaintiffs do not dispute that the policy sets forth that contractors moving into the secure area of the jail are subject to search by the security staff.  The plaintiffs dispute any implication that this policy allows for the strip search and visual body cavity search of contractors absent reasonable and individualized suspicion.

5.   With respect to the allegations contained in paragraph 5 of the Statement, plaintiffs do not dispute that plaintiffs signed a form acknowledging that they know they are subject to being searched when entering the jail.  Plaintiffs dispute any implication that the form acknowledges that plaintiffs were subject to a strip search and visual body cavity search absent reasonable and individualized suspicion.  Plaintiffs Scott and Austin did not sign the form until after the search was conducted.  See Defs.' Ex 2; Pls.' Ex. 5, Scott decl.  ¶ 12; Pls.' Ex. 8, Austin decl. ¶11.[1]

6.   Plaintiffs do not dispute that defendants' Exhibit A-3 contains the statements set forth in paragraph 6.

7.   Plaintiffs do not dispute the allegations contained in paragraph 7 of the Statement.

8.   With respect to the allegations contained in paragraph 8 of the Statement, plaintiffs dispute that Sheriff Watson had reasonable suspicion to justify the strip search and visual body cavity search of the plaintiffs.   *See infra* at Part II.

---

[1] The declaration submitted as Exhibit 5 is unsigned because, due to a family emergency, Ms. Austin was unable to send a signed copy of the affidavit to counsel in time to be filed with this Response.  However, Ms. Austin has reviewed and approved of the content of the declaration, and a signed copy will be filed as soon as possible.

9. With respect to the allegations contained in paragraph 9 of the Statement, plaintiffs dispute that Sheriff Watson had reasonable suspicion to conduct searches.  *See infra* at Part II.

    a. With respect to the allegations contained in paragraph 9a of the Statement, Plaintiffs do not dispute that the affidavit of Sheriff Watson, Defs.' Ex. A, contains the statements set forth in paragraph 9a; however, the statement is hearsay and inadmissible in this proceeding.  Additionally, plaintiffs dispute the allegations until afforded the opportunity to conduct discovery on the authenticity and veracity of the information provided.

    b. With respect to the allegations contained in paragraph 9b of the Statement, plaintiffs do not dispute that the affidavit of Sheriff Watson, Defs.' Ex. A, contains the statements set forth in paragraph 9b; however, plaintiffs dispute the allegations until afforded the opportunity to conduct discovery on the authenticity and veracity of the information provided.

    c. With respect to the allegations contained in paragraph 9c of the Statement, Plaintiffs do not dispute that the affidavit of Sheriff Watson, Defs.' Ex. A, contains the statements set forth in paragraph 9c; however, plaintiffs dispute the allegations until afforded the opportunity to conduct discovery on the authenticity and veracity of the information provided.

    d. With respect to the allegations contained in paragraph 9d of the Statement, Plaintiffs do not dispute that the affidavit of Sheriff Watson, Defs.' Ex. A, contains the statements set forth in paragraph 9d; however, plaintiffs dispute the

allegations until afforded the opportunity to conduct discovery on the authenticity and veracity of the information provided.

    f.   With respect to the allegations contained in paragraph 9f of the Statement, Plaintiffs do not dispute that the affidavit of Sheriff Watson contains the statements set forth in paragraph 9d; however, plaintiffs dispute the allegations until afforded the opportunity to conduct discovery on the authenticity and veracity of the information provided.

10. With respect to the allegations contained in paragraph 10 of the Statement, Plaintiffs do not dispute that the affidavit of Sheriff Watson, Defs.' Ex. A, contains the statements set forth in paragraph 10; however, plaintiffs dispute the allegations until afforded the opportunity to conduct discovery on the authenticity and veracity of the information provided.

11. Plaintiffs do not dispute that Sheriff Watson ordered a strip search of civilian contractors to take place on April 22, 2011. With respect to the remaining allegations contained in paragraph 11 of the Statement, Plaintiffs do not dispute that the affidavit of Sheriff Watson, Defs.Ex. A, contains the statements set forth in paragraph 11; however, plaintiffs dispute the allegations until afforded the opportunity to conduct discovery on the authenticity and veracity of this information provided.

12. With respect to the allegations contained in paragraph 12 of the Statement, Plaintiffs do not dispute that the affidavit of Sheriff Watson, Defs.' Ex. A, contains the statements set forth in paragraph 12; however, plaintiffs dispute the allegations until afforded the opportunity to conduct discovery on the authenticity and veracity of the information provided.

13. With respect to the allegations contained in paragraph 13of the Statement, Plaintiffs do not dispute that the affidavits of Captain Natividad and Lt. Sugg contain the statements set forth in paragraph 13;  however, plaintiffs dispute the allegations until afforded the opportunity to conduct discovery on the authenticity and veracity of the information provided.

14. With respect to the allegations contained in paragraph 14 of the Statement, plaintiffs do not dispute the affidavits of Captain Natividad and Lt. Sugg contain the statements set forth in paragraph 14; however, plaintiffs dispute the allegations until afforded the opportunity to conduct discovery on the authenticity and veracity of this information provided.

    a. With respect to the allegations contained in paragraph 14a of the Statement, plaintiffs do not dispute that the affidavits of Captain Natividad and Lt. Sugg contain the statements set forth in paragraph 14a; however, plaintiffs dispute the allegations until afforded the opportunity to conduct discovery on the authenticity and veracity of the information provided.

    b. With respect to the allegations contained in paragraph 14b of the Statement, plaintiffs do not dispute that the affidavits of Captain Natividad and Lt. Sugg contain the statements set forth in paragraph 14b; however, plaintiffs dispute the allegations until afforded the opportunity to conduct discovery on the authenticity and veracity of the information provided.

    c. With respect to the allegations contained in paragraph 14c of the Statement, plaintiffs do not dispute that the affidavits of Captain Natividad and Lt. Sugg contain the statements set forth in paragraph 14c; however, plaintiffs dispute the

allegations until afforded the opportunity to conduct discovery on the authenticity and veracity of the information provided.  Plaintiffs dispute that all the searches took place in Lt. Col. Rucker's office and Captain Natividad's office.  Some of the searches also took place in a bathroom.  Pls.  Ex. 2, Cannon-Coleman decl. ¶8; Pls.' Ex. 6, Hockaday decl. ¶5.  Plaintiffs dispute that all the searches took place in private.  Some of the offices had windows that were open to the public.   Pls.' Ex. 1, Vollette decl. ¶6; Pls.' Ex. 8, Austin decl., ¶4.

    d.   With respect to the allegations contained in paragraph 14d of the Statement, plaintiffs do not dispute that the affidavits of Captain Natividad and Lt. Sugg contain the statements set forth in paragraph 14d; however, plaintiffs dispute the allegations until afforded the opportunity to conduct discovery on the authenticity and veracity of the information provided.

15. With respect to the allegations contained in paragraph 15 of the Statement, Plaintiffs do not dispute that defendants the affidavits of Captain Natividad and Lt. Sugg contain the statements set forth in paragraph 15; however, plaintiffs dispute the allegations until afforded the opportunity to conduct discovery on the authenticity and veracity of the information provided.

16. With respect to the allegations contained in paragraph 16 of the Statement, Plaintiffs do not dispute that the affidavits of Captain Natividad and Lt. Sugg contain the statements set forth in paragraph 16; however, plaintiffs dispute the allegations until afforded the opportunity to conduct discovery on the authenticity and veracity of the information provided.

17. With respect to the allegations contained in paragraph 17 of the Statement, Plaintiffs do not dispute that defendants the affidavits of Captain Natividad and Lt. Sugg contain the statements set forth in paragraph 17; however, plaintiffs dispute the allegations until afforded the opportunity to conduct discovery on the authenticity and veracity of the information provided.

18. With respect to the allegations contained in paragraph 18 of the Statement, Plaintiffs do not dispute that the affidavits of Captain Natividad and Lt. Sugg contain the statements set forth in paragraph 18; however, plaintiffs dispute the allegations until afforded the opportunity to conduct discovery on the authenticity and veracity of the information provided.

19. With respect to the allegations contained in paragraph 19 of the Statement, Plaintiffs do not dispute that the affidavits of Captain Natividad and Lt. Sugg contain the statements set forth in paragraph 19; however, plaintiffs dispute the allegations until afforded the opportunity to conduct discovery on the authenticity and veracity of the information provided.

20. With respect to the allegations contained in paragraph 20 of the Statement, Plaintiffs dispute that Lt. Sugg and Deputy Baker told each worker as they entered the jail that they were conducting strip searches of all contract workers.  The plaintiffs were not told until after they were escorted into the administrative area or into the room where the searches were conducted that they would be subject to a strip search.  *See* Pls.' Ex. 1, Vollette decl.  ¶7; Pls.' Ex. 2, Cannon-Coleman decl.  ¶7; Pls.' Ex. 3, Stokley decl.  ¶7-8; Pls.' Ex. 4 , Vines decl.  ¶5; Pls.' Ex. 5, Scott ¶¶5-6; Pls.' Ex. 6, Hockaday decl. ¶6; Pls.' Ex. 7, Braswell decl.  ¶7; Pls.' Ex. 8, Austin decl.  ¶6; Pls.' Ex. 9, Floyd-Sharp decl.  ¶7.

21. With respect to the allegations contained in paragraph 21 of the Statement, Plaintiffs do not dispute that the plaintiffs were never told they were under arrest.  Plaintiffs, however, dispute that they were never told that they could not leave.  Plaintiffs were told that if they did not comply with the search that they would lose their security clearance, implying that they could not leave if they wished to stay employed at Portsmouth City Jail.  *See* Pls.' Ex. 1, Vollette decl.  ¶7; Pls.' Ex. 2, Cannon-Coleman decl.  ¶7; Pls.' Ex. 3, Stokley decl.  ¶7-8; Pls.' Ex. 4, Vines decl.  ¶5; Pls.' Ex. 5, Scott ¶6; Pls.' Ex. 6, Hockaday decl. ¶6; Pls.' Ex. 7, Braswell decl.  ¶7; Pls.' Ex. 8, Austin decl.  ¶6; Pls.' Ex. 9, Floyd-Sharp decl.  ¶7.

22. With respect to the allegations contained in paragraph 22 of the Statement, Plaintiffs do not dispute that the affidavit of Lt. Suggs contains the statements set forth in paragraph 22; however, plaintiffs dispute the allegations until afforded the opportunity to conduct discovery on the authenticity and veracity of the information provided.

23. With respect to the allegations contained in paragraph 23 of the Statement, Plaintiffs do not dispute that Lt. Baker conducted searches of Nurse Emma Floyd, Darnetta Austin, Nurse Vines, Nurse Barbara Stokley, Marilyn Scott, Nan Vollette, Nurse Verita Braswell and Nurse Coleman. Plaintiffs dispute that all the searches took place in private.  Some of the offices had windows that were open to the public.   Pls.' Ex. 1, Vollette decl. ¶6; Pls.' Ex. 8, Austin decl., ¶4.

24. Plaintiffs do not dispute the allegations contained in paragraph 24 of the Statement.

25. With respect to the allegations contained in paragraph 25 of the Statement, Plaintiffs do not dispute that the affidavit of Deputy Baker contains the statements set forth in

paragraph 25; however, plaintiffs dispute the allegations until afforded the opportunity to conduct discovery on the authenticity and veracity of the information provided.

26. Plaintiffs dispute the allegations contained in paragraph 26 of the Statement, specifically that the plaintiffs agreed to the search and that the plaintiffs understood that they had a right to refuse the search.  Plaintiffs were told that if they did not comply with the search they would lose their security clearance.   *See* Pls.' Ex. 1, Vollette decl. ¶7; Pls.' Ex. 2, Cannon-Coleman decl.  ¶7; Pls.' Ex. 3, Stokley decl. ¶7-8; Pls.' Ex. 4 , Vines decl. ¶5; Pls.' Ex. 5, Scott ¶6; Pls.' Ex. 6, Hockaday decl. ¶6; Pls.' Ex. 7, Braswell decl. ¶7; Pls.' Ex. 8, Austin decl. ¶6; Pls.' Ex. 9, Floyd-Sharp decl. ¶7.  Plaintiffs also dispute that they voluntarily entered a private office or bathroom.  Several of the plaintiffs were not told that they would be strip searched until after entering the room.  *See* Pls.' Ex. 1, Vollete decl. ¶7; Pls.' Ex. 2, Cannon-Coleman decl. ¶5; Pls.' Ex. 3, Stokley decl. ¶¶6-7); Pls.' Ex. 4, Vines decl. ¶5; Pls.' Ex. 6, Hockaday decl. ¶6; Pls.' Ex. 8, Austin decl. ¶4-6; Pls. Ex. 9, Floyd-Sharp decl. ¶¶5-6.

27. Plaintiffs dispute the allegations contained in paragraph 27 of the Statement, specifically that Deputy Baker utilized that same standard strip search procedures for each of the females she searched.  The search conducted by Deputy Baker was a visual body cavity search and not a standard strip search.  *See* Pls.' Ex. 1, Vollette decl. ¶14; Pls.' Ex. 2, Cannon-Coleman decl. ¶9; Pls.' Ex. 3, Stokley decl. ¶10; Pls.' Ex. 4, Vines decl. ¶7; Pls.' Ex. 5, Scott decl. ¶7; Pls. Ex. 6, Hockaday decl. ¶8; Pls.' Ex. 7, Braswell decl. ¶8; Pls.' Ex. 8, Austin decl. ¶7; Pls.' Ex. 9, Floyd-Sharp decl. ¶8.

   a. Plaintiffs do not dispute the allegations contained in paragraph 27a of the Statement.

b.  Plaintiffs do not dispute the allegations contained in paragraph 27b of the Statement.

c.  Plaintiffs dispute the allegations contained in paragraph 27c of the Statement. Prior to asking plaintiffs Vollette, Vines, Braswell, Austin and Floyd-Sharp to squat and cough, she first instructed them to bend over while she visually inspected their anal and genital areas. Pls.' Ex. 1, Vollette decl. ¶14; Pls.' Ex. 4, Vines decl. ¶7; Pls.' Ex. 7, Braswell decl. ¶8; Pls.' Ex. 7, Austin decl. ¶8; Pls.' Ex. 9, Floyd-Sharp decl.¶8.  After telling plaintiffs Stokley and Scott to squat and cough, Deputy Baker then told them to bend over further as she appeared to lower her head and visually inspect their anal and genital areas.  *See* Pls.' Ex. 3, Stokley decl. ¶10; Pls.' Ex. 5, Scott decl. ¶7.

d.  Plaintiffs dispute the allegations contained in paragraph 27d of the Statement. Deputy Baker bent, crouched over, or tilted her head and appeared to have visually inspected the plaintiffs' anal and rectal areas.  *See* Pls.' Ex. 1, Vollette decl. ¶14; Pls.' Ex. 2, Cannon-Coleman decl. ¶9; Pls.' Ex. 3, Stokley decl. ¶10; Pls.' Ex. 4, Vines decl. ¶7; Pls. Ex. 6, Hockaday decl. ¶8; Pls.' Ex. 7, Braswell decl. ¶8; Pls.' Ex. 8, Austin decl. ¶7; Pls.' Ex. 9, Floyd-Sharp decl. ¶8.

e.  Plaintiffs dispute the allegations contained in paragraph 27e of the Statement. Deputy Baker appeared to be inspecting the plaintiffs' anal and genital areas as they were bent over or as they were squatting.  *See* Pls.' Ex. 1, Vollette decl. ¶14; Pls.' Ex. 2, Cannon-Coleman decl. ¶9; Pls.' Ex. 3, Stokley decl. ¶10; Pls.' Ex. 4, Vines decl. ¶7; Pls.' Ex. 5, Scott decl. ¶7; Pls. Ex. 6, Hockaday decl. ¶8; Pls.' Ex. 7, Braswell decl. ¶8; Pls.' Ex. 8, Austin decl. ¶7; Pls.' Ex. 9, Floyd-Sharp decl. ¶8.

    f.   Plaintiffs dispute the allegations contained in paragraph 27f of the Statement, specifically that Deputy Baker did not touch plaintiff Braswell.  Pls.' Ex. 7, Braswell decl. ¶9.

28.  Plaintiffs do not dispute that Deputy Baker performed the searches on April 22, 2011.

    a.   Plaintiffs dispute the allegations in paragraph 28a of the Statement, specifically that Nurse Floyd was advised of the search and that she agreed to be searched. Nurse Floyd was not told until after the search began that it would a strip search. She did not know that a visual body cavity search would be conducted until after her clothes were already removed.  Additionally, she complied with the order to remove her clothes only after being told that she would lose her security clearance if she did not comply.  Pls.' Ex. 9, Floyd-Sharp decl.  ¶¶6-8.

    b.   Plaintiffs dispute the allegations in paragraph 28b of the Statement, specifically that Darnetta Austin was advised of the search and that she agreed to be searched. Darnetta Austin did not know that a visual body cavity search would be conducted until after all her clothes were already removed.  Additionally, she complied with the order to remove her clothes only after being told that she would lose her security clearance if she did not comply with the search.   Pls.' Ex. 8, Austin decl.  ¶¶4-7.

    c.   Plaintiffs dispute the allegations in paragraph 28c of the Statement, specifically that Nurse Vines was advised of the search and that she agreed to be searched. She did not know that a visual body cavity search would be conducted until after all her clothes were already removed.  Additionally, she complied with the order

to remove her clothes only after being told that she would lose her security clearance if she did not comply with the search.  Pls.' Ex. 4, Vines decl.  ¶¶5-7.

d.  Plaintiffs dispute the allegations in paragraph 28d of the Statement, specifically that Nurse Stokley was advised of the search and that she agreed to be searched. She did not know that a visual body cavity search would be conducted until after all her clothes were already removed.  Additionally, she complied with the order to remove her clothes only after being told that she would lose her security clearance if she did not comply with the search.   Pls.' Ex. 3, Stokley decl.  ¶¶5-8.

e.  Plaintiffs dispute the allegations in paragraph 28e of the Statement, specifically that Marilyn Scott was advised of the search and that she agreed to be searched. She did not know that a visual body cavity search would be conducted until after all her clothes were already removed.  Additionally, she complied with the order to remove her clothes only after being told that she would lose her security clearance if she did not comply with the search.   Pls.' Ex. 5, Scott decl. ¶¶6-7.

f.  Plaintiffs dispute the allegations in paragraphs 28f of the Statement, specifically that Nan Vollette was advised of the search and that she agreed to be searched. She did not know that a visual body cavity search would be conducted until after all her clothes were already removed.  Additionally, she complied with the order to remove her clothes only after being told that she would lose her security clearance if she did not comply with the search.   Pls.' Ex. 1, Vollette decl.  ¶¶6-7, 11-12.  Plaintiffs do not dispute that Ms. Volette was agitated and crying throughout the search.  With respect to the remaining allegations of paragraph 28c, plaintiffs do not dispute that the affidavit of Deputy Baker contains the

12

statements set forth in paragraph 28c; however, plaintiffs dispute the allegations until afforded the opportunity to conduct discovery on the authenticity and veracity of the information.

g.  With respect to the allegations contained in paragraph 28g of the Statement, Plaintiffs do not dispute the affidavit of Deputy Baker contains the statements set forth in paragraph 28g; however, plaintiffs dispute the allegations until afforded the opportunity to conduct discovery on the authenticity and veracity of this information provided.

h.  Plaintiffs dispute the allegations in paragraph 28h of the Statement, specifically that Nurse Braswell was advised of the search and that she agreed to be searched. She did not know that a visual body cavity search would be conducted until after all her clothes were already removed.  Additionally, she complied with the order to remove her clothes only after being told that she would lose her security clearance if she did not comply with the search.  Pls.' Ex. 7, Braswell decl.  ¶¶7-8

i.  Plaintiffs dispute the allegations in paragraph 28i of the Statement, specifically that Nurse Coleman was advised of the search and that she agreed to be searched. She did not know that a visual body cavity search would be conducted until after all her clothes were already removed.  Additionally, she complied with the order to remove her clothes only after being told that she would lose her security clearance if she did not comply with the search.  Pls.' Ex. 2, Cannon-Coleman decl. ¶¶7-9.

29.  With respect to the allegations contained in paragraph 29 of the Statement, Plaintiffs do not dispute that the affidavit of Lt. Sugg contains the statements set forth in paragraph 29;

however, plaintiffs dispute the allegations until afforded the opportunity to conduct discovery on the authenticity and veracity of the information provided.

30.  With respect to the allegations contained in paragraph 30 of the Statement, Plaintiffs do not dispute that the affidavit of Lt. Keese contains the statements set forth in paragraph 30; however, plaintiffs dispute the allegations until afforded the opportunity to conduct discovery on the authenticity and veracity of this information provided.

31.  With respect to the allegations contained in paragraph 31 of the Statement, Plaintiffs do not dispute that the affidavit of Lt. Keese contains the statements set forth in paragraph 31; however, plaintiffs dispute the allegations until afforded the opportunity to conduct discovery on the authenticity and veracity of the information provided.

32. With respect to the allegations in paragraph 32 of the Statement, plaintiffs dispute that Nurse Hockaday was told that she was subject to being strip searched as she entered the jail.  She was not told until after being led into the bathroom that she would be strip searched.  Pls.' Ex. 6 , Hockaday decl. ¶¶4-6.

33. With respect to the allegations contained in paragraph 33 of the Statement, plaintiffs do not dispute that the Nurse Hockaday was never told she was under arrest.  Plaintiffs dispute that Ms. Hockaday was not advised that she could not leave.  Ms. Hockaday was told that her security clearance would be revoked if she did not comply with the search, implying that she could not leave if she wished to continue working at Portsmouth City Jail.  Pls.' Ex. 6 , Hockaday decl. ¶6

34.     a.   Plaintiffs do not dispute the allegations contained in paragraph 34a of the Statement.

    b.   Plaintiffs do not dispute the allegations contained in paragraph 34b of the Statement.

    c.   Plaintiffs dispute the allegations contained in paragraph 34c of the Statement, specifically the purpose for requiring Nurse Hockaday to turn around, squat and cough.  Hockaday decl. Pls.' Ex. 6 ¶8.

    d.   With regards to the allegations contained in paragraph 34 d of the Statement, plaintiffs do not dispute that the affidavit of Deputy Mabry contains the statements set forth in paragraph 34d; however, plaintiffs dispute the allegations until they have been afforded an opportunity to conduct discovery on the authenticity and veracity of the information provided.

    e.   Plaintiffs dispute the allegations contained in paragraph 34e of the Statement.  As Nurse Hockaday was squatting, Deputy Mabry appeared to be visually inspecting her anal and genital areas.  Hockaday decl. Pls.' Ex. 6 ¶8.

    f.   Plaintiffs do not dispute the allegations contained in paragraph 34f of the Statement.

35.   With regards to the allegations contained in paragraph 35 of the Statement, plaintiffs dispute that Nurse Hockaday was advised of and consented to the strip search.  Nurse Hockaday was not told until after the search began that it would a strip search.  She did not know that a visual body cavity search would be conducted until after her clothes were already removed.  Additionally, she complied with the order to remove her clothes only after being told that she would lose her security clearance if she did not comply.  Hockaday decl. Pls.' Ex. 6 ¶¶6-8.  Plaintiffs do not dispute that Deputy Mabry found a cell phone and advised Nurse Hockaday to put it in her vehicle.

36. Plaintiffs dispute the allegations contained in paragraph 36 of the statement.   Plaintiffs were told that if they did not comply with the search, that their security clearances would be revoked.  The implication of this threat was that they would no longer be able to work at Portsmouth City Jail if they failed to comply with the search.  *See* Pls.' Ex. 1 , Vollette decl. ¶7; Pls.' Ex. 2, Cannon-Coleman decl. ¶7; Pls.' Ex. 3, Stokley decl.  ¶7-8; Pls.' Ex. 4, Vines decl. ¶5; Pls.' Ex. 5, Scott ¶6; Pls.' Ex. 6, Hockaday decl. ¶6; Pls.' Ex. 7, Braswell decl. ¶7; Pls.' Ex. 8, Austin decl. ¶6; Pls.' Ex. 9, Floyd-Sharp decl. ¶7.

37. With respect to the allegations contained in paragraph 37 of the Statement, Plaintiffs do not dispute that the affidavits of Sheriff Watson and Deputy Baker contain the statements set forth in paragraph 37a; however, plaintiffs dispute the allegations until afforded the opportunity to conduct discovery on the authenticity and veracity of the information provided.

38. With respect to the allegations contained in paragraph 38 of the Statement, Plaintiffs do not dispute that the affidavit of Sheriff Watson contains the statements set forth in paragraph 38; however, plaintiffs dispute the allegations until afforded the opportunity to conduct discovery on the authenticity and veracity of the information provided.

39. Plaintiffs dispute the allegations contained in paragraph 39 of the Statement.  Sheriff Watson's statements on this matter are conclusory, contradictory, and implausible for the reasons set forth *infra* at Part VII.

40. Plaintiffs dispute the allegations contained in paragraph 40 of the Statement.  Sheriff Watson's statements on this matter are conclusory, contradictory, and implausible for the reasons set forth *infra* at Part VII.

**ARGUMENT**

I.      STANDARD OF REVIEW

Summary judgment is appropriate only when the Court finds that "that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56.  "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  Summary judgment should be granted only if no reasonable jury could find in favor of the moving party.  *Id.* at 250-51.

II.     UNDER CLEARLY ESTABLISHED LAW, THE SEARCHES OF PLAINTIFFS
        VIOLATED THE FOURTH AMENDMENT.

Public officials are entitled to qualified immunity only "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982).   When a defendant claims qualified immunity on motion for summary judgment prior to any discovery, the Court must determine whether the plaintiff has stated a claim for a constitutional violation under clearly established law, and whether there is a genuine issue of material fact as to what happened.  "In instances where there is a material dispute over what the defendant did, and under the plaintiff's version of the events the defendant would have, but under the defendant's version he would not have, violated clearly established law, it may be that the qualified immunity question cannot be resolved without discovery."  *DiMeglio v. Haines*, 45 F.3d 790, 795 (4th Cir. 1995).

In the present case, even if the facts are as defendants claim, the defendants violated the plaintiffs' rights under clearly established law by subjecting them to a strip search without reasonable suspicion of wrongdoing.  However, if the Court determines that the defendants may be entitled to qualified immunity on their version of events, that version is based on disputed

17

facts, and the Court must allow discovery in order to resolve those factual disputes.

      A.      Under Clearly Established Law, Strip Searches and Body Cavity Searches
                      Require Reasonable, Individualized Suspicion.

      The search conducted by the City of Portsmouth's Sheriff's office on the nine plaintiffs was a visual cavity search performed without reasonable and individualized suspicion, and therefore violated the Fourth Amendment's prohibition of "unreasonable searches and seizures." U.S. CONST. amend. VI.  The Fourth Circuit Court of Appeals has held that "prison authorities must have at least a reasonable suspicion that the individual is bearing contraband before conducting an invasive search." *Leverette v. Bell*, 247 F.3d 160, 167 (4th Cir. 2011).  "[P]rison authorities generally may conduct a visual body cavity search when they possess a reasonable and individualized suspicion that an employee is hiding contraband on his or her person." *Id. at* 168. The Court emphasized that "the more personal and invasive the search activities of the authorities becomes, the more particularized and individualized the articulated supporting information must be." *Id*. at 167.

      The defendants attempt to avoid this clear case law by claiming that the searches were not cavity searches but "the most minimally invasive, standard strip searches."  Defs.' Mem. Supp. Summ. J. 19.  But this assertion relies on disputed facts.  The plaintiffs state that the defendants visually inspected their body cavities.  According to the plaintiffs, Deputy Baker required the plaintiffs to turn around with their backs facing her before ordering the plaintiffs to bend over or squat.  Pls.' Ex. 1, Vollette decl. ¶14; Pls.' Ex. 2, Cannon-Coleman decl. ¶9; Pls.' Ex. 3, Stokley decl.  ¶10; Pls.' Ex. 4, Vines decl. ¶7; Pls.' Ex. 5, Scott decl. ¶7; Pls. Ex. 6, Hockaday decl. ¶8; Pls.' Ex. 7, Braswell decl. ¶8; Pls.' Ex. 8, Austin decl. ¶7; Pls.' Ex. 9, Floyd-Sharp decl. ¶8. Deputy Baker instructed several plaintiffs to bend over further or to squat deeper only after they held their original pose, leading those plaintiffs to believe that Deputy Baker was visually

inspecting their genital areas.  Pls.' Ex. 1, Vollette decl. ¶14; Pls.' Ex. 3, Stokley decl. ¶10; Pls.' Ex. 5, Scott decl. ¶7; Pls.' Ex. 7, Braswell decl. ¶8.  During Nurse Vines' search, Deputy Baker bent over as Nurse Vines bent over and appeared to be visually inspecting Nurse Vines' anal and genital areas.  Pls.' Ex. 4, Vines decl. ¶7. Likewise, during Nurse Floyd's search, Deputy Baker first instructed Nurse Floyd to bend over and to touch her ankles while Deputy Baker appeared to be looking at her genital area, and then told her to squat and cough while Deputy Baker bent over and inspected her anal and genital areas.  Pls.' Ex. 9, Floyd-Sharp decl. ¶8.  Such visual inspections of the plaintiffs' cavities constitute a "visual cavity search."  *Leverette*, 247 F.3d at 166 n.3; *Blackburn v. Snow*, 771 F.2d 556, 561 n.3 (1st Cir. 1985).

Moreover, even if the searches could be considered standard strip searches, as defendants claim, clearly established law still required the defendants to have particularized and individualized supporting information to meet the reasonable standard requirement.  Contrary to the defendants' assertion that the "Fourth Circuit did not definitively hold that the least invasive strip search requires individualized reasonable suspicion," a plain reading of *Leverette* indicates that a degree of individualized suspicion is required for a strip search.  *Leverette*, 247 F.3d at 168.  The Court held that "the more personal and invasive the search activities of the authorities become, the *more* particularized and individualized the articulating supporting information must be." *Id.* (emphasis added).  The usage of the word "more" indicates that *any* strip search requires some degree of "particularized and individualized" supporting information.

   B.  Under Clearly Established Law, the Defendants Did Not Have Reasonable Suspicion of Any of the Plaintiffs.

The defendants justify their searches of the plaintiffs primarily with reference to several anonymous tips.  *See* Defs.' Mem. 3.  To determine whether "prison searches based on tips by informants," were valid, the Fourth Circuit, in *Leverette*, "focused on the factors important to the

informant context: the specificity of the tip, the likely accuracy of the informant, and the decision-making process used in choosing whether or not to search." *Bruan v. Maynard*, 652 F.3d 557, 562 (4th Cir. 2011) (citing *Leverette*, 247 F.3d at 168).

The first *Leverette* factor requires that "the information [be] particularized and individualized." *Leverette*, 247 F.3d at 168, (citing *Hunter v. Auger*, 672 F.2d 668, 675 (8th Cir. 1982) (requiring, under reasonable suspicion standard, "individualized suspicion, specifically directed to the person targeted for the strip search" and "reasonable cause to believe that drugs or other contraband are concealed in the particular place they decide to search")).  "Mere physical proximity to or association with another individual suspected of smuggling activity does not provide the independent basis necessary for intruding on the privacy of the strip search candidate." *Hunter*, 672 at 675.  Furthermore, "a generalized suspicion of smuggling is insufficient to justify the extensive intrusion of a strip search." *Id*. at 675.

The second *Leverette* factor requires that the information bears "indicia of reliability, i.e., the inmate-informant had provided accurate drug-related tips in the past." *Leverette*, 247 F.3d at 168 (citing *Spear v. Sowders*, 71 F.3d, 626, 631 (1995) (reasonable suspicion satisfied where inmate-informant "had provided accurate and important information on at least one prior occasion")).

Applying these factors, no reasonable official in the defendants' position could conclude that reasonable suspicion existed as to any of the plaintiffs.   As explained below, the information on which defendants rely to justify their searches of Darnetta Austin and Verita Braswell consist of anonymous tips with no indicia of reliability and no particularized information.   As to the other seven plaintiffs, there was *no* information implicating them in *any* kind of wrongdoing at the time the searches were performed.

i.     Darnetta Austin.

The allegations against plaintiff Darnetta Austin do not meet the *Leverette* "reasonable and individualized suspicion" standard.  According to the internal incident report, an anonymous caller informed Lt. Sugg that Austin "[w]as in a relationship with a certain inmate," that Austin "brought food in from outside for the inmate," that the caller overheard the inmate ask Austin to get cigarettes for him, and that Austin brought her cell phone into the jail.  Defs.' Ex A-4.  An anonymous tip on its own does not bear "indicia of reliability."  *Leverette*, 247 F.3d at 168.  Furthermore, the anonymous tip did not specifically suggest that any contraband was being smuggled on Austin's body and, therefore, was not particularized enough to warrant a strip search or cavity search.  According to the internal incident report, the anonymous informant stated that she did not see any "exchange between them," did not see "any physical contact between them," and had no knowledge that "Austin had ever provided drugs or anything illegal to the inmates."  Defs.' Ex. A-4.  The sparse information provided by the anonymous phone call in August 2010 does not constitute reasonable suspicion warranting a visual body cavity search eight months later.

ii.     Verita Braswell

The defendants' justification for the visual cavity search of Verita Braswell also fails to meet the *Leverette* standards for reasonable suspicion.  The investigation into Nurse Braswell was based on an anonymous letter from an inmate to Major Benzie that had no "indicia of reliability" as required by *Leverette*.   Defs.' Mem. 3; Defs.' Ex. A-9.  The court stated that an inmate's tip is reliable when, "the inmate-informant ha[s] provided accurate drug-related tips in the past," which cannot be ascertained with an anonymous informant.  *Leverette*, 247 F.3d at 168.   Nor does the anonymous tip contain any other information to establish its credibility.

The anonymous letter also fails to provide particularized information about the allegations against Nurse Braswell.[2]  The letter did not specify the means and place that the alleged contraband was smuggled and stored, and therefore did not amount to "reasonable cause to believe that drugs or other contraband [were] concealed in the particular place they decide to search." *Leverette*, 247 F.3d at 168.  Furthermore, the mere mention of alleged association with Deputy Dean "does not provide the independent basis necessary for intruding on the privacy of the strip search candidate." *Hunter*, 672 at 675.

    iii.    Nan Vollette, Angelene Cannon-Coleman, Barbara Stokley, Yolanda Vines, Marilyn Scott, Hashena Hockaday, and Emma Lee Floyd-Sharp.

The defendants' attempt to weave a few flimsy threads of evidence into a tapestry of suspicion against the remaining seven plaintiffs falls far short of the "reasonable and individualized suspicion" standard required to conduct invasive visual body cavity searches of the plaintiffs.  The defendants have failed to provide any information that warranted *any* suspicion of the remaining seven plaintiffs of smuggling contraband into the jail.  Nothing in the defendants' memorandum of law or supporting exhibits names the remaining plaintiffs, and the defendants have not suggested that the remaining seven plaintiffs were the focus of any internal affairs investigation.

The defendants' memorandum of law posits that the reasonable suspicion standard was met because the "information came from a variety of sources, including a cooperating inmate who proved reliable on two occasions, the Commonwealth's Attorney, and another contractor." Defs.' Mem. 18-19.  This recitation obfuscates the fact that these sources did not actually

---

[2] The defendants' suspicion of Braswell relies on the description in the anonymous letter of a "Fat Lady with gold hair" that comes in at 3:00 in the afternoon.  Def. Ex. A-8.  The defendants have failed to provide any support that Braswell was the nurse referred to in the anonymous letter.  In the spring of 2011, Braswell had two wigs, one that was light brown in color and another that was red.  Pls.'Ex. 7, Braswell Decl. ¶12.  She did not have gold hair.  Pls.' Ex. 7, Braswell Decl. ¶12.

implicate any of the remaining plaintiffs. The inmate-informant provided information on Nurse Margaret Reid and Deputy Jarrod Dean, who are not plaintiffs in this case and who were both terminated prior to the visual body cavity search of the plaintiffs. Defs.' Ex. A-5; A-7. The letter from the Commonwealth's Attorney provides information from an unnamed citizen about smuggling by deputies, not contract workers, and explicitly states that the Commonwealth's Attorney "cannot vouch for the accuracy of this information." Defs.' Ex. A-6. The identity of the purported Aramark employee who provided an anonymous telephone tip was never ascertained; moreover the anonymous tipster named only defendant Austin, whom the caller could not say "had ever provided drugs or anything illegal to the inmates." Defs.' Ex. A-4. Furthermore, three of these tips took place in the summer and fall of 2010, half a year before the visual cavity searches were conducted on the plaintiffs.

In sum, the clearly established law of the Fourth Circuit provides that jail officials must have reasonable, individualized suspicion before subjecting employees to a strip search or a visual cavity search. Because the undisputed facts do not reveal any such reasonable suspicion, defendants are not entitled to qualified immunity on plaintiffs' Fourth Amendment claim.[3]

III.    THE ELEVENTH AMENDMENT DOES NOT PROVIDE IMMUNITY FROM PLAINTIFFS' CLAIMS FOR INJUNCTIVE RELIEF AGAINST DEFENDANTS IN THEIR OFFICIAL CAPACITIES.

Although state entities are generally entitle to sovereign immunity from suits against citizens, "[t]he long-standing doctrine of *Ex parte Young* . . . 'allows private citizens, in proper cases, to petition a federal court to enjoin State officials in their official capacities from engaging in future conduct that would violate the Constitution or a federal statute.'" *Franks v. Ross*, 313 F.3d 184, 197 (4th Cir. 2002) (quoting *Antrican v. Odom*, 290 F.3d 178, 184 (4th Cir.2002)). In

---

[3] Additionally, even if the defendants were entitled to qualified immunity as to damages, they would not have qualified immunity as to plaintiffs' request for injunctive relief. "Claims for declaratory and injunctive relief are not affected by qualified immunity." *Lefemine v. Wideman*, 672 F.3d 292, 303 (4th Cir. 2012).

this case, plaintiffs ask the Court to enjoin the defendants from future cavity searches or strip searches without reasonable suspicion in violation of their Fourth Amendment rights.  They further seek an injunction requiring defendants to restore the security clearances that were revoked in violation of their First Amendment rights.  These claims are permissible under *Ex Parte Young*, 209 U.S. 123 (1908).  The plaintiffs seek damages against defendants only in their individual capacities, not in their official capacities.

## IV.  DISPUTED MATERIAL FACTS PRECLUDE SUMMARY JUDGMENT ON PLAINTIFFS' FALSE IMPRISONMENT CLAIM.

"False imprisonment is restraint of one's liberty without any sufficient legal excuse therefor by word or acts which he fears to disregard, and neither malice, ill will, nor the slightest wrongful intentions is necessary to constitute the offense."  *Montgomery Ward & Co. v. Freeman*, 199 F.2d 720, 723 (4th Cir. 1952) (quoting *Montgomery Ward & Co. v. Wickline*, 188 Va. 485, 489, 50 S.E.2d 387, 388 (1948)).  Neither physical force nor the threat of physical force is a required element of the tort:

> The wrong may be committed by words alone, or by acts alone, or by both, and by merely operating on the will of the individual or by personal violence, or by both. It is not necessary that the individual be confined within a prison or within walls, or that he be assaulted or even touched. . . . All that is necessary is that the individual be restrained of his liberty without sufficient cause therefor, *and by words or acts which he fears to disregard.*

*W.T. Grant Co. v. Owens*, 149 Va. 906, 922, 141 S.E. 860, 865 (1928) (emphasis added).  In *W.T. Grant*, for example, a store employee kept the plaintiff in a room by threatening her with jail if she failed to sign a confession.  This was sufficient to show false imprisonment.  *Id.*

In this case, the defendants threatened plaintiffs with revocation of their security clearances, and thus, their ability to work at Portsmouth City Jail, if they failed to stay in the room and comply with the strip searches.  *See* Pls.' Ex. 1, Vollette decl.  ¶7; Pls.' Ex. 2, Cannon-

Coleman decl.  ¶7; Pls.' Ex. 3, Stokley decl.  ¶7-8; Pls.' Ex. 4, Vines decl.  ¶5; Pls.' Ex. 5, Scott

¶6; Pls.' Ex. 6, Hockaday decl. ¶6; Pls.' Ex. 7, Braswell decl.  ¶7; Pls.' Ex. 8, Austin decl.  ¶6;

Pls.' Ex. 9, Floyd-Sharp decl.  ¶7.  They were therefore restrained by words that they feared to

disregard, and their compliance with the search cannot be regarded as voluntary.  As explained in

Part II, *supra*, the restraint was without legal justification because it was carried out without

reasonable suspicion, in violation of the Fourth Amendment.  Nor does the defendants' search

policy justify their restraint of the plaintiffs, because that policy does not – and could not,

constitutionally – authorize a strip search in the absence of reasonable suspicion.

## V.    THE MASTERIAL FACTS ARE IN DISPUTE AS TO PLAINTIFF BRASWELL'S BATTERY CLAIM

The defendants claim that plaintiff Verita Braswell cannot establish battery because

defendant Deputy Baker did not touch Ms. Braswell in the course of the search.  This fact is in

dispute, however.  Plaintiff Braswell avers that Deputy Baker "touched [Braswell's] head and

moved her fingers through [Braswell's] wig."  Ex. 7, Brasswell decl. ¶ 9.  Because this fact is in

dispute, summary judgment may not be granted.[4]

## VI.    DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' CONSPIRACY CLAIM BECAUSE INTRACORPORATE IMMUNITY DOES NOT APPLY TO DEFENDANTS' CRIMINAL ACTS.

The doctrine of intracorporate immunity cannot shield defendants against the common

law conspiracy claims.  "Dispositive of this claim is that an exception to the intracorporate

conspiracy exists in the criminal arena."  *U.S. v. Pryba*, 674 F.Supp. 1504 (E.D.Va. 1987).  The

intracorporate conspiracy doctrine is ignored when the underlying conduct that forms the basis of

---

[4] Plaintiffs acknowledge that defendant did not touch plaintiff Yolanda Vines during the search, and therefore withdraw her claim for battery.

the conspiracy could be criminal in nature.[5]  *See McAndre v. Lockheed Martin Corp.,* 206 F.3d 1031, 1039–40 (11th Cir. 2000). By conspiring to restrict the plaintiffs Fourth Amendment rights, the plaintiffs violated Federal criminal law, thereby nullifying intracorporate immunity.  18 U.S.C. §241 (1996).

VII.    DEFENDANT WATSON'S REVOCATION OF PLAINTIFFS' SECURITY
        CLEARANCES VIOLATED THEIR FIRST AMENDMENT RIGHTS.

"The First Amendment protects not only the affirmative right to speak, but also the 'right to be free from retaliation by a public official for the exercise of that right.'" *Adams v. Trustees of the University of N.C.-Wilmington*, 640 F.3d 550, 560 (4th Cir. 2011) (internal quotation marks and citation omitted).   To determine whether a government employer has unlawfully retaliated against an employee for her speech, courts must determine:

> (1) whether the public employee was speaking as a citizen upon a matter of public concern or as an employee about a matter of personal interest; (2) whether the employee's interest in speaking upon the matter of public concern outweighed the government's interest in providing effective and efficient services to the public; and (3) whether the employee's speech was a substantial factor in the employee's [adverse employment] decision.

*Id.* at 560-61 (quoting *McVey v. Stacy,* 157 F.3d 271, 277-78 (4th Cir.1998) (alteration in *Adams*).   Application of this test to the present case demonstrates that Sheriff Watson violated plaintiffs' clearly established First Amendment rights by revoking their security clearances in retaliation for the filing of this lawsuit.

First, the lawsuit is a matter of public concern.  "To determine whether speech involves a

---

[5] Additionally, the Fourth Circuit has held that "while authorized acts of the officials would constitute corporate action, (and hence would avoid a conspiracy charge), unauthorized acts would not." *Buschi v. Kirven*, 775 F.2d 1240 (4th Cir. 1985).  If corporate officers act outside the normal course of corporate duties, then they are "separate from the corporation in legal contemplation."  *Id.* The Sheriff's order to violate the Fourth Amendment rights of the plaintiffs and the actions by the other defendants to violate the plaintiffs' Fourth Amendment rights, falls out of normal corporate duties and thus must be considered authorized acts.  Corporate officials cannot hide under the cloak of intracorporate immunity simply by claiming that violation of civil rights were sanctioned by superiors and thus were "authorized acts."

matter of public concern, we examine the content, form, and context of the speech at issue in light of the entire record . . . . Speech involves a matter of public concern when it involves an issue of social, political, or other interest to a community." *Kirby v City of Elizabeth City,* 388 F.3d 440, 446 (4th Cir. 2004).   An employer's alleged violation of constitutional rights is almost invariably a matter of public concern. *See Connick v. Myers*, 461 U.S. 138, 146 (1983) (citing *Givhan v. Western Line Consolidated School District,* 439 U.S. 410 (1979)) ("it is clear that [a teacher's] statements concerning the school district's allegedly racially discriminatory policies involved a matter of public concern"); *Jackler v. Byrne*, 658 F.3d 225, 236-237 (2nd Cir. 2011) (use of excessive force by police in violation of the Fourth Amendment "is plainly a matter of public concern").   Litigation involving the government's alleged violation of constitutional rights is likewise speech on a matter of public concern. *See Kirby* (lawsuit challenging retaliation for exercise of free speech rights is of public concern); *Andrew v. Clark*, 561 F.3d 261 (4th Cir. 2009) (same); *Baird v. Cutler*, 883 F. Supp. 591 (D. Utah 1995) (assistant city attorney's First Amendment suit against employer was a matter of public concern); *Zorzi v. County of Putnam*, 30 F.3d 885, 896 (7th Cir. 1994) (dispatcher's lawsuit alleging unlawful political patronage by sheriff was on a matter of public concern:  "Political speech is clearly a matter of public concern, as is the fact that a governmental employer would fire an employee for his political speech or support of a candidate.")

As in these cases, the Fourth Amendment lawsuits filed by the plaintiffs are on a matter of public concern.  The plaintiffs allege that the defendants subjected them to a blanket search, consisting of degrading, invasive body cavity inspections, with no individualized suspicion of wrongdoing.  This is a gross violation of constitutional rights, and one that the voters who elected Sheriff Watson have a right to know about.  They bring this lawsuit not only to vindicate

their own rights, but to ensure that such a violation does not happen to anyone else working at the Portsmouth City Jail.  (5/16/12 Tr. at 5-6, 8, 13.)  Moreover, to the extent that Sheriff Watson claims that the unlawful searches of the plaintiffs were conducted under the same policy that applies to visitors and other members of the public entering the jail (*see* Defs.' Ex. A ¶¶ 4, 6; Defs.' Ex. A-1), the public has an even greater interest in seeing that the Sheriff observes the Fourth Amendment when conducting searches.

The defendant collapses the second and third steps in the *McVey* analysis – the balance of plaintiffs' First Amendment rights against the defendant's interest in running an efficient workplace, and the role of plaintiffs' speech in the adverse employment action – by claiming that he was motivated purely by security concerns when he revoked plaintiffs' security clearances immediately upon learning that they had filed the present lawsuit.   But Sheriff Watson's claims in this regard simply make no sense.  Watson first professes a concern that the plaintiffs may be bringing contraband into the facility.  (Defs.' Mem. Supp. Mot. Summ. J. at 25.)  But, at *most*, the basis for such a concern was no more than two anonymous tips, directed against only two of the six plaintiffs whose clearances were revoked, both of which occurred over a year before the revocation of the security clearances.  (Defs.' Ex. A ¶¶ 9a, 9f.)  Indeed, Watson admits that "[s]ince April 22, 2011, there have been no further incidents involving or reports of subcontractors bringing drugs, cigarettes,  or other contraband into the jail."  (Defs.' Ex. A ¶ 15.) If contraband was the concern, Watson cannot explain why all six plaintiffs had to be expelled. Nor can he explain why the expulsion took place over a year after any such concerns were raised.

Watson next claims that he revoked the plaintiffs' security clearances because he thought they might "retaliate against inmates who provided information to the Sheriff's Department." Again, however, the Sheriff received only *one* tip from an inmate allegedly implicating *one* of

the six plaintiffs.  (Ex. A ¶ 9f; Ex. A-8.)  Again, there is no explanation for why the other five inmates had to have their clearances revoked.  Nor is there any explanation of how even the one plaintiff against whom a complaint was made could possibly uncover the identity of the complaining inmate, given that the tip was anonymous and the inmate "unknown."  (*Id.*)

Finally, Watson invokes concerns about "trust" and "morale" as reasons for revoking the security clearances.  But he provides no facts to support the allegations that plaintiffs are untrustworthy or would create a morale problem.  His vague, conclusory, and self-serving statements are not sufficient to create an undisputed fact.

Sheriff Watson is not entitled to qualified immunity on the First Amendment claim.  First, as the case law cited above illustrates, it is clearly established that a lawsuit alleging constitutional violations by a public employer is speech on a matter of public concern.  *Cf. Love-Lane v. Martin*, 355 F.3d 766, 784 (4th Cir. 2004) (holding that "by 1997 it was clearly established that [plaintiff]'s speech about race discrimination at [school] involved a matter of public concern.")  Moreover, given the strength of plaintiffs' free speech rights and the utter implausibility of the Sheriff's purported reasons for revoking their security clearances, "the interests to be balanced . . . weigh so heavily in [plaintiffs'] favor that [their] right to speak . . . was clearly established."  *Id.*  Finally, even if defendant were entitled to qualified immunity as to plaintiffs' claim for money damages, he cannot claim qualified immunity as to plaintiffs' request for injunctive relief.  "Claims for declaratory and injunctive relief are not affected by qualified immunity."  *Lefemine v. Wideman*, 672 F.3d 292, 303 (4th Cir. 2012).

## CONCLUSION

For the foregoing reasons, plaintiffs respectfully request that the defendants' Motion for Summary Judgment be denied.

Respectfully submitted,

NAN VOLLETTE
ANGELENE COLEMAN
YOLANDA VINES
HASHENA HOCKADAY
VERITA BRASWELL
EMMA FLOYD-SHARP
BARBARA STOKLEY
DARNETTA AUSTIN
MARILYN SCOTT


_____/s/_____
David P. Morgan, Esquire (VSB #70211)
Cooperating Attorney for the ACLU of Virginia
Cravens & Noll, P.C.
9011 Arboretum Parkway
Suite 200
Richmond, Virginia 23236
(804) 330-9220
(804) 330-9458 Facsimile
dmorgan@cravensnoll.com

Rebecca K. Glenberg (VSB #44099)
Thomas O. Fitzpatrick (VSB #80364)
American Civil Liberties Union of
        Virginia Foundation, Inc.
530 E. Main Street, Suite 310
Richmond, Virginia 23219
Telephone: (804) 644-8080
Facsimile:  (804) 649-2733
rglenberg@acluva.org
tfitzpatrick@acluva.org

**CERTIFICATE OF SERVICE**

I hereby certify that on this 13th day of July, 2012, I filed this document with the Clerk of Court using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

_____/s/_____

Thomas O. Fitzpatrick (VSB #80364)
American Civil Liberties Union of
    Virginia Foundation, Inc.
530 E. Main Street, Suite 310
Richmond, Virginia 23219
Telephone: (804) 644-8080
Facsimile:  (804) 649-2733
tfitzpatrick@acluva.org