

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**Norfolk Division**

**NAN VOLLETTE, et al.,**

        **Plaintiffs,**

v.                                    **Civil Action No. 2:12cv231**

**BILL WATSON, et al.,**

        **Defendants.**

<u>**OPINION AND ORDER**</u>

This matter is before the Court on a "Motion for Temporary Restraining Order and/or Preliminary Injunction," filed by six of the nine plaintiffs in this consolidated action.[1] These six, the "Injunction Plaintiffs," worked for Correct Care Solutions ("Correct Care").[2] Injunction Plaintiffs' written and oral requests for a preliminary injunction pending the outcome of this case are predicated on the alleged retaliatory action taken by defendant Bill Watson, the elected Sheriff for the City of Portsmouth, Virginia ("Sheriff Watson"), and ask that the Court issue a Temporary Restraining Order or Preliminary Injunction:

---

[1] Each plaintiff initially filed a Complaint in a separately styled suit, and the nine suits were later consolidated by the Court. Having been consolidated, the Court now issues a single Opinion and Order resolving the six outstanding motions. All citations to the record refer to the docket in case number 2:12cv231.

[2] The following six plaintiffs seek a preliminary injunction: Nan Vollette, Angelene Coleman, Yolanda Vines, Hashena Hockaday, Verita Braswell, and Emma Floyd-Sharp. One of the three remaining plaintiffs was also previously employed by Correct Care, while the other two remaining plaintiffs worked for a separate employer, Aramark Correctional Facility Food Service.

(1) ordering Sheriff Watson to restore Injunction Plaintiffs' security clearances and allow them to return to work at the Portsmouth City Jail; and (2) enjoining Sheriff Watson from any further retaliation against the Injunction Plaintiffs for the filing of this lawsuit.[3]   Following notification to Sheriff Watson regarding the preliminary relief sought by the Injunction Plaintiffs, the Court conducted a hearing on their motions. After considering the case file and the testimony presented at the hearing, for the reasons stated below, each of the Injunction Plaintiff's motions seeking a preliminary injunction is **DENIED**, pending the outcome of this case.

## I.  FACTUAL[4] AND PROCEDURAL BACKGROUND

Defendant Sheriff Watson is responsible for overseeing the Portsmouth City Jail ("the Jail").  See VA Code Ann. § 53.1-116.2.   Although the Injunction Plaintiffs only seek a preliminary injunction against Sheriff Watson, the Court notes that it appears from the record that all of the other named defendants are Portsmouth Deputy Sheriffs that work under the supervision of Sheriff Watson (collectively "Defendants").

---

[3] As the hearing on the pending motions was not ex parte, but was instead conducted after Sheriff Watson had an opportunity to submit a written brief in opposition and present evidence at the hearing on such motions, the Court considers the pending motions as motions seeking a preliminary injunction, not a temporary restraining order.

[4] The facts reproduced here are merely preliminary facts and do not represent factual findings for any purpose other than the resolution of the instant motion.

Each of the Injunction Plaintiffs is an employee of the private health care contractor Correct Care. Pursuant to a written contract between Correct Care and Sheriff Watson, Correct Care provides nursing and other medical services to the inmates housed at the Jail. See Health Services Agmt., ECF No. 9-1.

In April of 2011, and at the time that the instant suits were filed in April of 2012, the Injunction Plaintiffs were assigned to work at the Jail by their direct employer, Correct Care. On April 22, 2011, Defendants required all six Injunction Plaintiffs, as well as at least three other Jail contractors who are Plaintiffs in this case but did not seek a preliminary injunction, to undergo a strip search and visual body cavity search at the Jail. According to Sheriff Watson's hearing testimony, such searches were conducted because he had "continuous reliable information" about nurses (including some of the Injunction Plaintiffs) and other contractors bringing contraband into the Jail. Prelim. Injun. Tr. 53, ECF No. 20 (hereinafter, "Tr. __"). When specifically asked by Plaintiffs' counsel whether "[s]ome of these plaintiffs were involved in illegal contraband," Sheriff Watson responded "Yes, ma'am." Tr. 58. Sheriff Watson also testified that "jail officers" were strip searched around the same time that the Plaintiffs were strip searched. Tr. 56.

3

Despite Sheriff Watson's assertion that "some" of the Injunction Plaintiffs were involved in bringing contraband into the Jail, Tr. 58, following the 2011 strip searches of the Injunction Plaintiffs, all six Injunction Plaintiffs apparently retained their security clearances and returned to work at the Jail.   On April 27, 2012, approximately one year after the searches, the Injunction Plaintiffs filed suit in this Court seeking relief pursuant to 42 U.S.C. § 1983 for violation of their Constitutional rights under color of state law, as well as seeking relief for various state law causes of action.   Each Injunction Plaintiff's Complaint alleges an unlawful strip search occurring on April 22, 2011, in violation of the filing Plaintiff's Fourth Amendment right to be free from unreasonable searches.   None of the Injunction Plaintiffs' Complaints expressly allege the existence of an unconstitutional Jail policy regarding strip searches, nor do any of the Complaints allege that the filing Plaintiff was strip searched at any time other than on April 22, 2011.   Each of the six Injunction Plaintiffs alleges in her Complaint that she suffered and continues to suffer humiliation and emotional distress, a feeling of being invaded, and other emotional harm.   See, e.g., Compl. ¶ 56, ECF No. 1.   Each Injunction Plaintiff seeks millions of dollars in monetary damages, punitive damages, and a "preliminary and permanent injunction" prohibiting any further

strip searches on the named Plaintiff absent individualized suspicion of illegal activity. Id. ¶ 63.

Shortly after the filing of the original Complaints, the six Injunction Plaintiffs, while still working at the Jail in April of 2012, had their security clearances revoked at the direction of Sheriff Watson. In response, the Injunction Plaintiffs each filed an Amended Complaint in this case adding a First Amendment retaliation claim against Sheriff Watson. According to the Injunction Plaintiffs' Amended Complaints, on April 30, 2012, just three days after the original Complaints were filed, such Plaintiffs had their Jail security clearance revoked, thereby prohibiting such Plaintiffs from any further work assignments at the Jail. The Amended Complaints allege that such revocation was motivated by the filing of the original Complaints. Injunction Plaintiffs thereafter filed motions seeking preliminary injunctions that would require Sheriff Watson to immediately reinstate their security clearance at the Jail.

Subsequent to the filing of the motions seeking preliminary injunctions, Sheriff Watson filed a response in opposition to the requested injunctions. After receiving the Injunction Plaintiffs' reply briefs, the Court conducted a preliminary injunction hearing where each side presented testimony and offered argument in support of their respective positions. The

Court also granted a motion permitting Injunction Plaintiffs to file a Second Amended Complaint clarifying that all Defendants were sued in their individual and official capacities.[5] Having received such written filings, oral testimony, and oral argument, this matter is now ripe for decision.

## II. PRELIMINARY INJUNCTION STANDARD

"A preliminary injunction is 'an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief.'" Dewhurst v. Century Aluminum Co., 649 F.3d 287, 290 (4th Cir. 2011) (quoting Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 22 (2008)); see Peterson v. National Telecommunications & Information Admin., 505 F. Supp. 2d 313, 317 (E.D. Va. 2006) (quoting Direx Israel, Ltd. v. Breakthrough Med. Corp., 952 F.2d 802, 811 (4th Cir. 1992)) (recognizing that "[a] preliminary injunction is 'an extraordinary remedy involving the exercise of a very far-reaching power, which is to be applied only in the limited circumstances which clearly demand it'"). In order to obtain the extraordinary remedy of a preliminary injunction, the burden is on the moving party to demonstrate: (1) "that [s]he is likely to succeed on the merits"; (2) "that [s]he is likely to suffer

---

[5] The three Plaintiffs that do not seek an injunction were also permitted to amend their Complaints in the above referenced manner. However, the newly filed Complaints submitted by those three Plaintiffs represented their "First" Amended Complaint.

irreparable harm in the absence of preliminary relief"; (3) "that the balance of equities tips in h[er] favor"; and (4) "that an injunction is in the public interest." Dewhurst, 649 F.3d at 290 (internal quotation marks and citations omitted); see Direx Israel, 952 F.2d at 812 (indicating that the moving party bears the burden of demonstrating the propriety of a preliminary injunction).   In Dewhurst, after setting forth the above four-part test, the United States Court of Appeals for the Fourth Circuit ("Fourth Circuit") separately highlighted the fact that controlling precedent from the Supreme Court of the United States ("Supreme Court") requires that a plaintiff "clearly show" that she is likely to succeed on the merits.   Id. (quoting Winter, 555 U.S. at 22) (emphasis added).

The demanding standard outlined above becomes even more exacting when a plaintiff seeks a preliminary injunction that mandates action, as contrasted with the typical form of preliminary injunction that merely preserves the status quo pending trial.   See East Tennessee Natural Gas Co. v. Sage, 361 F.3d 808, 828 (4th Cir. 2004) (quoting Wetzel v. Edwards, 635 F.2d 283, 286 (4th Cir. 1980)) (noting that "'mandatory preliminary injunctions do not preserve the status quo and normally should be granted only in those circumstances when the exigencies of the situation demand such relief'").   As recently explained by the Fourth Circuit:

> Ordinarily, preliminary injunctions are issued to "protect the status quo and to prevent irreparable harm during the pendency of a lawsuit ultimately to preserve the court's ability to render a meaningful judgment on the merits." In re Microsoft Corp. Antitrust Litig., 333 F.3d 517, 525 (4th Cir. 2003). Movant, however, seeks to alter the status quo by having a federal court order the Board to include his name on a primary election ballot. But such "[m]andatory preliminary injunctive relief in any circumstance is disfavored, and warranted only in the most extraordinary circumstances." Id. (citation omitted). Consequently, our "application of th[e] exacting standard of review [for preliminary injunctions] is even more searching when" the relief requested "is mandatory rather than prohibitory in nature." Id.

Perry v. Judd, No. 12-1067, 2012 WL 120076, at *4 (4th Cir. Jan 17, 2012) (unpublished).

### III. DISCUSSION

Each Injunction Plaintiff has filed a motion seeking a "mandatory" preliminary injunction ordering Sheriff Watson to reinstate her security clearance at the Jail pending the outcome of this case. Such requests for a preliminary injunction do not rely on the assertion of an unconstitutional strip search, but instead are based upon Injunction Plaintiffs' First Amendment claims that Sheriff Watson improperly revoked their security clearances in retaliation for them filing the original Complaints in this case. The "irreparable harm" alleged by the Injunction Plaintiffs is thus grounded entirely on the assertion that they suffered retaliation for exercising their First Amendment right to free speech. Accordingly, this Court's

8

analysis focuses on the Injunction Plaintiffs' claims that Sheriff Watson violated their First Amendment rights to free speech when he retaliated against them by revoking their security clearances.[6]   The Court begins such analysis by carefully considering whether the Injunction Plaintiffs have clearly demonstrated a likelihood of success on the merits of such claims, as required by the controlling precedent cited above.

## A. Likelihood of Success

The first hurdle that each Injunction Plaintiff must overcome in order to obtain a preliminary injunction is demonstrating a likelihood of success on the merits of her

---

[6]  The First Amendment to the Constitution provides, in relevant part, that "Congress shall make no law . . . abridging the freedom of speech . . . or the right of the people . . . to petition the Government for a redress of grievances." U.S. Const. amend. I.  The Supreme Court has held that the due process protections of the Fourteenth Amendment incorporate the protections of the First Amendment, and therefore make the protections of the First Amendment applicable to state and local governments. Gitlow v. People of State of New York, 268 U.S. 652, 666 (1925); see also Kowalski v. Berkeley County Schools, 652 F.3d 565, 571 (4th Cir. 2011) (quoting U.S. Const. Amend. I.) ("The First Amendment prohibits Congress and, through the Fourteenth Amendment, the States from 'abridging the freedom of speech.'").
Each Injunction Plaintiff's Second Amended Complaint asserts a First Amendment violation of her "right to seek redress in court . . . ." See, e.g., Second Amend. Compl. ¶ 82, ECF No. 14.  Injunction Plaintiffs' briefs in support of their motions seeking a preliminary injunction expressly invoke both the "petition clause" and the "free speech clause" of the First Amendment.  The Supreme Court recently held that the same legal framework applies regardless of which clause of the First Amendment is invoked by a government employee in support of her retaliation claim. Borough of Duryea, Pa. v. Guarnieri, 131 S. Ct. 2488, 2493-2501 (2011).  Therefore, for consistency only, the remainder of this opinion will reference Injunction Plaintiffs' allegations of retaliation in violation of their "speech rights" under the First Amendment.

retaliation claim.  <u>Dewhurst</u>, 649 F.3d at 290.  As set forth below, if the speaker alleging a First Amendment violation qualifies as a "public employee," a special test applies to the determination of whether such individual's First Amendment rights were violated, and therefore whether they are likely to succeed on their retaliation claim.  After determining that each of the Injunction Plaintiffs before the Court qualifies as a "public employee," this Court applies such special test and concludes that the Injunction Plaintiffs have failed to clearly demonstrate a likelihood of success on the merits of their retaliation claims.

### 1. Are Injunction Plaintiff's Public Employees?

In examining Injunction Plaintiffs' likelihood of success on the merits of their retaliation claims, the Court first considers whether they qualify as "public employees" for the purposes of such analysis.  The protections afforded by the First Amendment generally include "not only the affirmative right to speak, but also the 'right to be free from retaliation by a public official for the exercise of that right.'"  <u>Adams v. Trustees of the University of N.C.-Wilmington</u>, 640 F.3d 550, 560 (4th Cir. 2011) (quoting <u>Suarez Corp. Indus. v. McGraw</u>, 202 F.3d 676, 685 (4th Cir. 2000)).  However, the First Amendment protection afforded to a "public employee" is less than that afforded to an ordinary citizen because the government <u>and the</u>

10

general public both have a strong interest in public agencies providing efficient public services. Id. "While government employees do not lose their constitutional rights at work, the Supreme Court has repeatedly held that the government may impose certain restraints on its employees' speech and take action against them that would be unconstitutional if applied to the general public. Id.; see Connick v. Myers, 461 U.S. 138, 142 (1983) (quoting Pickering v. Board of Education, 391 U.S. 563, 568 (1968)) ("Our task, as we defined it in Pickering, is to seek 'a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.'") (alteration in original).

Here, there is some dispute among the parties as to whether the Injunction Plaintiffs should be categorized as "public employees" since they are not employees of the Jail or Sheriff's Office, but instead are employees of Correct Care, a company that is under contract to provide health services to the inmates housed at the Jail. Second Amend. Compl. ¶¶ 18–19, ECF No. 14. Plaintiffs' counsel acknowledges that the Injunction Plaintiffs' status as employees of a Jail contractor likely qualifies them as "public employees," however, counsel's position falls short of conceding such point. This Court's research revealed that

11

the Supreme Court has squarely addressed this threshold issue, concluding that there is <u>not</u> a "difference of constitutional magnitude between independent contractors and employees" in the context of First Amendment retaliation analysis. <u>Board of County Comm'rs, Wabaunsee County, Kan. v. Umbehr</u>, 518 U.S. 668, 684 (1996) (internal quotation marks and citations omitted).[7] The Supreme Court's conclusion was based on the fact that "[i]ndependent government contractors are similar in most relevant respects to government employees, although both the speaker's and the government's interests are typically-though not always-somewhat less strong in the independent contractor case." <u>Id.</u> Accordingly, "the same form of balancing analysis should apply to each," and any such differences in interests can be adequately accounted for by the case specific balancing required of federal courts. <u>Id.</u> at 678, 685; <u>see</u> <u>Braswell v. Haywood Regional Medical Center</u>, 234 Fed. Appx. 47, 53 (4th Cir. 2007) (recognizing that "the government's legitimate reasons for regulating its employees' speech apply equally to independent contractors").

---

[7] Defense counsel failed to cite any cases demonstrating that the Injunction Plaintiffs should be held to the "public employee" standard. Although the authority cited by Plaintiffs' counsel did not include <u>Umbehr</u>, Plaintiffs' counsel commendably acknowledged, against her clients' interest but consistent with her ethical obligations, that federal courts appear to apply the same legal standard to government contractors as that applied to government employees.

Having determined that the Injunction Plaintiffs are "public employees" for the purposes of analyzing their First Amendment retaliation claims, the Court must examine the appropriate legal standard governing First Amendment retaliation claims advanced by public employees.  In Goldstein v. Chestnut Ridge Volunteer Fire Co., 218 F.3d 337 (4th Cir. 2000), the Fourth Circuit articulated a four-part test that must be met in order to prove a public employee's "claim for deprivation of First Amendment rights flowing from an adverse employment action."  Id. at 351.  Such test, applicable to both public employees and government contractors, applies as follows:

> First, to trigger First Amendment protection, the speech at issue must relate to matters of public interest. Second, the employee's interest in First Amendment expression must outweigh the employer's interest in efficient operation of the workplace. Third, the employee must establish retaliation of some kind-that he was deprived of a valuable government benefit or adversely affected in a manner that, at the very least, would tend to chill his exercise of First Amendment rights. Finally, the employee must establish a causal relationship between the protected expression and the retaliation: that the protected speech was a "substantial factor" in the decision to take the allegedly retaliatory action.

Id. at 351-52 (internal quotation marks and citations omitted).[8]

---

[8] The Fourth Circuit has elsewhere defined the above standard as a three-prong test, requiring a court to determine:  "(1) whether the public employee was speaking as a citizen upon a matter of public concern or as an employee about a matter of personal interest; (2) whether the employee's interest in speaking upon the matter of public concern outweighed the government's interest in providing effective and efficient services to the public; and (3) whether the employee's speech was a substantial factor in the employee's termination

## 2. Is Sheriff Watson Immune from Suit?

Before applying the Goldstein test to determine whether the Injunction Plaintiffs have demonstrated a likelihood of success on their First Amendment retaliation claims, the Court must consider Sheriff Watson's claims of immunity from suit. In the Sheriff's brief in opposition to the pending motions and at oral argument, Sheriff Watson asserted that he is protected by the common law doctrine of qualified immunity. As the Supreme Court recently noted, "[a]t common law, those who carried out the work of government enjoyed various protections from liability when doing so, in order to allow them to serve the government without undue fear of personal exposure," and the Court has looked to these protections in extending qualified immunity to individuals sued under 42 U.S.C. § 1983. Filarsky v. Delia, 132 S. Ct. 1657, 1660 (2012). Sheriff Watson argues that such qualified immunity should be considered in assessing the Injunction Plaintiffs' likelihood of success on the merits. See Braun v. Maynard, 652 F.3d 557, 560 (4th Cir. 2011) (noting that "even where an officer violated [a] plaintiff's rights, [the officer]

---

decision." McVey v. Stacy, 157 F.3d 271 (4th Cir. 1998). As articulated by the Fourth Circuit, the McVey test applies to determine "whether a public employee has stated a claim under the First Amendment for retaliatory discharge." Id. at 277 (emphasis added). Accordingly, because the McVey test presupposes a termination, prong three of the Goldstein test (deprivation of a valuable government benefit) has necessarily been satisfied by such termination. Here, because Plaintiffs were not "terminated" from employment, the Court applies the Goldstein test, which mirrors prongs one, two, and four of the McVey test.

14

may claim immunity if the law in question was not clearly established"). Furthermore, as discussed at the hearing on this matter, Sheriff Watson also may be immune from any "official capacity" damages claims based on the sovereign immunity afforded states by the Eleventh Amendment to the United States Constitution. See Bland v. Roberts, -- F. Supp. 2d --, 2012 WL 1428198, at *10 (E.D. Va. Apr. 24, 2012) (indicating that, in Virginia, a Sheriff is a constitutional officer, and is shielded by the doctrine of sovereign immunity as to "official capacity" damages claims since any monetary award would be paid by the sovereign-the Commonwealth of Virginia).

Despite Sheriff Watson's assertions of immunity, at this stage in the proceedings, the Court finds it unnecessary to delve into these complex immunity issues because the Injunction Plaintiffs seek both monetary damages and permanent injunctive relief. Since it is well-established that neither qualified immunity nor Eleventh Amendment sovereign immunity are a defense to a claim for permanent injunctive relief, there is no need to analyze Sheriff Watson's potential immunity to monetary damages claims. See Lefemine v. Wideman, 672 F.3d 292, 303-04 (4th Cir. 2012) (recognizing that "[c]laims for declaratory and injunctive relief are not affected by qualified immunity"); Lee-Thomas v. Prince George's County Public Schools, 666 F.3d 244, 249 (4th Cir. 2012) (recognizing that "the Eleventh Amendment permits

suits for prospective injunctive relief against state officials acting in violation of federal law"). Accordingly, notwithstanding Sheriff Watson's apparent invocation of two separate immunity doctrines, because the Injunction Plaintiffs seek a permanent injunction to remedy the alleged retaliatory action, the Court moves on to analyze whether Injunction Plaintiffs have clearly demonstrated a likelihood of success on their First Amendment claims. See Kikumura v. Hurley, 242 F.3d 950, 962-63 (10th Cir. 2001) (indicating that because the primary relief sought by the plaintiff was permanent injunctive relief, the doctrine of qualified immunity did not impact the "likelihood of success" calculus).

### 3. Application of the Goldstein Test

Although it is well-established that a citizen does not relinquish all of her First Amendment speech rights by accepting public employment, "the state, as an employer, undoubtedly possesses greater authority to restrict the speech of its employees than it has as sovereign to restrict the speech of the citizenry as a whole." Urofsky v. Gilmore, 216 F.3d 401, 406 (4th Cir. 2000) (en banc). Accordingly, when analyzing the free speech protections afforded to a public employee, the Court must ultimately balance the interests of the public employee as a citizen with those of the state in promoting efficient governance. Id. (citing Connick, 461 U.S. at 142). The

16

threshold question in determining whether the Injunction Plaintiffs can demonstrate retaliation in violation of their First Amendment speech rights is whether the filing of the initial lawsuits alleging unconstitutional workplace strip searches implicates a matter of "public concern."  Id.; Goldstein, 218 F.3d at 352.

### a. Prong One - Speech on a Matter of Public Concern

The first step in the multi-faceted Goldstein test requires the Court to determine whether the speech at issue (in this case, the lawsuit that allegedly caused the retaliation) was made "as a citizen upon a matter of public concern" or whether it was made "as an employee about a matter of personal interest." McVey v. Stacy, 157 F.3d 271, 277 (4th Cir. 1998); see Ridpath v. Board of Governors Marshall University, 447 F.3d 292, 316 n.26 (4th Cir. 2006) (indicating that classifying the speech as involving a "public concern" or a "personal interest" is the "threshold question").  If a court determines that a public employee's speech "does not touch upon a matter of public concern, the state, as employer, may regulate it without infringing any First Amendment protection." Urofsky, 216 F.3d at 406; see Stroman v. Colleton County Sch. Dist., 981 F.2d 152, 156 (4th Cir. 1992)) (explaining that "[p]ersonal grievances, complaints about conditions of employment, or expressions about other matters of personal interest do not constitute speech

17

about matters of public concern that are protected by the First Amendment, but are matters more immediately concerned with the self-interest of the speaker as employee").

Whether speech addresses a matter of public concern versus a matter of personal interest "must be determined by the content, form, and context of a given statement, as revealed by the whole record." Connick, 461 U.S. at 147-48.   A public employee's speech involves a matter of public concern if it addresses "an issue of social, political, or other interest to a community."   Id.   Such inquiry, however, does not turn on how "interesting" the subject matter of the speech is.   Id.; see Baker v. McCall, --F. Supp. 2d--, 2012 WL 363963, at *9 (W.D. Va. Feb. 6, 2012) (quoting DiMeglio v. Haines, 45 F.3d 790, 805 (4th Cir. 1995)) (recognizing that "[e]ven if the subject of the [speech] would arouse interest in the small town [where it occurred], 'the mere fact that the topic of the employee's speech was one in which the public might or would have had a great interest is of little moment'") (emphasis added). Whether the speech occurs inside or outside of the workplace is also not determinative, as an individual can speak as a private citizen while at work, and can speak as a government employee while away from the workplace. Urofsky, 216 F.3d at 406.   The forum in which the speech is made, is however, relevant to the inquiry, as internal non-public complaints are less likely to

18

garner constitutional protection than publicly disseminated statements. <u>Borough of Duryea, Pa. v. Guarnieri</u>, 131 S. Ct. 2488, 2501 (2011).

The Fourth Circuit articulated the contours, or lack thereof, of the <u>case specific</u> test for determining whether speech touches on a matter of public concern in <u>Campbell v. Galloway</u>, 483 F.3d 258 (4th Cir. 2007). In <u>Campbell</u>, the Fourth Circuit expressly declined to "articulate any sort of bright-line rule" as to whether sexual harassment claims are matters of public concern, suggesting that such a universal rule does not appear "consistent with the Supreme Court's directive that [lower courts] engage in a case-and fact-specific inquiry to determine" if a public employee's speech addresses a matter of public concern. <u>Id.</u> at 269. Both the Fourth Circuit and Supreme Court have expressly acknowledged that the flexible nature of such test necessarily results in a lack of clear precedential guidance. <u>See id.</u> at 270 (noting that Fourth Circuit precedent has "provided little concrete guidance on the question of when . . . a [sexual discrimination] complaint amounts to an issue of public concern"); <u>City of San Diego, Cal. v. Roe</u>, 543 U.S. 77, 83-84 (2004) (noting that "the boundaries of the public concern test are not well defined"). Therefore, whether the public would be "truly concerned" with a public employee's speech remains a "subtle, qualitative inquiry" that

must be performed in every case, even where the speech at issue criticizes public officials in the handling of matters directly impacting public safety. Goldstein, 218 F.3d at 352-53; see Mills v. Steger, 64 Fed. Appx. 864, 871 (4th Cir. 2003) (explaining that "[o]ne of the critical factors in determining whether speech is on public or private matters is whether it concerns matters of public debate or whether it reflects merely personal pique and internal employment issues").

More recently, the Supreme Court and the Fourth Circuit have added some clarity as to the importance of the forum of the speech, indicating that internal employee complaints implicating workplace duties or advancing on-the-job favoritism claims rarely implicate a matter of public concern. Guarnieri, 131 S. Ct. at 2501; Brooks v. Arthur, -- F.3d --, 2012 WL 2695418, at *3 (4th Cir. July 9, 2012). This is particularly true in the case of speech focusing solely on the alleged unfair workplace treatment of a single individual. Brooks, 2012 WL 2695418, at *6-7. In Guarnieri, the Supreme Court noted that "[a] petition filed with an employer using an internal grievance procedure in many cases will not seek to communicate to the public or to advance a political or social point of view beyond the employment context" and that such internal complaints involving "nothing more than a complaint about a change in the employee's own duties does not relate to a matter of public concern."

20

_Guarnieri_, 131 S. Ct. at 2501.   Likewise, in _Brooks_, the Fourth Circuit stressed the private nature of "individualized" internal workplace complaints that are "significant chiefly to the parties involved," noting that "[t]he First Amendment demands more." _Brooks_, 2012 WL 2695418, at *8.

Notwithstanding such recent cases, the applicable legal test remains unchanged: the ultimate inquiry requires consideration of the "content, form, and context of a given statement, as revealed by the whole record," _Connick_, 461 U.S. at 147-48, with the ultimate question being "whether the 'public' or the 'community' is likely to be truly concerned with or interested in the particular expression," _Goldstein_, 218 F.3d at 352 (internal quotation marks and citations omitted).   The Fourth Circuit's most recent commentary on such test appears in the _Brooks_ opinion:

> As to content, . . . _Connick_ directed us to scrutinize the comments to assess whether they are intended "to evaluate the performance of the office"—which would merit constitutional protection—or merely "to gather ammunition for another round of controversy" with superiors–which would not.   _Id._ at 148.   The _Connick_ Court was explicit on this point: "When employee speech concerning office policy arises from an employment dispute concerning the very application of that policy to the speaker, additional weight must be given to the supervisor's view" that the employee's speech addresses solely a private dispute.   _Id._ at 153.
>
> . . .

> [Considering the form and context], [a]s the Supreme
> Court has emphasized, "[t]he forum in which a petition
> is lodged will be relevant to the determination of
> whether the petition relates to a matter of public
> concern." Guarnieri, 131 S. Ct. at 2501. . . . The
> Court stressed that the right of a public employee "to
> participate as a citizen, through petitioning
> activity, in the democratic process . . . is not a
> right to transform everyday employment disputes into
> matters for constitutional litigation in the federal
> courts." Id. at 2501.

Brooks, 2012 WL 2695418, at *5.

Here, although a close question, the Court finds that Injunction Plaintiffs' federal lawsuits alleging unconstitutional strip searches orchestrated by an elected official are sufficient to satisfy the first prong of the Goldstein test as they implicate a matter of public concern. The Court reaches such conclusion after conducting the required "subtle, qualitative inquiry" into the case specific factual allegations. Goldstein, 218 F.3d at 352; see Jackson v. Bair, 851 F.2d 714, 717 (4th Cir. 1988) (indicating that the elements of a public employee's speech rights "are subtle and difficult [in] application, precisely because of the obviously conflicting interests and values involved in the public employment relationship"); Stickley v. Sutherly, 416 Fed. Appx. 268, 272 (4th Cir. 2011) (noting that "the line marking when something becomes a matter of public concern is blurry, and thus the boundary confining a public official's behavior is hard to discern").

As the Court's finding is based on balancing competing factors, the Court first reviews the factors that favor Defendants' categorization of the instant suits as involving matters restricted to each Plaintiff's personal interest. A review of each original Complaint in isolation suggests that each Injunction Plaintiff is pursuing relief based on her own self-interest since: (1) each Injunction Plaintiff originally filed a separate suit; (2) each suit sought monetary damages to remedy personal suffering; (3) each suit alleged misconduct on a single occasion; and (4) the requested injunctive relief is phrased in a manner that limits such relief to Defendants' future treatment of the filing Plaintiff. See Love-Lane v. Martin, 355 F.3d 766, 776 (4th Cir. 2004) (indicating that complaints regarding employment conditions, or personal work grievances, are not matters of public concern); Brooks, 2012 WL 2695418, at *5 (classifying the internal workplace complaints at issue as "of a purely private nature" because such complaints do not seek to inform the public of a failure to discharge governmental responsibilities, do not seek to bring to light actual wrongdoing or a breach of the public trust, and if released to the public, would merely convey that a single employee is upset with his present conditions of employment). In addition to the above, none of the Plaintiffs expressly allege the existence of an unconstitutional Jail search policy,

23

nor suggest that there was an impending risk of further unconstitutional searches of the named Plaintiff, any other Jail contractor or employee, or anyone else. Cf. Campbell, 483 F.3d at 270 (indicating that the plaintiff's complaints about sexual harassment, "which involve improper treatment of members of the public as well as [other] female officers, would be of genuine interest and concern to the public") (emphasis added).

Notwithstanding the above factors favoring Sheriff Watson's position, based on the complete record before the Court, the Court finds that there are sufficient factors weighing in the Injunction Plaintiffs' favor to demonstrate that the speech allegedly causing retaliation involves a matter of public concern. First, considering the "form" and "context" of the speech at issue, the Court observes that the speech that allegedly caused the retaliation was not an internal grievance, but was instead a publicly-filed federal lawsuit alleging that an elected state official acted in violation of the Constitution of the United States ("the Constitution"). Although such fact is not dispositive, the public nature of the Injunction Plaintiffs' Complaints is distinguishable from internal workplace grievances that are unlikely to inform the public of any alleged wrongdoing of a state actor. Compare Gunter v. Morrison, 497 F.3d 868, 872 (8th Cir. 2007) (recognizing that a lawsuit is "the most formal method of speech"), with Brooks,

24

2012 WL 2695418, at *5 (indicating that relief through an internally filed employment grievance generally "does not seek to communicate to the public or to advance a political or social point of view beyond the employment context") (internal quotation marks and citations omitted); see also Cromer v. Brown, 88 F.3d 1315 (4th Cir. 1996) (finding that even an internal letter to the sheriff from employees raising broad allegations of racial discrimination within the sheriff's office was "an expression of concern about the ability of the sheriff's office to carry out its vital public mission effectively," and thus, was speech "as citizens, not merely as employees"). Notably, the purpose of an internal employee grievance is typically to address "the government in its capacity as the petitioners' employer, rather than its capacity as their sovereign." Guarnieri, 131 S. Ct. at 2506 (Scalia, J., concurring in part and dissenting in part). In contrast, the purpose of each of the original federal Complaints appears, at least in part, to be to publicly seek redress based on the allegation that a powerful state official knowingly exercised his authority in direct violation of the Constitution. See, e.g., Compl. ¶¶ 23-24, 53-54, ECF No. 1 (alleging that Sheriff Watson and his deputies had actual knowledge of the illegality of the searches, but conducted them anyway); Tr. 5-6, 8, 13

(indicating that Injunction Plaintiffs' intent in filing suit was to protect others from similar abuses).

Although each Injunction Plaintiff's suit, considered in isolation, focuses on a single individual's complaint about a single event occurring at the workplace, collectively nine Plaintiffs filed suit on the same day, all alleging the same unconstitutional conduct orchestrated by a publicly elected official. Although they do not expressly allege a formal unconstitutional search policy, such collective allegations support the inference that Sheriff Watson's conduct was motivated by a policy or practice that did not individually analyze the level of suspicion to search each jail contractor, as appears to be required by the Constitution. See Braun, 652 F.3d at 558 (recognizing that, in 2008, it was "clearly established that intrusive prison employee searches require reasonable suspicion").[9] The nine publicly filed federal Complaints thus collectively allege a far more sweeping failure to comply with the dictates of the Constitution than would a private internal complaint of a single employee. See Campbell, 483 F.3d 269-70 (suggesting that sexual harassment complaints are more likely to implicate a public concern when the

---

[9] The fact that Sheriff Watson testified that strip searches were conducted not only on contract workers but also on "jail officers," further supports the inference that others were at risk based on an allegedly unconstitutional policy/practice. Tr. 56.

26

allegations involve <u>repeat discrimination</u> impacting <u>numerous individuals</u>); <u>Brooks</u>, 2012 WL 2695418, at *5 (contrasting the facts before that court with the facts in <u>Cromer</u>, and noting that the "public concern" speech in <u>Cromer</u>: (1) "addressed department-wide procedures"; (2) was made "outside an employee grievance channel"; and (3) "represented the concerns of a larger group of officers within the department"). Furthermore, although the Injunction Plaintiffs' lawsuits were filed almost a year after the challenged searches were performed, the three Injunction Plaintiffs that testified at the injunction hearing all indicated under oath that their purpose for filing suit was so that something like this would never happen to anyone else, and such stated goal was <u>not challenged</u> by Sheriff Watson at the hearing.  Tr. 5-6, 8, 13.[10]

---

[10] The Court's consideration of the nature of the speech at issue is guided in part by, but not controlled by, the apparent motives for the speech.  Any contention that "an individual's <u>personal</u> motives for speaking may dispositively determine whether that individual's speech addresses a matter of <u>public</u> concern" appears in conflict with the Supreme Court's ruling in <u>Connick</u> and is "'contrary to the broader purposes of the First Amendment'" which is "'concerned not only with a speaker's interest in speaking, but also with the public's interest in receiving information.'"  <u>McVey v. Virginia Highlands Airport Comm'n</u>, 44 Fed. Appx. 630, 638 (4th Cir. 2002) (quoting <u>Chappel v. Montgomery County Fire Protection Dist. No. 1</u>, 131 F.3d 564, 574 (6th Cir. 1997)); <u>see</u> <u>Sousa v. Roque</u>, 578 F.3d 164, 174 (2d Cir. 2009) (indicating that, in light of <u>Connick</u>, a majority of Circuits hold that a plaintiff's motivation in seeking redress for workplace grievances is not dispositive of whether the subject of such complaint implicates a matter of public concern, and thus holding that "it does not follow that a person motivated by a personal grievance cannot be speaking on a matter of public concern").

Next, considering the "content" of the Injunction Plaintiffs' speech that allegedly caused retaliation, the conduct complained of in the Injunction Plaintiffs' original Complaints plainly involves far more serious matters than ordinary workplace disputes like "favoritism" or "interpersonal discord." Goldstein, 218 F.3d at 352; see Guarnieri, 131 S. Ct. at 2501 (stressing that public employees do not have the right "to transform everyday employment disputes into matters for constitutional litigation in the federal courts") (emphasis added). Rather, here the Injunction Plaintiffs allege that a publicly elected state constitutional officer, and his subordinates, knowingly violated the Constitution by forcing numerous jail contractors to either immediately submit to a full body strip and visual body cavity search, or lose their ability to work at the Jail. See Campbell, 483 F.3d at 269 (suggesting that a sexual harassment complaint "by a single employee . . . might well constitute a matter of public interest-for example, where a high-ranking public official is the offender") (emphasis added).

Furthermore, the content of the Plaintiffs' speech implicates the public interest because it alleges the broad implementation of a type of intrusive search that, if constitutionally unfounded, could significantly impact the public's viewpoint regarding the elected Sheriff's judgment and

28

exercise of his broad powers.   Cf. Connick, 461 U.S. at 148-49 (distinguishing speech involving internal workplace matters from speech implicating a matter of "public concern," and noting that the internal workplace speech "did not seek to . . . bring to light actual or potential wrongdoing or breach of public trust on the part of [the defendant] and others") (emphasis added). To better illustrate such point, the Constitution may be violated when, in the field, a low-ranking police officer makes the erroneous, but innocent, split-second decision to pat-down a single suspect for weapons over his or her clothes, when such officer lacks reasonable suspicion to perform such pat-down. However, the public is far more likely to be offended by, and thus have a far more powerful legitimate interest in being apprised of, an allegedly premeditated and knowingly unconstitutional search orchestrated by an elected state-constitutional officer that required at least nine Jail contractors to remove all of their clothing, all of their undergarments, and submit to a visual search of their body cavities. The Court further notes that the filing of the nine lawsuits instantly generated front page news, apparently not only because the "subject matter" of the suits were interesting, but because the citizenry was legitimately concerned about Sheriff Watson's alleged misuse of his broad powers.   See Maciariello v. Sumner, 973 F.2d 295, 300 (4th Cir. 1992)

(agreeing with the district court that "an allegation of evidence tampering by a high-ranking police officer is a matter in which the public should be interested"); Sexton v. Martin, 210 F.3d 905, 910 (8th Cir. 2000) (quoting Brockell v. Norton, 732 F.2d 664, 668 (8th Cir. 1984)) (explaining that "the 'public has a vital interest in the integrity of those commissioned to enforce the law'"); Brawner v. City of Richardson, Tex., 855 F.2d 187, 191-92 (5th Cir. 1988) (noting that "[t]he disclosure of misbehavior by public officials is a matter of public interest and therefore deserves constitutional protection, especially when it concerns the operation of a police department") (emphasis added). The community is thus "likely to be truly concerned with or interested in the particular expression" at issue in this case. Goldstein, 218 F.3d at 352.[11]

Although the Court carefully weighed all of the above factors in determining whether the speech causing the alleged

---

[11] Controlling case law demonstrates that speech highlighting lenient security policies at a prison, or inadequately trained emergency personnel, clearly implicate a matter of public concern because such government failures create a direct threat to public safety. See Jackson, 851 F.2d at 716, 720 (speech highlighting lenient security policies at a prison); Goldstein, 218 F.3d at 355 (speech highlighting lack of training for emergency personal). Here, the Sheriff's alleged failure to uphold the United States Constitution does not fit neatly into the category of cases involving direct threats to public safety because his actions were based on alleged overzealous, as opposed to lenient, internal jail procedures. However, the public nevertheless has an interest in being informed when a high-ranking jail official, such as a sheriff or warden, allegedly abuses his power. Absent reporting from public employees or contractors, individuals in the unique position to witness such misconduct, a jail official's abuse of power could continue unchecked.

retaliation involves a matter of public concern, most compelling in this case are the following facts: (1) that the speech involved was the public filing of a federal lawsuit, as contrasted with an internal employee grievance; (2) that nine Jail contractors all spoke up to challenge an alleged unconstitutional practice, as contrasted with a grievance specific to a single public employee, and it is undisputed at this time that at least some of the Injunction Plaintiffs filed suit to prevent the alleged abuses from happening to anyone else; (3) that the speech at issue alleged invasive strip and visual body cavity searches knowingly conducted in violation of the Constitution; and (4) the speech at issue alleged that a state constitutional officer, directly elected by the public and responsible for keeping the peace and maintaining inmates at a city jail, was abusing his power, thus calling his judgment into question. See Jackson, 851 F.2d at 720 ("Form and context may of course in some cases give special color to speech, tipping it one way or the other on the public concern-private grievance spectrum, . . . [b]ut content, subject-matter, is always the central aspect.") (emphasis added).

This Court's conclusion, that the speech causing the alleged retaliation implicates a matter of public concern, was reached only after careful consideration of the competing factors discussed above. When considered on a theoretical

31

spectrum ranging from a purely personal grievance about favoritism in the workplace, to a true "whistleblower" suit aimed solely at exposing government corruption, the Injunction Plaintiffs' suits appear to fall somewhere in the middle. Some aspects suggest that the Injunction Plaintiffs were only seeking personal redress based on each Plaintiff's very personal embarrassment, and some aspects suggest that the Injunction Plaintiffs' speech is the type of public challenge to an elected official's alleged abuse of power to which the electorate unquestionably has an interest in being apprised. In the end, the content of the speech is more compelling than the speakers' express or implicit intent, and the Court thus concludes that the Injunction Plaintiffs' suits satisfy the first prong of Goldstein. In reaching this preliminary conclusion, the Court recognizes that, as the record is further developed, Plaintiffs may demonstrate an even stronger public interest than that evident from the current record. On the other hand, Defendants may demonstrate a weaker public interest in the disputed speech based on the illumination of details regarding Sheriff Watson's internal investigation into the importation of contraband into the Jail, the results of which purportedly prompted the strip searches. See Florence v. Board of Chosen Freeholders of County of Burlington, 132 S. Ct. 1510 (2012) (indicating that "correctional officials must be permitted to devise reasonable

32

search policies to detect and deter the possession of contraband in their facilities" and that "in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations courts should ordinarily defer to their expert judgment in such matters") (quotation marks and citations omitted). The preliminary facts, as alleged in each original Complaint and as presented through live testimony at the hearing, are however, sufficient to demonstrate the speech at issue touches a matter of public concern.[12]

### b. Prong Two - Balancing Government vs. Citizen Interest

The second prong of the Goldstein test, "commonly referred to as 'Pickering balancing,'" Ridpath, 447 F.3d at 317, requires the Court to determine "whether the degree of public interest in the employee's statement was . . . outweighed by the employer's responsibility to manage its internal affairs and provide 'effective and efficient' service to the public," Daniels v.

---

[12] Although the Court makes a preliminary finding that the speech at issue relates to a matter of public concern, it notes that the first prong of Goldstein might be satisfied if speech only "arguably" relates to a matter of public concern. See Stroman v. Colleton County School Dist., 981 F.2d 152, 158 (4th Cir. 1992) ("When speech arguably relates to a matter of public concern, we prefer to apply the approach taken in Connick and weigh whatever public interest commentary may be contained in the [speech] against the state's dual interest as a provider of public service and employer of persons hired to provide that service.") (emphasis added); cf. Connick, 461 U.S. at 146 (indicating that a court need not consider the reasons for an employee's discharge if the "employee's expression cannot be fairly considered as relating to any matter of political, social, or other concern to the community") (emphasis added).

Quinn, 801 F.2d 687, 690 (4th Cir. 1986) (emphasis added). In
this case, then, the Court weighs the degree of public interest
in the allegations contained in the original Complaints filed by
the Injunction Plaintiffs, i.e. that Sheriff Watson and his
employees abused their power by knowingly disregarding the
Constitution, against the Sheriff's responsibility to manage the
Jail's internal affairs and provide effective and efficient
service to the public. As outlined by the Fourth Circuit, some
of the many factors relevant to this inquiry include whether the
employee's speech "impairs discipline by superiors," "impairs
'harmony among co-workers,'" "'has a detrimental impact on close
working relationships,'" "interferes with the operation of the
agency," and whether it is "communicated to the public or to co-
workers in private." McVey, 157 F.3d 278 (quoting Rankin, 483
U.S. at 388-91). Additionally, the Fourth Circuit more recently
noted in Ridpath that: "A majority of the McVey panel observed
that both [the Fourth Circuit] and the Supreme Court have also
included the value of the employee's speech to the public in the
Pickering balance." Ridpath, 447 F.3d at 317 n.28; see Connick,
461 U.S. at 152 (cautioning that "a stronger showing [by the
employer] may be necessary if the employee's speech more
substantially involved matters of public concern"); Goldstein,
218 F.3d at 355 (recognizing that matters "of the highest public
concern" are to be given "the highest level of First Amendment

34

protection"); Daniels, 801 F.2d at 690 (indicating that courts should compare "the degree of public interest" in the speech at issue with the employers' need to manage its affairs and provide efficient public services) (emphasis added).

The Supreme Court and the Fourth Circuit have expressly recognized the inherent difficulty in performing such balancing, and the need for reasoned, case specific consideration of all relevant factors. Jackson, 851 F.2d at 717-18; see Connick, 461 U.S. at 150 (noting that "particularized balancing" is required, but "difficult"). "This is so because both 'public concern' and 'public employer interests' are relative notions, varying in kind and degree in different situations." Jackson, 851 F.2d at 717. When performing such balancing, if the public employer's alleged retaliatory action "is taken in response to merely threatened rather than actual disruption of employer interests, the reasonableness of the employer's perception must be weighed in the balance." Id. at 718. Although a public employer is not required to "await actual disruption before acting," such employer's justification for preemptive action must be "objectively justifiable under the circumstances." Id.

Adding a further gloss to such balancing in this case is the fact that the public employer is a law enforcement officer responsible for overseeing and maintaining order at a city jail. See Maciariello, 973 F.2d 295, 300 (4th Cir. 1992) (indicating

that because discipline is demanded within a police force, "greater latitude is afforded to police department officials in dealing with dissension in their ranks"). The Injunction Plaintiffs in this case were contractors working at the Jail, and such employment position necessarily impacts the Pickering balancing because the public has a paramount interest in the preservation of security, order, and control at jails and prisons. As explained in detail by the Fourth Circuit:

> [C]ourts must give weight to the nature of the employee's job in assessing the possible effect of his action on employee morale, discipline or efficiency. . . . In analyzing the weight to be given a particular job in this connection "nonpolicymaking employees can be arrayed on a spectrum, from university professors at one end to policemen at the other. State inhibition of academic freedom is strongly disfavored. In polar contrast is the discipline demanded of, and freedom correspondingly denied to policemen.
>
> . . . Viewing thus the employee's status, the courts, under the second part of the Pickering-Connick test, must accord what the Supreme Court in Connick characterized as "full consideration of the government's interest . . . 'in promot[ing] efficiency and integrity in the discharge of official duties, and [in] maintain[ing] proper discipline in the public service.'" 461 U.S. at 150-51. In fact, one of the errors for which the Supreme Court in Connick chided the lower court in that case was that "full consideration" of those interests had not been given. In a case such as this, involving as it does employment in a police department, it is important, as has already been suggested, to take account of the special character of such department in determining the matter of "the government's interest." Police departments "[r]egardless of the historical origin," are "para-military organizations" and the free speech rights of employees in those departments must thus be

evaluated  with  the  special  character  of  the
organization in mind.

Jurgensen v. Fairfax County, Va., 745 F.2d 868, 880 (4th Cir.

1984)  (internal  citations  omitted)  (emphasis  added);  see

Jackson,  851  F.2d  at  722  (noting  that  "[t]he  district  court

rightly  considered  that  employment  in  the  prison  context

presents  special  considerations  favoring  the  public  employer  in

the  balancing  process");  Maciariello,  973  F.2d  at  300

(recognizing  that  "[p]olice  are  at  the  restricted  end  of  the

spectrum  because  they  are  'paramilitary'—discipline  is  demanded,

and freedom must be correspondingly denied").[13]

The  fact  that  the  Injunction  Plaintiffs  are  "public

employees"  working  at  a  jail  for  a  law  enforcement  officer

cannot,  however,  operate  as  a  universal  trump  card  over  such

public  employees'  First  Amendment  rights.  Jurgensen,  745  F.2d

at  880;  see  Cromer,  88  F.3d  at  1327  (recognizing  that,  to  be

effective,  a  police  department  must  have  the  respect  of  the

community  and  its  officers,  creating  a  public  interest  in

officers  "speak[ing]  up  against  any  broad-based  discrimination

in  their  agencies");  Goldstein,  218  F.3d  at  355  (rejecting  an

approach  that  would  impermissibly  permit  fire  companies  or

---

[13] In  conducting  such  balancing,  the  Court  recognizes  that  Injunction
Plaintiffs  are  medical  contractors,  and  not  themselves  police
officers.  However,  as  discussed  below,  Sheriff  Watson  testified  that
the  Injunction  Plaintiffs  worked  unsupervised  with  inmates,
demonstrating  that  a  high-level  of  trust  and  disciple  was  nevertheless
demanded of them.

police departments to "quash complaints affecting public safety under the general aegis of 'camaraderie' and the avoidance of disruptions"). The Court must therefore still carefully balance the competing interests of the state with that of the speaker. However, in doing so, the powerful public interest in a safe and secure jail, and the difficult discretionary decisions that are inherent in overseeing such a facility, acts to some slight degree as a thumb on the scale in favor of the public employer.

Here, for the reasons discussed below, the Court finds that the Injunction Plaintiffs have not, at this time, demonstrated a likelihood of success on the second prong of the Goldstein test. The following considerations significantly impact the Court's ultimate conclusion. First, the Court recognizes that Injunction Plaintiffs are not merely seeking the "extraordinary" remedy of a typical preliminary injunction, but instead are seeking a disfavored preliminary injunction mandating action that modifies, rather than preserves, the status quo. See Perry, 2012 WL 120076, at *4 (quoting In re Microsoft Corp. Antitrust Litig., 333 F.3d 517, 525 (4th Cir. 2003), abrogated on other grounds by, eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388 (2006)) (noting that any form of mandatory preliminary injunctive relief "'is disfavored, and warranted only in the most extraordinary circumstances.'"). Second, the form of mandatory relief sought here warrants even stronger caution as

38

the Injunction Plaintiffs seek reinstatement of a Jail security clearance that would apparently permit them to move about the Jail without interference.    Sheriffs and prison wardens "routinely make close decisions in the exercise of the broad authority that necessarily is delegated to them," and "[s]econd-guessing such judgment calls would inhibit 'principled and fearless decision-making,' and displace experienced local administration with more removed judicial policymaking." Braun, 652 F.3d at 560 (quoting Richardson v. McKnight, 521 U.S. 399, 408 (1997)).    The likely results of judicial forays second guessing such difficult judgment calls "would not be salutary." Id.    Accordingly, before granting such relief, the Court must be confident that the requisite balancing tips in the Injunction Plaintiffs' favor.    Third, the Court notes that the preliminary record demonstrates a sufficient, but not overwhelming, public concern in Plaintiffs' speech asserting constitutional violations by the Sheriff for ordering the searches at issue, and the Court considers "the value of the employee's speech to the public in the Pickering balance." Ridpath, 447 F.3d at 317 n.28.

### i. Workplace Harmony

Among the many relevant factors this Court considers as part of its Pickering balancing is the extent to which the employees' speech impairs harmony among co-workers, and/or has a

detrimental impact on working relationships. Such concern is heightened in a law enforcement agency or jail environment. Here, the fact that the speech at issue took the form of federal lawsuits, whereby Jail medical contractors publicly aligned themselves against Sheriff Watson and numerous Sheriff's deputies, on its face suggests some impairment to the internal harmony and work environment at the Jail. See Guarnieri, 131 S. Ct. at 2496 (acknowledging that "[w]hen a petition takes the form of a lawsuit against the government employer, it may be particularly disruptive"). Furthermore, Sheriff Watson testified under oath that the allegations regarding nurses and other contractors bringing contraband into the Jail were substantiated, and that it would negatively impact morale if such individuals were permitted to remain at the Jail because they would "have a different set of rules to go by" than the other employees and contractors. Tr. 56. Although Sheriff Watson did not provide a clear explanation as to why the Injunction Plaintiffs' security clearances were revoked after the lawsuits were filed, as opposed to after some of the allegations of contractors' misconduct were substantiated, the Sheriff was unequivocal in his contention that some of the Injunction Plaintiffs were in fact responsible for bringing illegal contraband into the Jail. Tr. 58. Injunction Plaintiffs did not offer any evidence challenging the accuracy

40

of such assertion, nor did they offer any rebuttal evidence suggesting that workplace harmony would not be negatively impacted by their filing of Complaints in federal court.[14]

### ii. Interference with Agency Operation

The Court also considers whether a public employee's speech impedes the performance of her duties or interferes with the operation of the agency. Sheriff Watson testified that the Plaintiffs work unsupervised with inmates and that, in light of the litigation, he no longer felt that the Injunction Plaintiffs could be trusted to work alone. Tr. 55. Sheriff Watson indicated that the Jail could not be efficiently run if the Injunction Plaintiffs returned to work because he would feel obligated to ensure that an escort be assigned to each nurse. Tr. 55-56. When asked on direct examination why he revoked the Injunction Plaintiffs' security clearances, Sheriff Watson twice indicated that he did so out of concern for the safety of the inmates. Tr. 52, 54. Sheriff Watson explained that some of the inmates that accused the nurses of importing contraband into the Jail were still housed at the Jail and that it would not be appropriate to let the nurses interact, unsupervised, with these

---

[14] Injunction Plaintiffs presented very limited testimony in support of their motions, with three Injunction Plaintiffs answering very basic questions at the injunction hearing about their prior, and current, work schedules. The direct examination of all three Injunction Plaintiffs amounted to a combined total of less than four transcript pages. Furthermore, as noted above, none of the Injunction Plaintiffs were recalled to the witness stand to offer rebuttal testimony challenging any of Sheriff Watson's sworn statements.

individuals because the nurses might learn their identities and retaliate against them.   Tr. 54.   During cross-examination, Sheriff Watson again stated that the potential danger to the inmates from the Injunction Plaintiffs was the reason he revoked their security clearances, and that, from his perspective, until the lawsuits were filed, the inmates were not in jeopardy.   Tr. 59.   Sheriff Watson indicated that the lawsuit made it more likely that the nurses might know which inmates had spoken out against them, but he failed to explain his reasoning for such somewhat confusing conclusion.   Tr. 60.   Although Sheriff Watson did not offer specific details demonstrating a risk of danger to any inmate, Injunction Plaintiffs <u>failed to present contradictory evidence</u>, or otherwise undermine the legitimacy of the Sheriff's contention that one or more inmates might have been in danger.

While Sheriff Watson's explanation regarding his motivation for revoking the security clearances failed to fully explain the timing of his action,[15] he did testify that allegations against certain nurses regarding the importation of contraband <u>were in fact substantiated</u>.   Tr. 56.   Sheriff Watson further stated that he knew that some of the Injunction Plaintiffs were responsible

---

[15] Sheriff Watson's <u>alleged</u> comments to the news media, if admissible, have the potential to impact the finder of fact's credibility determinations in this case with respect to the Sheriff's explanation of his decision to revoke Injunction Plaintiffs' security clearances.

for importing contraband.  Tr. 58.  Although such statements may not provide a complete explanation as to Sheriff Watson's reasoning or the timing for his decision, as of this time, Injunction Plaintiffs have failed to offer any evidence in rebuttal to Sheriff Watson's assertions that: (1) some of the Injunction Plaintiffs seeking mandatory relief in the form of reinstated security clearances were responsible for importing contraband; and (2) that inmates still at the Jail had implicated some of the Injunction Plaintiffs in wrongdoing and might therefore be at risk.  Although it would appear, to an outsider, that a more prudent course would have been for Sheriff Watson to individually revoke security clearances for any contractor for which allegations of wrongdoing were substantiated, the Court cannot, based on the incomplete record at this time, conclude that Sheriff Watson's justification for his judgment call regarding jail security and safety of inmates was unreasonable.  See Maciariello, 973 F.2d at 300 (quoting Jurgensen, 745 F.2d at 879) (noting that when "balanc[ing] the competing interests under Pickering and Connick, [the Fourth Circuit] do[es] not require the public employer to prove that the employee's speech actually disrupted efficiency, but only that an adverse effect was 'reasonably to be apprehended'").

### iii. Strength of Competing Public Interests

In addition to the above, the Court's balancing considers the strength of the public interest in the speech at issue in this case with the strength of the government interest in operating a safe and secure jail. The facts of this case differ from prior precedent involving a risk to the public from unsafe fire department practices, Goldstein, 218 F.3d at 352-53, or failure to safely maintain a prison, Jackson, 851 F.2d at 716, 720. Here, the speech at issue challenged Sheriff Watson's alleged overzealousness in attempting to root out internal misconduct that, if occurring, acted to increase the risk of danger to inmates, Jail workers, visitors, and the general public.[16] Although the public certainly has an interest in knowing whether an elected official performs his duties in compliance with the Constitution, the alleged violation must be considered in the context of the individual case. Here, Sheriff

---

[16] It is certainly obvious that importation of some contraband into a jail is dangerous because prisoners routinely fashion all manner of items into weapons. While it may not be immediately obvious that importation of some contraband, such as a mobile telephone, can endanger the public, case law is replete with instances of prisoners seeking to avoid recording technology on jail/prison telephones in order to continue their criminal activity. See Thomas v. Owens, No. 9:11cv443, 2012 WL 591791, at *2 (D.S.C. Feb. 23, 2012) (quoting Robinson v. Warden, 250 Fed. Appx. 462, 463 (3d. Cir. 2007)) (indicating that cell phones "permit an inmate to circumvent the telephone monitoring system, and may be used as a tool which coordinates or facilitates escape and the introduction of illicit materials or drugs"); 28 CFR § 541.3 (2011) (defining prohibited acts and available sanctions for federal prisoners and classifying an inmate's possession of a "portable telephone" as a prohibited act of the "Greatest Severity Level").

Watson's alleged violations occurred on a single day, more than a year ago.   Furthermore, based on the record evidence from the hearing, any constitutional violation was made in the name of Jail safety, based on a "reliable source" implicating nurses and contractors in importing contraband into the Jail.   Tr. 52-53. Stated slightly differently, the public would likely be far more concerned with an elected Sheriff whose lax security policies put Jail employees, contractors, visitors, and the public at-large at risk than a Sheriff who allegedly, on a single day, based on reliable information, overstepped his authority by conducting overly invasive searches on Jail employees and contractors.   Accordingly, based on the record evidence, the nature of the Injunction Plaintiffs' employment in a Jail environment, the lack of any rebuttal evidence challenging the Sheriff's testimony, and the extreme nature of the mandatory relief requested in light of the Sheriff's sworn testimony that he had credible evidence implicating some of the Injunction Plaintiffs, the Court finds that Injunction Plaintiffs have not demonstrated that they will likely prevail on the Pickering balancing.

The Court's ruling on this preliminary injunction in no way suggests that some or all of the Plaintiffs will not ultimately prevail in this case.   However, Pickering balancing, particularly when a jail or law-enforcement department is

45

involved, is a difficult task even with a completely developed record, and it is infinitely more difficult with a limited pre-discovery record. See Jackson, 851 F.2d at 718 (indicating that although the "ultimate issue" in Pickering balancing is a question of law for the court, "as is often the case in constitutional litigation, th[is] ultimate issue[] of constitutional law inevitably embrace[s] subsidiary issues of pure historical fact which establish the context in which . . . the appropriate balance of competing interests must be legally assessed in particular cases") (emphasis added). Similarly, additional complex legal issues, including immunity defenses, will be impacted by the yet to be developed facts. Some Plaintiffs may ultimately prevail on their Fourth Amendment injunction claims if, as alleged, strip searches were conducted without regard to individualized suspicion as to each person searched. Some Plaintiffs may also prevail on their First Amendment claims since Sheriff Watson allegedly issued a blanket order terminating the security clearances of all individuals that filed suit against him the next business day after such suits were filed, and Sheriff Watson's explanation for his actions may not survive scrutiny after the record is further developed. It is therefore appropriate for all parties to "keep in mind that a preliminary injunction is intended to serve the limited purpose of preserving 'the relative positions of the

46

parties until a trial on the merits can be held'" and that "'the findings of fact and conclusions of law made by a court'" in ruling on a preliminary injunction "'are not binding at trial on the merits.'" AttorneyFirst, LLC v. Ascension Entertainment, Inc., 144 Fed. Appx. 283, 287-88, (4th Cir. 2005) (quoting University of Texas v. Camenisch, 451 U.S. 390, 395 (1981)).

Although the preliminary facts demonstrate the possibility that at least some of the Injunction Plaintiffs may prevail on at least some of their claims, based on a preliminary and undeveloped record, the Court simply cannot find that any of the Injunction Plaintiffs have made a sufficient showing to warrant the extreme mandatory relief of security clearance restoration as sought in the pending motions. The Court acknowledges the fact that each day the Injunction Plaintiffs are barred from the Jail they are potentially suffering First Amendment retaliation. However, Injunction Plaintiffs have not demonstrated any exigencies in this case, such as speech being directly restricted each day that an injunction is not in place. It therefore appears that this is not a case where a preliminary injunction is necessary to maintain the status quo and preserve the Court's ability to render a meaningful judgment. Rather, at the conclusion of this case, the Court will still be in a position to "'render a meaningful judgment on the merits.'" Perry, 2012 WL 120076, at *4 (quoting In re Microsoft Corp., 333

F.3d at 525).   Injunction Plaintiffs have likewise failed to demonstrate any facts or circumstances suggesting that this is the type of "extraordinary case" that would warrant disfavored mandatory relief in a form that would require the Court to substitute the Court's judgment for the Sheriff's judgment on matters relating to Jail security.[17]   See Braun, 652 F.3d at 560 (recognizing the danger in substituting a prison official's judgment with that of the court).   Such failure is particularly notable in light of the unchallenged preliminary evidence indicating that one or more individuals currently barred from the Jail were responsible for bringing contraband into the Jail. Considering the above factors as a backdrop to the Pickering balancing, and recognizing the very real possibility that one or more of the Injunction Plaintiffs or the Defendants may ultimately prevail, the Court concludes that the preliminary record, as it stands, is insufficient to clearly demonstrate that the Pickering balancing will ultimately be resolved in favor of the Injunction Plaintiffs.

### c. Prongs Three and Four of the Goldstein Test

The third prong of the Goldstein test requires a plaintiff to establish that she "was deprived of a valuable government

---

[17] Such judgment calls take on added significance when notions of federalism come into play.   Here, a federal court is being asked to overrule the judgment of a state constitutional officer about who can enter the Jail he supervises—a matter arguably better left to a state court.

benefit or adversely affected in a manner that, at the very least, would tend to chill h[er] exercise of First Amendment rights." Goldstein, 218 F.3d at 352. The fourth and final prong requires a public employee to establish that the "protected speech was a 'substantial factor' in the decision to take the allegedly retaliatory action." Id. Because this Court finds that the Injunction Plaintiffs have not demonstrated their ability to succeed on the second prong of the Goldstein test, the Court only briefly reviews these final two prongs. See Brooks, 2012 WL 2695418, at *8 (affirming entry of summary judgment in favor of the defendants based on the district court's analysis that was limited to the first prong of McVey/Goldstein).

### i. Chilling First Amendment Rights—Prong Three

Sheriff Watson appears to take an incorrect legal position by contending that the Injunction Plaintiffs must demonstrate an adverse employment action tantamount to a "termination" to satisfy the third prong of the Goldstein test. To the contrary, it is well-established that "a public employer is prohibited from discharging or taking other adverse action against one of its employees on a basis that infringes the employee's constitutionally protected interest in freedom of speech." Edwards v. City of Goldsboro, 178 F.3d 231, 245-46 (4th Cir. 1999) (emphasis added). Although the Fourth Circuit has not

adopted an exhaustive list of "sufficiently adverse actions in the context of retaliation," it has held that the "dispositive inquiry is whether the adverse actions complained of, under the particular circumstances of the case, would deter the employee from again exercising his constitutional right to publicly comment on matters of public concern." Saleh v. Upadhyay, 11 Fed. Appx. 241, 255-56 (4th Cir. 2001); see Rutan v. Republican Party of Illinois, 497 U.S. 62, 76 (1990) (holding that an adverse employment action does not need to be the "substantial equivalent of a dismissal"); DiMeglio, 45 F.3d at 806 (suggesting that an employment action having a negative impact on an employee's "general duties, pay, benefits, or perquisites of office" could constitute a constitutional deprivation).[18]

Here, it is undisputed that although the Injunction Plaintiffs were not terminated from their positions at Correct Care, they are only compensated by Correct Care when they work a shift, and the preliminary evidence suggests that revocation of

---

[18] As discussed herein in footnote 8, McVey and its progeny also do not require that a plaintiff demonstrate an adverse employment action equivalent to a termination. Rather, the McVey test presupposes a termination, likely because an alleged retaliatory discharge is the most frequently occurring fact pattern. Furthermore, although a "transfer" to a different work location with the same benefits and same pay might not amount to an adverse action, DiMeglio, 45 F.3d at 806-07, here, Sheriff Watson plainly did not "transfer" the Injunction Plaintiffs to another position with the same benefits and same pay. Rather, Sheriff Watson abruptly eliminated Injunction Plaintiffs' work placements at the Jail, leaving each of them temporarily without work and forcing most, if not all, to settle on less favorable job placements.

Injunction Plaintiffs' security clearances had a serious negative impact on their short-term or long-term ability to generate a steady income. Accordingly, the Injunction Plaintiffs appear able to satisfy the third prong by showing that Sheriff Watson's actions would tend to chill their First Amendment rights.

### ii. Protected Speech Causes Retaliation—Prong Four

As to causation, the Court notes that although Sheriff Watson testified that he did not revoke the Injunction Plaintiffs' security clearances <u>because</u> they filed federal lawsuits, he at least implicitly acknowledged that the filing of such suits was the "trigger" for his perception of an increased risk of harm to inmates. Furthermore, it was the filing of such suits that purportedly created an internal lack of trust/interpersonal discord that would be detrimental to Sheriff Watson's ability to effectively manage the Jail. Accordingly, the <u>preliminary evidence</u> suggests that Injunction Plaintiffs could likely satisfy the causation prong of the <u>Goldstein</u> test by showing that the filing of their suits was a substantial factor in Sheriff Watson's decision to terminate their security clearances.

After careful application of the <u>Goldstein</u> test, the Court finds that Injunction Plaintiffs have not, at this time, made a clear showing of a likelihood of success on the merits.

## B. Irreparable Harm

Out of an abundance of caution, the Court briefly considers the second prong of the preliminary injunction standard even though Injunction Plaintiffs have failed to make a "clear showing" of a likelihood of success on the merits. See Real Truth About Obama, Inc. v. Federal Election Comm'n, 575 F.3d 342, 346 (4th Cir. 2009), vacated on other grounds, 130 S. Ct. 3271 (2010) (indicating that "all four requirements" for obtaining a preliminary injunction "must be satisfied"). The second prong of the preliminary injunction standard requires a plaintiff to demonstrate that, absent an injunction, she will suffer "irreparable harm." Dewhurst, 649 F.3d at 290.

The irreparable harm allegedly suffered by each of the six Injunction Plaintiffs in this case is the same: they assert that, each day that they are prevented from returning to their prior work assignments at the Jail, they are being retaliated against in violation of their First Amendment rights. Thus, it is the non-curable loss of a Constitutional right, and not the curable loss of income, that the Injunction Plaintiffs highlight in this case.

The First Amendment to the Constitution provides, in relevant part, that "Congress shall make no law . . . abridging the freedom of speech . . . or the right of the people . . . to petition the Government for a redress of grievances." U.S.

Const. amend. I.   The Fourth Circuit recently reiterated the well-established rule within this circuit that "'[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury' and that "monetary damages are inadequate to compensate for the loss of First Amendment freedoms." Legend Night Club v. Miller, 637 F.3d 291, 302 (4th Cir. 2011) (quoting Elrod v. Burns, 427 U.S. 347, 373 (1976) (plurality opinion)).   Based on such rule, "in the context of an alleged violation of First Amendment rights, a plaintiff's claimed irreparable harm is 'inseparably linked' to the likelihood of success on the merits of plaintiff's First Amendment claim." WV Ass'n of Club Owners and Fraternal Services, Inc. v. Musgrave, 553 F.3d 292, 298 (4th Cir. 2009); see Newsom ex rel. Newsom v. Albemarle County School Bd., 354 F.3d 249, 254 (4th Cir. 2003).   In other words, if the Injunction Plaintiffs cannot show that they are likely to prevail on their claims that Sheriff Watson retaliated against them because they spoke up and filed this suit, then they cannot show that they will suffer an irreparable injury without issuance of a preliminary injunction reinstating their security clearances.

Accordingly, because this Court concluded above that the preliminary record is insufficient to clearly show that the Injunction Plaintiffs are likely to succeed on the merits by

53

showing that Sheriff Watson retaliated against them because they spoke up and filed this suit, the Injunction Plaintiffs have failed to show they will suffer irreparable harm absent issuance of a preliminary injunction.  After further factual development, each Injunction Plaintiff's ability to demonstrate "irreparable harm" will rise and fall with her ability to succeed on the merits of her retaliation claim by demonstrating a loss of First Amendment freedoms through satisfying all four prongs of the Goldstein test.

### C. Balancing of Equities and Public Interest

The third and fourth prongs of the preliminary injunction standard require a plaintiff to demonstrate that the balance of equities tips in her favor and that a preliminary injunction is in the public interest.  Dewhurst, 649 F.3d at 290.  As the Court concludes above that Injunction Plaintiffs have, on the limited record, failed to satisfy either of the first two prongs of the preliminary injunction standard, the Court does not analyze at length the merits of the parties' arguments with respect to such latter two prongs.  Real Truth About Obama, 575 F.3d at 346; see Holbrook, 706 F. Supp. 2d at 655 (suggesting that a motion for an injunction should be denied if the movant fails to meet any prong of "the four-prong standard required by Winter").  The Court does, however, recognize that these factors may have to be analyzed in light of additional evidence in this

matter, and it therefore reiterates that the relief sought by the Injunction Plaintiffs in the pending motion is: (1) a disfavored mandatory injunction; and (2) relief that would require this Court, on an incomplete record, to order a Sheriff to reinstate the security clearances of six former Jail contractors. Not only are courts, as a general rule, loathe to second guess the difficult judgment calls regarding security that are made by prison and jail administrators, see Braun, 652 F.3d at 560, but here, Sheriff Watson's uncontradicted testimony supports the preliminary finding that at least some individuals seeking reinstatement are responsible for violating Jail rules and bringing contraband into the Jail. Entry of such extraordinary relief, on undeveloped facts, absent a clear showing of irreparable harm, would not be in the public interest because it would risk substituting the Sheriff's difficult judgment call with a viewpoint of the Court that could be predicated on erroneous facts. See Braun, 652 F.3d at 560 (quoting Richardson, 521 U.S. at 408 ("Second-guessing such judgment calls would inhibit 'principled and fearless decision-making' . . . .")).  Similarly, it does not appear that the "balance of equities" would tip in the Injunction Plaintiffs' favor based on their failure, at this time, to demonstrate a likelihood of success on their retaliation claims. Accordingly,

even if the Court reached the final two prongs, they appear, at this time, to favor Sheriff Watson.

### IV. SUMMARY AND CONCLUSION

As set forth above, six Plaintiffs (the "Injunction Plaintiffs") seek a preliminary injunction based on Sheriff Watson's revocation of their security clearances at the Portsmouth City Jail. Injunction Plaintiffs are all health care contractors that were previously providing medical services to the inmates at the Jail. Injunction Plaintiffs filed lawsuits in this Court in April of 2012 alleging that, approximately one year earlier, Sheriff Watson and several Sheriff's deputies required Injunction Plaintiffs to undergo strip searches in violation of their Fourth Amendment rights. Several days after the lawsuits were filed, Sheriff Watson revoked Injunction Plaintiffs' security clearances, thereby excluding them from any further contract work at the Portsmouth Jail. Injunction Plaintiffs claim that Sheriff Watson's action punishes them for filing suit, in violation of the protections established by the First Amendment's "free speech clause" and its "petition clause." Injunction Plaintiffs therefore ask this Court to enter a mandatory preliminary injunction requiring Sheriff Watson to reinstate their security clearances pending resolution of this case.

Injunction Plaintiffs have the burden to demonstrate that a preliminary injunction should issue in this case. Furthermore, because Injunction Plaintiffs seek a mandatory injunction that would alter the status quo during the pendency of the litigation, the Court's inquiry is even more searching than in a typical case, and entry of the requested mandatory injunction is "disfavored" by governing law. In order to obtain a preliminary injunction, Injunction Plaintiffs must show: (1) that they will likely succeed on the merits of their First Amendment retaliation claims; (2) that absent an injunction, they will suffer irreparable harm; (3) that the balance of equities tips in their favor; and (4) that the public interest favors entry of a preliminary injunction.

Applying the four-part injunction test to the preliminary record reveals that Injunction Plaintiffs have not carried their burden to demonstrate that the extraordinary mandatory relief sought in their motions is appropriate at this stage of the case. Injunction Plaintiffs fail to satisfy such test as they have, among other things, failed to "clearly show" that they are likely to succeed on the merits of their First Amendment retaliation claims. Injunction Plaintiffs fail to make such a showing because they have not demonstrated that they will likely satisfy the special legal test that governs the First Amendment speech rights of "public employees."

The First Amendment protections afforded to public employees are less than the protections afforded to ordinary citizens because the government, and the general public, both have a strong interest in efficient public services. Accordingly, to establish a free speech violation, a public employee or public contractor must establish: (1) that the speech that allegedly caused retaliation relates to a matter of public concern; (2) that the employee's interest in expression outweighs the employer's interest in efficiently operating the public workplace; (3) that the employee lost a valuable government benefit; and (4) that such benefit was lost as a result of the public employee's speech.

Although it presents a relatively close question, here, the Court finds that Injunction Plaintiffs have demonstrated that their speech—the filing of federal lawsuits alleging unconstitutional strip searches—touches a matter of "public concern." Furthermore, Injunction Plaintiffs appear able to demonstrate that they lost a valuable government benefit and that they lost such benefit as a result of their speech. However, Injunction Plaintiffs do not, at this preliminary stage, demonstrate that their interest in First Amendment expression outweighs the Sheriff's interest in the efficient operation of the Portsmouth City Jail. Injunction Plaintiffs fail to do so because of the Sheriff's uncontradicted sworn

58

testimony at the injunction hearing indicating: (1) that some of the Injunction Plaintiffs were responsible for bringing contraband into the Jail; and (2) that Injunction Plaintiffs' alignment of themselves against the Sheriff and Sheriff's deputies through filing suits would create a breakdown in trust at the Jail and raise safety concerns regarding inmates currently housed at the Jail that had implicated some of the Injunction Plaintiffs in smuggling contraband into the Jail.

This Court's analysis is constrained by the preliminary record, and the facts discussed above do not represent factual findings for any purpose other than the resolution of the instant motions. Similarly, the Court's ruling is not a predictor as to the likelihood that either party will ultimately prevail in this case, as further factual development will likely dictate the final resolution. The preliminary injunction standard not having been met, and mindful of the fact that the disfavored relief sought by Injunction Plaintiffs would require this federal Court to substitute its judgment for that of an elected state constitutional officer (the Sheriff) on an important matter of Jail security, the Court finds that an injunction should not issue at this early stage of the proceedings.

Based on the detailed analysis above, the Court **DENIES** the Injunction Plaintiffs' six pending motions seeking preliminary

injunctions ordering Sheriff Watson to reinstate their security clearances at the Portsmouth City Jail.

The Clerk is **REQUESTED** to send a copy of this Opinion and Order to all counsel of record.

It is so **ORDERED**.

/s/ ~~Mark S. Davis~~

Mark S. Davis
UNITED STATES DISTRICT JUDGE

Norfolk, Virginia
July 24 , 2012