**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Norfolk Division**



**NAN VOLLETTE, et al.,**

                **Plaintiffs,**

v.                                          **Civil Action No. 2:12cv231**

**BILL WATSON, et al.,**

                **Defendants.**

### OPINION and ORDER

This matter is before the Court on a motion for Summary Judgment jointly filed by all of the defendants (collectively "Defendants") against each of the nine plaintiffs (collectively "Plaintiffs") in this consolidated action. After examination of the briefs and the record, the Court determines that a hearing is unnecessary, as the facts and legal arguments are adequately presented, and the decisional process would not be aided significantly by oral argument. Fed. R. Civ. P. 78(b); E.D. Va. Loc. Civ. R. 7(J). For the reasons set forth below, Defendants' motion seeking summary judgment is **GRANTED**, in part, and **DENIED**, in part.

## I.  FACTUAL AND PROCEDURAL BACKGROUND[1]

Each of the Plaintiffs was previously a contractor working at the Portsmouth City Jail ("the Jail"), which is overseen by defendant Sheriff Bill Watson ("Sheriff Watson").[2]  As contractors, the Plaintiffs regularly worked in the Jail, but were directly employed by either "Aramark" (a food services company) or "Correct Care Solutions" (a medical services company).

According to Sheriff Watson's testimony at the May 16, 2012 preliminary injunction hearing conducted in this case, as of April 2011 he had "continuous reliable information" indicating that nurses and other contractors were bringing contraband into the Jail.  Prelim. Injun. Tr. 53, ECF No. 20 (hereafter "Tr."). Sheriff Watson claims that on April 22, 2011, as a result of receiving this information, all nine Plaintiffs, and at least two other contractors, were required by Defendants to undergo a strip search before being allowed to perform their employment duties at the Jail.  Sheriff Watson testified that, in addition to the contractors, he also required all "jail officers" to be strip searched.  Tr. 56.  Disputed facts exist as to whether the

---

[1] The facts are set forth in greater detail in this Court's July 24, 2012 Opinion and Order denying motions filed by six of the Plaintiffs seeking entry of a preliminary injunction.  ECF No. 37 (hereafter "Injunction Opinion").

[2] It appears that all of the other named Defendants are Portsmouth Deputy Sheriffs that work under the supervision of Sheriff Watson.

strip searches involving the Plaintiffs also included a "visual body cavity" inspection.   Compare ECF No. 31-12 through 31-16, with ECF No. 34-1 through 34-9, and ECF No. 49-1, at 5-7. "Contraband" was found on four of the Plaintiffs, consisting of three cell phones and one "jump drive."[3]   ECF. No. 31-1. However, none of the Plaintiffs found with contraband had their Jail security clearances revoked at the time of the April 2011 searches.

On April 27, 2012, approximately one year after the April 22, 2011 strip searches were performed, each of the nine Plaintiffs in this consolidated set of cases filed a separate federal complaint in a separate civil case including the following Counts: (1) a 42 U.S.C. § 1983 (hereafter "Section 1983") count seeking money damages and a permanent injunction based on an unreasonable search in violation of the Fourth Amendment; (2) two Virginia law false imprisonment claims seeking money damages; (3) a Virginia common law civil conspiracy claim seeking money damages; and (4) a punitive damages claim associated with the Section 1983 Fourth Amendment claim and a punitive damages claim associated with the civil conspiracy claim.   In addition to the claims recited above, Plaintiff Yolanda Vines and Plaintiff Verita Braswell each

---

[3] It does not appear that any "contraband" was concealed by any of the Plaintiffs in a manner that required a strip search in order to be discovered.

advanced a battery claim seeking money damages based on the assertion that physical contact was made by one of the Defendants during the strip searches.

The next business day after such suits were filed, Sheriff Watson revoked the Jail security clearances of the six Plaintiffs that were still working at the Jail. Those six Plaintiffs (collectively "Injunction Plaintiffs")[4] then amended their complaints to add an injunctive relief Section 1983 claim asserting that the revocation of their security clearances was in retaliation for filing this lawsuit, and was therefore a violation of their First Amendment rights to free speech. The Injunction Plaintiffs' newly added claim sought preliminary and permanent injunctive relief in the form of immediate reinstatement of their security clearances and a permanent bar on any further retaliation. After conducting an evidentiary hearing on May 16, 2012, this Court denied the request for preliminary injunctive relief in its Injunction Opinion issued on July 24, 2012. ECF No. 37.

Subsequent to the filing of the amended complaints, Plaintiffs were granted leave of Court to again amend their complaints to clarify that the Defendants were being sued in their "official capacities" as well as their "individual

---

[4] The following Plaintiffs amended their complaint to include a Section 1983 First Amendment claim: Nan Vollette, Angelene Coleman, Yolanda Vines, HaShena Hockaday, Verita Braswell, and Emma Floyd-Sharp.

capacities." Each of the Injunction Plaintiffs filed a second amended complaint in May 2012.[5] For administrative ease, and with agreement of counsel, all nine separately filed civil cases were then consolidated into case number 2:12cv231. ECF No. 17.

Presently before the Court is Defendants' summary judgment motion, which raises: (1) immunity defenses as a bar to Plaintiffs' suit; and (2) asserts that the undisputed facts support a ruling in Defendants' favor on the merits. Plaintiffs oppose summary judgment, arguing primarily that material factual disputes preclude summary resolution of Plaintiffs' claims. Subsequent to the filing of the motion for summary judgment, the Court afforded all parties an opportunity to submit supplementary evidence relevant to the summary judgment motion. This matter is therefore ripe for review.

## II. SUMMARY JUDGMENT STANDARD

The Federal Rules of Civil Procedure provide that a district court shall grant summary judgment in favor of a movant if such party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The mere existence of some alleged factual dispute between the parties "will not defeat an

---

[5] The three Plaintiffs that did not pursue preliminary injunctive relief based on an alleged First Amendment retaliation violation did not file an amended complaint adding "official capacity" claims.

otherwise properly supported motion for summary judgment; the requirement is that there be no <u>genuine</u> issue of <u>material</u> fact." <u>Anderson v. Liberty Lobby Inc.</u>, 477 U.S. 242, 247-48 (1986).

If a movant has properly advanced evidence supporting entry of summary judgment, the non-moving party may not rest upon the mere allegations of the pleadings, but instead must set forth specific facts in the form of exhibits and sworn statements illustrating a genuine issue for trial. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-24 (1986). At that point, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." <u>Anderson</u>, 477 U.S. at 249. In doing so, the judge must construe the facts and all "justifiable inferences" in the light most favorable to the non-moving party, and the judge may not make credibility determinations. <u>Id.</u> at 255; <u>T-Mobile Northeast LLC v. City Council of City of Newport News, Va.</u>, 674 F.3d 380, 385 (4th Cir. 2012). Because a ruling on summary judgment "necessarily implicates the substantive evidentiary standard of proof that would apply at the trial on the merits[,] . . . [t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient" to overcome a defendant's well-founded summary judgment motion. <u>Anderson</u>, 477 U.S. at 252.

### III. DISCUSSION

As indicated above, in addition to seeking summary judgment on the merits of several of Plaintiffs' claims, Defendants assert Eleventh Amendment immunity as a bar to Plaintiffs' official capacity claims seeking monetary damages, and assert qualified immunity as a bar to Plaintiffs' individual capacity claims seeking monetary damages. Plaintiffs appear to abandon their official capacity claims seeking monetary damages based on Defendants' invocation of Eleventh Amendment immunity, but pursue their official capacity claims seeking injunctive relief. Pls.' Opp'n to S.J. 23-24, ECF No. 34. In contrast, Plaintiffs' squarely challenge Defendants' assertion of qualified immunity as to the individual capacity claims seeking monetary damages. In an effort to fully consider the numerous, and distinct, legal issues in this difficult area of the law, the Court separately addresses Plaintiffs' official capacity and individual capacity claims below. After conducting such analysis, the Court finds that Defendants have demonstrated that they are immune from suit as to certain claims for relief. However, because disputed facts preclude completion of the immunity analysis as to other claims, and because the immunities invoked by Defendants do not extend to all claims for relief, a trial remains necessary in this case.

7

## A. Official Capacity Claims
### (Eleventh Amendment Immunity)

The Eleventh Amendment to the Constitution of the United States provides that "[t]he judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. "Although the terms of the amendment only prohibit suits against a state by citizens of other states and foreign countries, the Supreme Court, in 1890, in Hans v. Louisiana, held that it would be 'anomalous' to allow states to be sued by their own citizens." E. Chemerinsky, Federal Jurisdiction § 7.3, at 432 (6th ed. 2012) (citing Hans v. Louisiana, 134 U.S. 1, 18 (1890)); see Lytle v. Griffith, 240 F.3d 404, 408 (4th Cir. 2001) (quoting Edelman v. Jordan, 415 U.S. 651, 663 (1974)) (noting that, notwithstanding the express language of the Eleventh Amendment, "it is well established that 'an unconsenting State is immune from suits brought in federal courts by her own citizens'"). When the Supreme Court reaffirmed this doctrine in Seminole Tribe of Florida v. Florida, the majority explained that it viewed Hans as reflecting a constitutional principle, embodied in the Eleventh Amendment, that states have sovereign immunity when sued in federal court. Seminole Tribe of Florida v. Florida, 517 U.S.

44, 69 (1996). More recently, in <u>Virginia Office for Protection and Advocacy v. Stewart</u>, the Supreme Court stated that "[s]ince <u>Hans v. Louisiana</u> . . . we have understood the Eleventh Amendment to confirm the structural understanding that States entered the Union with their sovereign immunity intact, unlimited by Article III's jurisdictional grant." <u>Virginia Office for Protection and Advocacy v. Stewart</u>, 131 S. Ct. 1632, 1637-38 (2011).

Here, as discussed below, to the extent Defendants are sued in their "official capacities" as state officers, Defendants have demonstrated Eleventh Amendment Immunity from Plaintiffs' claims seeking monetary damages.[6]  However, as conceded by defense counsel at the preliminary injunction hearing, and as well-established in the law, Eleventh Amendment Immunity does not extend to claims against state officers that seek injunctive relief. Tr. 44; <u>Ex parte Young</u>, 209 U.S. 123, 159-160 (1908).

The jurisdiction of federal courts is defined by Article III of the United States Constitution. "The Eleventh Amendment limits the Article III jurisdiction of the federal courts to

---

[6] The Eleventh Amendment's bar to suits "to recover money damages from the state or its alter egos acting in their official capacities . . . is equally applicable to pendent state law claims." <u>Parks v. Piedmont Technical College</u>, 76 F.3d 374 (table) (4th Cir. 1996) (unpublished); <u>see</u> <u>Huang v. Board of Governors of University of North Carolina</u>, 902 F.2d 1134, 1138 (4th Cir. 1990) (indicating that the plaintiff in that case "properly concedes that the Eleventh Amendment bars the pendent state monetary damage claims").

hear cases against States and state officers acting in their official capacities." Kitchen v. Upshaw, 286 F.3d 179, 183-84 (4th Cir. 2002). "Eleventh Amendment immunity does not extend to mere political subdivisions of a State such as counties or municipalities," but does confer immunity "on an arm of the State." Id. at 184.

In Virginia, Sheriffs are state officers whose positions are created by the Virginia Constitution, thereby making them constitutional officers. See Va Const. Art. VII, § 4 ("There shall be elected by the qualified voters of each county and city a treasurer, a sheriff, an attorney for the Commonwealth, a clerk, who shall be clerk of the court in the office of which deeds are recorded, and a commissioner of revenue."). As recently reiterated by the Supreme Court of Virginia, a Virginia Sheriff "'is an independent public official whose authority is derived from the Constitution of Virginia.'" Doud v. Commonwealth, 282 Va. 317, 321 (2011) (quoting Carraway v. Hill, 265 Va. 20, 24 (2003)) (emphasis added). Accordingly, even though Sheriffs, and other constitutional officers, "'may perform certain functions in conjunction with units of county or municipal government, neither the officers nor their offices are agencies of such [local] governmental units.'" Id. (quoting Carraway, 265 Va. at 24) (emphasis added). Based on the above state-law framework, federal district courts applying Virginia

10

law have repeatedly held that Virginia Sheriffs, and their deputies, are "state officers" for the purpose of the Eleventh Amendment. See Smith v. McCarthy, 349 Fed. Appx. 851, 858 n.11 (4th Cir. 2009) (unpublished) ("[T]he district court did not err in dismissing the [plaintiffs'] claims against [the deputy sheriffs] in their official capacities, as they are afforded immunity by the Eleventh Amendment."); Gemaehlich v. Johnson, No. 7:12cv263, 2013 WL 589234, at *4 (W.D. Va. Feb. 14, 2013) (unpublished) ("There is considerable authority holding that the Eleventh Amendment precludes § 1983 official-capacity suits against Virginia Sheriffs and their deputies because they are state, not local, officials."); Bland v. Roberts, 857 F. Supp. 2d 599, 610 (E.D. Va. 2012) (indicating that a "suit against the [Virginia] Sheriff in his official capacity is in fact a suit against the State," and thus, "Eleventh Amendment protection applies"); Harris v. Hayter, 970 F. Supp. 500, 502 (W.D. Va. 1997) ("In Virginia, a suit against a sheriff in his official capacity is a suit against a state official," and "a suit against a state official in his official capacity is a suit against a state.") (internal citations omitted); Blankenship v. Warren Cnty., 931 F. Supp. 447, 449 (W.D. Va. 1996) (finding that "the Sheriff and the Sheriff's Department [in Virginia] are arms of the state and cannot be held liable for monetary damages under § 1983 because they are entitled to Eleventh Amendment

11

immunity"); _see also_ McCoy v. Chesapeake Correctional Center, 788 F. Supp. 890, 893 (E.D. Va. 1992) (explaining that "[i]n Virginia, sheriffs are state officials, whose positions are constitutionally created," and that "[m]any of the sheriffs' duties pertaining to the administration of local jails are prescribed by state statute") (internal citations omitted).

Here, in light of the significant amount of authority just cited, and Plaintiffs' failure to provide any argument or case law to the contrary, this Court finds no reason to deviate from such authority in this case. The Court therefore finds that the Defendants are state officers for purposes of Eleventh Amendment immunity and are thus immune from suit in federal court as to Plaintiffs' official capacity claims seeking money damages.[7] Alternatively, the Court grants summary judgment in favor of Defendants on the official capacity money damages claims based

---

[7] The Supreme Court has explained that "[s]ection 1983 provides a federal forum to remedy many deprivations of civil liberties, but it does not provide a federal forum for litigants who seek a remedy against a State for alleged deprivations of civil liberties. The Eleventh Amendment bars such suits unless the State has waived its immunity or unless Congress has exercised its undoubted power under § 5 of the Fourteenth Amendment to override that immunity." Will v. Mich. Dep't of State Police, 491 U.S. 58, 66 (1989) (internal citation omitted). Immunity has not been waived as to the claims advanced by Plaintiffs, and as the Supreme Court concluded in Will, Section 1983 did not override that immunity. Id. Moreover, because a suit against a state official is a suit against the official's office, it is no different from a suit against the State itself. Therefore, while "state officials literally are persons," they are not "persons" for purposes of Section 1983 official capacity claims seeking monetary relief. Id. at 70-71. This means that a Virginia Sheriff, as an arm of the State, is not subject to official capacity Section 1983 monetary liability.

on Plaintiffs' purported withdrawal of such claims.  Pls.' Opp'n
to S.J. 24, ECF No. 34.  Accordingly, to the extent Plaintiffs'
complaints advance "official capacity" claims seeking monetary
damages against Defendants, summary judgment is granted in favor
of Defendants on such claims.

The above immunity ruling, however, is limited to
Plaintiffs' official capacity claims seeking money damages.  As
indicated above, in addition to money damages, Plaintiffs seek
injunctive relief in the form of: (1) a ban on future strip
searches absent individualized suspicion of illegal activities;
(2) a reinstatement of security clearances to the six Injunction
Plaintiffs; and (3) a ban on future retaliatory action against
the six Injunction Plaintiffs.  Although the Eleventh Amendment
"confirms the sovereign status of the States by shielding them
from suits[,] . . . the Eleventh Amendment permits suits for
prospective injunctive relief against state officials acting in
violation of federal law."  Frew ex rel. Frew v. Hawkins, 540
U.S. 431, 437 (2004) (emphasis added); accord Lee-Thomas v.
Prince George's County Public Schools, 666 F.3d 244, 249 (4th
Cir. 2012); see Will v. Michigan Dep't of State Police, 491 U.S.
58, 71 n.10 (1989) (indicating that "a state official in his or
her official capacity, when sued for injunctive relief, would be
a person under § 1983 because official-capacity actions for
prospective relief are not treated as actions against the

13

State," a distinction that is "commonplace in sovereign immunity doctrine") (internal quotation marks and citations omitted). Therefore, this Court's Eleventh Amendment immunity ruling in favor of Defendants does <u>not</u> extend to Plaintiffs' claims seeking injunctive relief. See Cromer v. Brown, 88 F.3d 1315, 1332 (4th Cir. 1996) (indicating that Eleventh Amendment immunity did not extend to shield a South Carolina county sheriff from a former employee's injunctive relief official capacity claims, including a claim seeking "reinstatement").

Since Eleventh Amendment immunity does not bar Plaintiffs' official capacity claims for injunctive relief, the Court must determine whether there is a genuine issue of material fact as to whether Defendants violated Plaintiffs' Fourth Amendment or First Amendment constitutional rights such that Plaintiffs are entitled to an injunction ending such ongoing violations and/or enjoining future violations. As to Defendants' request for summary judgment on such injunctive claims, summary resolution is not appropriate because genuine issues of material fact exist regarding the information that triggered the strip searches, the nature of such searches, and the factual predicate for the revocation of the Injunction Plaintiffs' security clearances. Those disputes are discussed in more detail below.

14

## B. Individual Capacity Claims
### (Qualified Immunity)

In addition to the official capacity claims discussed above, Plaintiffs advance "individual capacity" claims against Defendants pursuant to 42 U.S.C. § 1983. This federal statute provides that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects . . . any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . ." 42 U.S.C. § 1983. Section 1983, "is not 'a source of substantive rights, but a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it describes.'" Lambert v. Williams, 223 F.3d 257, 260 (4th Cir. 2000) (quoting Baker v. McCollan, 443 U.S. 137, 144 (1979)).

Unlike Plaintiffs' official capacity claims, discussed above, Plaintiffs' Section 1983 individual capacity claims are not subject to Eleventh Amendment immunity analysis because "the Eleventh Amendment does not erect a barrier against suits to impose individual and personal liability on state officials under § 1983." Hafer v. Melo, 502 U.S. 21, 30-31 (1991) (internal quotation marks and citation omitted). Such

15

individual capacity claims, however, are subject to scrutiny under the doctrine of qualified immunity, sometimes known as "good faith immunity," which has its origins in common law tort immunity. Filarsky v. Delia, 132 S. Ct. 1657, 1660 (2012). As recently explained by the Fourth Circuit:

> The doctrine of qualified immunity "balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." Pearson v. Callahan, 555 U.S. 223, 231 (2009). The doctrine shields government officials from liability for civil damages, provided that their conduct does not violate clearly established statutory or constitutional rights within the knowledge of a reasonable person. Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Because qualified immunity is an immunity from suit rather than merely a defense to liability, such immunity effectively is lost if a court erroneously permits a case to proceed to trial. Pearson, 555 U.S. at 231 (citation omitted).

Meyers v. Baltimore County, Md., -- F.3d --, 2013 WL 388125, at *4 (4th Cir. Feb. 1, 2013). In the Fourth Circuit, it is the defendant state official, and not the plaintiff, that bears "[t]he burden of proof and persuasion with respect to a defense of qualified immunity . . . ."[8]  Id.; see Ware v. James City

---

[8] In the qualified immunity context, a plaintiff maintains the burden on summary judgment to demonstrate that the facts, "when viewed in the light most favorable to the plaintiff, show that the official's conduct violated a constitutional right." Henry v. Purnell, 501 F.3d 374, 377 (4th Cir. 2007). Although the burden to demonstrate a constitutional violation remains with the plaintiff, the burden to demonstrate qualified immunity, that is, that a reasonable officer would not have known that his conduct was unlawful, falls on the Defendant. Id. at 377-78. In Henry, the Fourth Circuit recognized:

County, Virginia, 652 F. Supp. 2d 693, 702 (E.D. Va. 2009)
(quoting Pritchett v. Alford, 973 F.2d 307, 314 (4th Cir. 1992))
("The qualified immunity determination should normally be made
at the summary judgment stage in the litigation"; however, if
there are "'genuine issues of historical fact respecting the
officer's conduct,' the United States Court of Appeals for the
Fourth Circuit has stated, 'summary judgment is not appropriate,
and the issue must be reserved for trial.'").

    Here, as discussed below, the Court finds that Defendants
have failed to carry their burden to demonstrate that they are
qualifiedly immune from suit on Plaintiffs' individual capacity
claims alleging that their Fourth Amendment rights to be free
from unreasonable searches were violated.[9]  In contrast, to the
extent that Injunction Plaintiffs seek money damages on their
individual    capacity    First    Amendment    free    speech    claims,

_____

(1)  internal  conflicts  within  Fourth  Circuit  law  regarding  the
qualified  immunity  burden;  and  (2)  that  several  other  circuits  only
require  a  defendant  to  invoke  such  immunity  and,  once  invoked,  the
plaintiff  has  the  burden  to  rebut  it.    Id.  at  378  n.4-5  (citing
cases).    The  Fourth  Circuit,  however,  indicated  in  Henry  that  it  was
obligated  to  follow  the  earliest  published  opinion  on  such  issue,
which  held  that  in  a  "[Section]  1983  action,  the  good  faith  immunity
of  individual  police  officers  is  an  affirmative  defense  to  be  proved
by  the  defendant."    Logan  v.  Shealy,  660  F.2d  1007,  1014  (4th  Cir.
1981).    The  rule  set  forth  in  Logan,  and  adopted  in  Henry,  was
recently  reaffirmed  in  Meyers,  and  thus  remains  the  controlling
standard.

[9] The Court recognizes that qualified immunity is designed to shield an
official  from  suit  and  not  act  merely  as  a  defense  to  liability.
However,  it  is  the  official  that  bears  the  burden  of  proving  that  such
immunity  attaches,  and  here,  Defendants  have  not  carried  their  burden
to  advance  evidence  sufficient  to  invoke  the  full  protections  of  such
doctrine.

Defendants successfully demonstrate that qualified immunity bars such claims.  Because the denial of qualified immunity on the Fourth Amendment claims turns on a dispute as to a material fact, and not a legal determination, this Court's ruling is not immediately appealable.[10]

### 1. Fourth Amendment Unreasonable Search Claims

### a. Fourth Amendment Claims Seeking Money Damages (Assertion of Qualified Immunity)

Plaintiffs allege that they are entitled to monetary damages from Defendants in their individual capacities because such Defendants violated the Fourth Amendment's prohibition on "unreasonable searches."  See Board of Education of Independent School District No. 92 of Pottawatomie County v. Earls, 536 U.S. 822, 828 (2002) (quoting U.S. Const. amend. IV) ("The Fourth Amendment to the United States Constitution protects '[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures.'").  Defendants deny that the searches conducted were

---

[10]  Although "interlocutory appeals are generally disallowed, 'a district court's denial of a claim of qualified immunity, to the extent that it turns on an issue of law, is [immediately appealable] notwithstanding the absence of a final judgment,' under the collateral-order doctrine."  Iko v. Shreve, 535 F.3d 225, 234 (4th Cir. 2008) (quoting Mitchell v. Forsyth, 472 U.S. 511, 530 (1985)) (alteration and emphasis in original).  However, in Witt v. West Virginia State Police, Troop 2, 633 F.3d 272, 275 (4th Cir. 2011), the Fourth Circuit reiterated that a defendant invoking qualified immunity may not take an interlocutory appeal if the district court's denial of qualified immunity is based on the finding that a genuine dispute as to a material fact precludes summary disposition.

"unreasonable" under the Fourth Amendment, and assert that such claims are barred by qualified (good faith) immunity.

At the time that the Plaintiffs were strip searched, it was clearly established that "a prison employee . . . does not forfeit all privacy rights when she accepts employment," and thus, prison authorities must have "a reasonable and individualized suspicion that an employee is hiding contraband on his or her person" before performing a "visual body cavity search." Leverette v. Bell, 247 F.3d 160, 167-68 (4th Cir. 2001) (emphasis added); see also Braun v. Maynard, 652 F.3d 557, 558 (4th Cir. 2011) (indicating that it was "clearly established" in 2008 that "intrusive prison employee [and contractor] searches require reasonable suspicion").[11] When the evidence currently before the Court is viewed in Plaintiffs' favor, as required at the summary judgment stage of the case, such evidence fails to demonstrate that Defendants had individualized suspicion that the Plaintiffs were importing cigarettes, drugs, or other readily concealable contraband into the Jail on their persons. See ECF Nos. 31-1, 31-5, 31-9, 31-

---

[11] Braun v. Maynard was decided by the Fourth Circuit several months after the nine Plaintiffs in the instant case were strip searched. However, the analysis in Braun addresses the state of the law in 2008, and thus, it remains instructive. In Braun, the Fourth Circuit addressed the reasonableness of strip searches conducted on both employees and independent contractors working at a correctional facility without making any distinction based on their differing classifications as "employees" or "independent contractors."

10.[12] Defendants nevertheless assert that they are shielded by qualified immunity regarding the alleged Fourth Amendment unreasonable search violations because: (1) factually, the Plaintiffs were only subjected to "standard strip searches," not "visual body cavity" searches; (2) there is no clearly established law requiring "individualized" reasonable suspicion prior to conducting a "standard strip search" on jail employees or contractors; and (3) Defendants had a sufficient generalized reasonable suspicion to warrant strip searching all Jail contractors.

Although the law applicable at the time of the searches was "clearly established" regarding the degree of suspicion necessary to perform a "visual body cavity" search, the facts are clearly contested as to whether such type of search occurred in this case. Defendants maintain that Plaintiffs were merely required to "squat and cough" to see if anything was expelled from their body cavities. Each Plaintiff's sworn affidavit, however, asserts that, during such Plaintiff's strip search, one of the Defendants conducted a visual inspection of that Plaintiff's genital and anal areas. Although Defendants

---

[12] The only evidence before the Court of purported "individualized" suspicion is the existence of two anonymous tips implicating two different named Plaintiffs. There is no evidence of any corroboration of such anonymous tips prior to the searches being conducted. Similarly, there is no evidence of any kind, corroborated or uncorroborated, that is individually tied to the other seven Plaintiffs in this case.

submitted excerpts from each Plaintiff's deposition in an effort to demonstrate that no "visual body cavity" examination occurred, Defendants' evidence falls far short of establishing such fact, particularly when the evidence, and reasonable inferences therefrom, must be viewed in each Plaintiff's favor.

It is clear from the submitted deposition excerpts that multiple Plaintiffs maintain that, while they were completely naked, they were required to bend over and/or squat, and that while bent over or squatting, the Plaintiffs either saw, or could infer from the circumstances, that one of the Defendants was visually examining the Plaintiffs' genital area.[13] See, e.g., ECF No. 49-1 at 5-7. Accordingly, when viewing the evidence in the light most favorable to the non-moving party,

---

[13] In determining whether a Plaintiff's body cavities were visually examined, the difference between being required to "squat" and "bend at the waist" during the strip searches may prove important. It is far from clear from the deposition excerpts precisely what was required of each Plaintiff that was searched. Even if each Plaintiff was only asked to squat, it may be important how such individual was directed to squat because some positions, such as the "semi-squat" with "hands on knees" described in Plaintiff Hockaday's affidavit, might both permit a visual inspection of body cavities and enable the person being searched to see the individual standing behind her. See ECF No. 49-1 at 5-6 (deposition transcript excerpts from two Plaintiffs stating that they saw Defendants behind them performing a "visual body cavity" search while they bent over and/or squatted). To the extent some of the Plaintiffs stated that while they were squatting they could not see behind them, the totality of the evidence, including Defendants' claim that all searches were conducted in the same manner, suggests that material factual disputes exist as to those Plaintiffs as well. The Court notes, however, that Defendants' ultimate liability will not rise or fall with the Plaintiffs as a group. Nine strip searches were challenged, and nine separate constitutional inquiries and nine separate conclusions must be made.

material facts remain in dispute that preclude either a ruling

on the merits in Defendants' favor, or a finding that Defendants

are qualifiedly immune from suit.[14]    Therefore, Defendants'

---

[14] In light of the material factual disputes discussed above, it is
unnecessary for the Court to decide at this time the validity of
Defendants' legal assertion that a "standard strip search" of a Jail
contractor, to include a "squat and cough" while completely naked,
does not require any degree of "individualized" suspicion.  However,
the Court notes, preliminarily, that it questions Defendants'
position.  The "reasonable suspicion" standard across all contexts
appears to require some degree of "individualized" suspicion.  See
Ornelas v. United States, 517 U.S. 690, 696 (1996) (quoting United
States v. Cortez, 449 U.S. 411, 417-18 (1981)) ("We have described
reasonable suspicion simply as 'a particularized and objective basis'
for suspecting the person stopped of criminal activity . . . .")
(emphasis added); United States v. Hernandez-Mendez, 626 F.3d 203,
207-08 (4th Cir. 2010) (same); see also United States v. Montoya de
Hernandez, 473 U.S. 531, 540-41 (1985) (rejecting the adoption of a
third legal standard falling between "reasonable suspicion" and
"probable cause" applicable to extended detentions at border crossings
noting that "subtle verbal gradations may obscure rather than
elucidate" the constitutional inquiry).  If only a "generalized" form
of suspicion was necessary, large classes of individuals, such as "all
prison visitors," or even "all while males," would be subject to full
strip searches at the will of the warden based only on generalized
evidence that one or more members of such group were believed to have
engaged in misconduct.
    The Court further notes that even in its most basic application,
reasonable suspicion always requires more than an uncorroborated
anonymous tip.  See Florida v. J.L., 529 U.S. 266, 271-72 (2000)
(indicating that the "bare report of an unknown, unaccountable
informant" is insufficient to demonstrate a "reasonable suspicion"
because the requirement is that the "tip be reliable in its assertion
of illegality, not just in its tendency to identify a determinate
person").  Here, the only evidence currently before the Court that
implicates any of the Plaintiffs of wrongdoing at the time of the
strip searches appears to be two uncorroborated anonymous tips.  ECF
No. 31-5, 31-9, 31-10.  Accordingly, although such question is for
another day, two anonymous tips, identifying two different
individuals, received months apart, absent any corroboration, does not
appear to establish reasonable suspicion that such identified
individuals are involved in misconduct, let alone suggest that all of
their co-workers are involved in misconduct.  Defendants' suggestion
that Sheriff Watson's "reasonable suspicion proved warranted" because
three cell phones and a jump drive were recovered is not entitled to
any weight.  See J.L., 529 U.S. at 271 (indicating that "[t]he

summary judgment motion, asserting qualified immunity on Plaintiffs' Fourth Amendment unreasonable search claims, is denied.

### b. Fourth Amendment Claim Seeking Injunctive Relief (No Assertion of Qualified Immunity)

In addition to money damages, Plaintiffs seek a permanent injunction enjoining Defendants from conducting additional strip searches on Plaintiffs absent individualized suspicion of illegal activity. Defendants' liability on the Fourth Amendment injunctive relief claim must be separately analyzed from the Fourth Amendment money damages claim because, similar to the limits on Eleventh Amendment immunity discussed above, qualified immunity does not extend to claims seeking injunctive relief. See Pearson, 555 U.S. at 243 (indicating that the "defense [of qualified immunity] is not available [in] . . . § 1983 cases against individuals where injunctive relief is sought"); Lefemine v. Wideman, 672 F.3d 292, 303-04 (4th Cir. 2012) (noting that "[c]laims for declaratory and injunctive relief are not affected by qualified immunity"), rev'd on other grounds, 133 S. Ct. 9 (2012); see also Rowley v. McMillan, 502 F.2d 1326, 1331 (4th Cir. 1974) (recognizing that "the doctrine of immunity, whatever its scope . . . has no application to a suit for declaratory or injunctive relief"). Notwithstanding such

---

reasonableness of official suspicion must be measured by what the officers knew before they conducted their search") (emphasis added).

difference, as addressed in detail in the preceding section, because there are material factual disputes directly implicating the reasonableness of the strip searches, summary disposition of Plaintiffs' Fourth Amendment claims seeking injunctive relief is not appropriate in this case.

### 2. First Amendment Free Speech Retaliation Claims

### a. First Amendment Claims Seeking Injunctive Relief (No Assertion of Qualified Immunity)

The six Injunction Plaintiffs allege that their security clearances were revoked by Sheriff Watson in retaliation for filing this lawsuit, and that such revocation was a violation of their First Amendment rights to free speech.[15] Similar to their unreasonable search Fourth Amendment claims, Injunction Plaintiffs utilize Section 1983 to pursue a remedy for the alleged violation of their First Amendment rights. Sheriff Watson denies that he violated the Injunction Plaintiffs' First Amendment free speech rights, asserting: (1) that such speech (the filing of this suit) was not constitutionally protected speech; and (2) that even if such speech was constitutionally protected, the governmental interest in effectively operating the Jail outweighs Injunction Plaintiffs' First Amendment rights.

---

[15] Injunction Plaintiffs' second amended complaints only assert a Section 1983 retaliation claim against Sheriff Watson. However, even if the Injunction Plaintiffs named additional Defendants in such count, the same analysis set forth above would apply.

Unlike Plaintiffs' Fourth Amendment Claims, which expressly seek a monetary judgment _and_ permanent injunctive relief, the six Injunction Plaintiffs advancing a First Amendment retaliation claim only expressly request injunctive relief, asking the Court to order Sheriff Watson to reverse the revocation of their security clearances and further bar him from taking any additional retaliatory action. As previously discussed herein and as acknowledged by defense counsel at the preliminary injunction hearing, the doctrine of qualified immunity does not reach injunctive claims that seek to preclude state officials from violating the United States Constitution. Lefemine, 672 F.3d at 303-04; Tr. 44. Accordingly, the question on summary judgment as to Plaintiffs' First Amendment injunctive relief claims is whether Sheriff Watson demonstrated the absence of a genuine dispute of material fact that would warrant entry of judgment in his favor.

Having reviewed the briefs and the evidence before the Court, it is apparent that Sheriff Watson has not demonstrated that summary judgment should be entered in his favor on the merits of the six Injunction Plaintiffs' First Amendment injunctive relief claims. Rather, when viewed in Injunction Plaintiffs' favor, as required at the summary judgment stage, the evidence appears sufficient to support a verdict in favor of the Injunction Plaintiffs. Anderson, 477 U.S. at 255.

The protections afforded by the First Amendment generally include "not only the affirmative right to speak, but also the 'right to be free from retaliation by a public official for the exercise of that right.'" Adams v. Trustees of the University of N.C.-Wilmington, 640 F.3d 550, 560 (4th Cir. 2011) (quoting Suarez Corp. Indus. v. McGraw, 202 F.3d 676, 685 (4th Cir. 2000)). However, the First Amendment protection afforded to a "public employee" is less than that afforded to an ordinary citizen because the government and the general public both have a strong interest in public agencies providing efficient public services. Id. "While government employees do not lose their constitutional rights at work, the Supreme Court has repeatedly held that the government may impose certain restraints on its employees' speech and take action against them that would be unconstitutional if applied to the general public." Id.; see Connick v. Myers, 461 U.S. 138, 142 (1983) (quoting Pickering v. Board of Education, 391 U.S. 563, 568 (1968)) ("Our task, as we defined it in Pickering, is to seek 'a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.'") (alteration in original).

Here, because Plaintiffs are "public employees," they face a higher burden than an ordinary citizen to prove retaliation in

violation of the First Amendment.[16]  For the six Injunction Plaintiffs alleging retaliation to meet their burden: (1) "the speech at issue must relate to matters of public interest"; (2) "the employee's interest in First Amendment expression must outweigh the employer's interest in efficient operation of the workplace"; 3) "the employee must establish retaliation of some kind"; and (4) "the employee must establish a causal relationship between the protected expression and the retaliation." Goldstein v. Chestnut Ridge Volunteer Fire Co., 218 F.3d 337, 351-52 (4th Cir. 2000) (internal quotation marks and citations omitted).

As to the first prong of such test, which is the primary focus of Sheriff Watson's summary judgment motion, this Court previously concluded in its Injunction Opinion that, although a close call, based on the preliminary evidence, Injunction Plaintiffs' speech did involve a matter of public concern. ECF No. 37 at 33. Sheriff Watson has not provided supplemental evidence that would alter such finding, and thus, he has failed to demonstrate that summary judgment should be entered in his favor based on the classification of the disputed speech.

---

[16] The Supreme Court has held that there is not a "difference of constitutional magnitude between independent [government] contractors and [public] employees" in the context of First Amendment retaliation analysis. Board of County Comm'rs, Wabaunsee County, Kan. v. Umbehr, 518 U.S. 668, 684 (1996) (internal quotation marks and citations omitted).

As to the second prong of the Goldstein test, balancing the government vs. citizen interest, Sheriff Watson testified at the injunction hearing that he revoked the Injunction Plaintiffs' security clearances both: (1) to protect inmates that provided information against Injunction Plaintiffs; and (2) to ensure that nurses that had been found with contraband were not treated differently from other workers at the Jail.   Tr.  54-56. However, as highlighted by Injunction Plaintiffs in opposition to Sheriff Watson's summary judgment motion: (1) there is no evidence before the Court of a single tip from a known inmate implicating any of the Injunction Plaintiffs in wrongdoing; and (2) the Injunction Plaintiffs that were found with contraband on the day of the strip searches continued to work at the Jail for over a year without having their security clearances revoked. Sheriff Watson has thus failed to demonstrate that summary judgment should be entered in his favor based on the second prong of the Goldstein test.

The last two prongs of the Goldstein test, retaliation and causal relationship, are not expressly addressed in Sheriff Watson's summary judgment motion.   However, similar to the above, the Court's independent consideration of such final prongs supports denial of Sheriff Watson's motion.   Notably, the evidence viewed in Injunction Plaintiffs' favor suggests that they lost a valuable work opportunity and that there was an

apparent timing and causal relationship between the filing of the federal lawsuits and the loss of such benefit. Therefore, after considering all four prongs of the Goldstein test, the Court concludes that this issue should be resolved at trial because there are disputes as to genuine issues of material fact. Sheriff Watson's motion is therefore denied to the extent it seeks a ruling in his favor on the merits of the First Amendment claims seeking injunctive relief.

### b. First Amendment Claims Seeking Monetary Damages (Assertion of Qualified Immunity)

Although the Injunction Plaintiffs' amended complaints only expressly seek injunctive relief on their First Amendment retaliation claims, such claims do expressly request "any other relief this Court deems appropriate." ECF No. 14 ¶ 84. It is unclear whether such "other relief" includes a claim for monetary damages. The Court notes that Sheriff Watson's summary judgment brief does expressly assert that he is qualifiedly immune from suit on the Injunction Plaintiffs' First Amendment claims. Defs.' S.J. Brief 27-28, ECF No. 31. Such argument suggests that Sheriff Watson, presumably out of an abundance of caution, reads the amended complaints as seeking a money judgment on the First Amendment retaliation claims because, as repeatedly discussed herein, qualified immunity does not shield a defendant from claims that are limited to

injunctive relief. In an effort to fully address the immunity bar raised by Sheriff Watson, this Court assumes, without deciding, that Injunction Plaintiffs' First Amendment retaliation claims include a request for money damages.

At the time the instant lawsuit was filed, "[t]here is no doubt that the broad legal principle governing this case-that public employees may not be [retaliated against] on a basis that infringes on their First Amendment rights-was clearly established . . . ." Campbell v. Galloway, 483 F.3d 258, 271 (4th Cir. 2007). However, the same qualified immunity test that requires this Court to ask "whether a given right was clearly established requires [the Court] to define that right 'at a high level of particularity.'" Id. (quoting Edwards v. City of Goldsboro, 178 F.3d 231, 251 (4th Cir. 1999)) (emphasis added). Therefore, the appropriate threshold question in this case is whether a reasonable Sheriff would have known that each of the federal complaints, which were filed a year after the strip searches were conducted, and were phrased in a manner seeking personal relief, touched on a matter of public concern.

The difficulty in applying the four-part public employee speech test outlined in Goldstein is well-documented in the law. See McVey v. Stacy, 157 F.3d 271, 277 (4th Cir. 1998) (quoting DiMeglio v. Haines, 45 F.3d 790, 806 (4th Cir. 1995)) (indicating that "particularly in First Amendment cases, where a

sophisticated balancing of interests is required to determine whether the plaintiff's constitutional rights have been violated, 'only infrequently will it be "clearly established" that a public employee's speech on a matter of public concern is constitutionally protected'"). The Fourth Circuit explained the problematic nature of this inquiry in an unpublished case addressing public employee speech that was decided <u>the month before</u> the instant Plaintiffs were strip searched:

> [T]he language of the <u>Connick</u> test itself and the nuanced and careful approach the test requires lead to the conclusion that [a public] employee's right to speech in any particular situation will often not be immediately evident. The first prong of the test requires a determination of whether the employee's speech is on a "matter of public concern." This is a highly fact-intensive inquiry, which may be influenced by any variety of factors. Moreover, the line marking when something becomes a matter of public concern is blurry, and thus the boundary confining a public official's behavior is hard to discern. The second prong of the test may be even more problematic because it requires a balancing of the employee's and the employer's competing interests. This not only requires a keen understanding of the respective interests of each party, but also necessitates a conclusion as to which interests are more substantial. This conclusion, in turn, becomes an inherently subjective task, and it is the subjective nature of the inquiry—especially when an official must undertake it ex ante—that makes the inquiry problematic from a qualified immunity standpoint.

<u>Stickley v. Sutherly</u>, 416 Fed. Appx. 268, 272 (4th Cir. 2011) (unpublished). The above statements are "not meant to suggest that [a public] employee can never show that the employer violated his or her right to speech," such as in a situation

where it is "abundantly clear that the employee is speaking on a matter of public concern and the employer can show no demonstrable interest in silencing the employee . . . ." Id. at 272-73. However, when the facts "are close enough to the ill-defined line between private speech and speech involving matters of public concern," the public employer is shielded by qualified immunity, even if the Court ultimately concludes that the speech at issue involves matters of public concern. Campbell, 483 F.3d at 271-72; see Hunter v. Bryant, 502 U.S. 224, 229 (1991) (quoting Malley v. Briggs, 475 U.S. 335, 341, 343 (1986)) (noting that "[t]he qualified immunity standard 'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law'"); McVey, 157 F.3d at 277 (indicating that "[w]hen determining whether a reasonable officer would have been aware of a constitutional right, [the Fourth Circuit] do[es] not impose on the official a duty to sort out conflicting decisions or to resolve subtle or open issues").

Here, as this Court indicated in its July 24, 2012 Injunction Opinion, the preliminary evidence before the Court was sufficient to demonstrate that Injunction Plaintiffs' lawsuits satisfy the first prong of the Goldstein test as they address "a matter of public concern." ECF No. 37 at 33. However, the Court expressly labeled such conclusion "a close

32

question," which the Court carefully analyzed for more than fifteen pages of its Injunction Opinion. Id. at 17-33. The question was "close" because Injunction Plaintiffs' complaints had elements suggesting that each Plaintiff was merely seeking personal relief based on a personal grievance, as contrasted with a true "whistleblower" type complaint filed against a public figure. Specifically, each Plaintiff filed suit separately, alleged misconduct occurring on one day as contrasted with a broad unconstitutional practice, sought monetary damages for her own personal suffering, and further sought an injunction limited to protecting only the individual filing suit. Although multiple Injunction Plaintiffs testified at the injunction hearing that they filed suit so that improper invasive searches would not happen to anyone else, such information was not before Sheriff Watson when he revoked any of the Injunction Plaintiffs' security clearances. Therefore, because it is only after careful line drawing that this Court is able to conclude that Injunction Plaintiffs' speech qualifies as a matter of public concern, the Court finds that qualified immunity necessarily shields Sheriff Watson from monetary liability for the alleged violations of the six Injunction Plaintiffs' First Amendment rights. Campbell, 483 F.3d at 271-72.

Based on the above analysis, even if this Court assumes that Injunction Plaintiffs adequately allege a First Amendment retaliation claim seeking monetary damages, and further assumes that Sheriff Watson's revocation of the six Injunction Plaintiffs' security clearances was a violation of such Plaintiffs' First Amendment rights, it cannot be said that his actions were a violation of a "clearly established" constitutional right entitling Injunction Plaintiffs to monetary damages.[17] See Maciariello v. Sumner, 973 F.2d 295, 298 (4th Cir. 1992) (indicating that "[o]fficials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines"); see also Brooks v. Arthur, 685 F.3d 367, 371 (4th Cir. 2012) (quoting Connick, 461 U.S. at 146-47) (noting that even where a public employee is terminated in a manner that "'may not be fair' or is 'mistaken or unreasonable,'" summary judgment in favor of the public employer may nevertheless be appropriate). Accordingly, summary judgment is granted in favor of Sheriff Watson as to the Injunction Plaintiffs' First Amendment retaliation claims to the extent that such claims seek recovery of monetary damages.

---

[17] In Pearson, 555 U.S. at 236, the United States Supreme Court held that a district court may, in its discretion, skip the first prong of the qualified immunity test and move directly to consideration of the second prong—whether the constitutional right at issue is "clearly established."

### 3. State-law Claims
### (No Assertion of Qualified Immunity)

As to the remaining claims, Defendants' summary judgment motion does not seek entry of judgment based on any form of sovereign or qualified immunity. Rather, Defendants seek judgment based on the assertion that the undisputed facts support judgment, on the merits, in favor of Defendants. Similar to the preceding analysis, Defendants' summary judgment motion is granted in part, and denied in part, as to the merits of the Plaintiffs' state law claims.

#### a. False Imprisonment and Battery

Defendants seek entry of summary judgment on the merits of Plaintiffs' state law claims for false imprisonment and Plaintiff Vines' and Plaintiff Braswell's state law claim asserting a battery. Defendants assert that Plaintiffs cannot establish false imprisonment because such claim requires restraint without legal justification and the "undisputed facts reflect that Plaintiffs had knowledge of the Sheriff's search policy." Defs.' S.J. Brief 21, ECF No. 31. In essence, Defendants assert that there was legal justification for any restraint that occurred because Plaintiffs consented to the searches based on their knowledge of the Jail's general search policy. Plaintiffs, however, challenge such characterization of the undisputed facts, arguing that merely having a Jail policy

35

indicating that all persons are "subject to search" is a far cry from providing notice, or authorization, or consent, that would permit "visual body cavity" searches absent individualized suspicion. Plaintiffs further point to evidence indicating that, under Plaintiffs' version of the facts, Plaintiffs did not "consent" to remain in the room in which they were searched, but instead, felt compelled to do so based on the threat that they would lose their ability to perform their job and earn an income. ECF No. 34-1 through 34-9.

As to Plaintiff Yolanda Vines' battery claim, Plaintiff Vines fails to provide evidence to rebut Defendants' factual assertion that no physical contact occurred during her strip search. In fact, in a footnote to the Plaintiffs' consolidated brief in opposition to summary judgment, Plaintiff Vines notes that she is no longer pursuing such claim as she acknowledges that she was not physically touched during her strip search. Pls.' Opp'n to S.J. 25 n.4, ECF No. 34. Accordingly, this Court grants the unopposed motion for summary judgment as to Plaintiff Vines' battery claim.

As to Plaintiff Braswell's battery claim, which is asserted against Defendant Elizabeth Baker (hereafter "Deputy Baker"), Deputy Baker asserts in her summary judgment motion that, factually, Plaintiff Braswell was not touched during her strip search. In response, Plaintiff Braswell points to the

allegation in her affidavit indicating that, near the end of her search, Deputy Baker touched Plaintiff Braswell's head and moved her fingers through Plaintiff Braswell's wig.  ECF No. 34-7 ¶ 9. Deputy Baker's reply brief changes course, and for the first time asserts that she had sufficient legal justification to touch Plaintiff Braswell during her strip search.

Defendants' summary judgment motion is denied as to all Plaintiffs' false imprisonment claims and Plaintiff Braswell's battery claim.  The same factual disputes that precluded entry of summary judgment in favor of Defendants on Plaintiffs' Fourth Amendment unreasonable search claims preclude entry of summary judgment on the instant state-law claims.  Claims for battery and false imprisonment under Virginia law frequently rise and fall with the reasonableness of the arrest/search underlying such claims.  See Jackson v. Brickey, 771 F. Supp. 2d 593, 604- 05 (W.D. Va. 2011) (citing Jordan v. Shands, 255 Va. 492, 497 (1998)) (indicating that false imprisonment under Virginia law requires a restraint of physical liberty without legal justification, and then rejecting the defendant's request to dismiss the state law false imprisonment claim "for the same reasons that [the court] rejected at th[at] stage, [the officer's] qualified immunity defense" on the plaintiff's § 1983 claim); Ware, 652 F. Supp. 2d at 712 (citing Koffman v. Garnett, 265 Va. 12, 16 (2003)) (indicating that an "assault or battery

claim can be defeated by a legal justification for the act" and that "Virginia law recognizes that police officers are legally justified in using reasonable force to execute their lawful duties"); see also Figg v. Schroeder, 312 F.3d 625, 642 (4th Cir. 2002) (citing W.T. Grant Co. v. Owens, 149 Va. 906, 921-22 (1928)) (indicating that, under Virginia law, if a plaintiff demonstrates that she was detained "it is for the defendant to proffer an adequate legal justification warranting that detention").

Here, if Defendants lacked a legal justification to require Plaintiffs to submit to a "visual body cavity" search or a "standard strip search," whichever is determined to have occurred, then Plaintiffs may be successful on their false imprisonment claims.  As disputed material facts must be resolved to determine the propriety of Defendants' actions, the Court denies Defendants' motion for summary judgment on Plaintiffs' false imprisonment claims.  See Anderson, 477 U.S. at 255 (acknowledging a district court's discretion to deny summary judgment "where there is reason to believe that the better course would be to proceed to a full trial").

Similarly, the Court denies Deputy Baker's summary judgment motion on Plaintiff Braswell's battery claim.  Deputy Baker's summary judgment motion and brief in support are limited to arguing that, factually, Plaintiff Braswell was not touched

during her strip search. Plaintiff Braswell effectively rebuts such assertion by pointing to her affidavit in which she expressly alleges that she was physically touched on the head at the end of the strip search when Deputy Baker ran her hands through Plaintiff Braswell's wig. ECF No. 34-7 ¶ 9. Deputy Baker then attempts to advance a new <u>legal</u> argument for the first time in her reply brief, contending that such touching was authorized because wigs, like other outer garments, are subject to search during a "standard strip search." The Court rejects such late advanced legal argument both because it was tardy, and because the propriety of the alleged touching is subsumed within the factual dispute as to whether any of the Defendants were justified in performing the strip searches.[18] See <u>Touchcom, Inc. v. Bereskin & Parr</u>, 790 F. Supp. 2d 435, 446 (E.D. Va. 2011) (indicating that, "[t]ypically, courts will not consider an argument raised for the first time in a reply brief" as the "opposing party is prejudiced in its ability to respond to the argument") (citation omitted); see also <u>Anderson</u>, 477 U.S. at 255.

---

[18] It is unclear at this time whether Plaintiff Braswell was fully clothed at the time she was touched, ECF No. 34-7 ¶ 9, nor is it clear whether she was given the option of removing her wig to permit a closer inspection which would have avoided a touching. Accordingly, a final ruling on the purported justification for such touching will not be made until the relevant facts are fully developed at trial, Defendants renew such motion, and both parties are afforded the opportunity to argue the law relevant to such issue.

### b. **Common Law Conspiracy**

Defendants also seek entry of summary judgment on the merits of Plaintiffs' state "common law civil conspiracy" claims alleging that Defendants conspired to unlawfully search Plaintiffs. In their summary judgment motion, Defendants argue that the intracorporate immunity doctrine bars such claims. Plaintiffs respond by invoking a purported "criminal acts" exception to the intracorporate immunity doctrine. As discussed below, Plaintiffs fail to demonstrate the existence of such exception, and summary judgment is therefore granted in favor of Defendants based on the application of the intracorporate immunity doctrine.

In Virginia, "'[a] common law conspiracy consists of <u>two or more persons</u> combined to accomplish, by some concerted action, some criminal or unlawful purpose or some lawful purpose by a criminal or unlawful means.'" <u>T.G. Slater & Son, Inc. v. Donald P. and Patricia A. Brennan LLC</u>, 385 F.3d 836, 845 (4th Cir. 2004) (quoting <u>Commercial Bus. Sys., Inc. v. BellSouth Servs., Inc.</u>, 249 Va. 39, 48 (1995)) (emphasis added). However, the "intracorporate immunity doctrine," which has been adopted by the Virginia Supreme Court and the Fourth Circuit, deems multiple defendants a single entity for the purpose of analyzing a civil conspiracy claim if such defendants are employees or agents of the same entity and are acting <u>within the scope</u> of

their employment/agency.  Fox v. Deese, 234 Va. 412, 428 (1987);

Greenville Publishing Co., Inc. v. Daily Reflector, Inc., 496

F.2d 391, 399 (4th Cir. 1974).  In other words, a single entity,

"[b]y definition . . . cannot conspire with itself."  Fox, 234

Va. at 428; see Perk v. Vector Resources Group, Ltd., 253 Va.

310, 317 (1997) (adopting the defendants' contention that "a

principal-agent or an employer-employee relationship existed

between the several Defendants" and thus, "a conspiracy among

the Defendants was legally impossible"); Lewin v. Cooke, 95 F.

Supp. 2d 513, 524 (E.D. Va. 2000) (explaining that "because a

corporation and its agents comprise a single legal entity, they

are legally incapable of conspiracy").[19]

---

[19] There is one recognized exception to the intracorporate immunity
doctrine as applied by the Fourth Circuit, which provides that a
conspiracy can exist when an officer or agent of a single entity acts
in pursuit of "a personal stake independent of his relationship to the
corporation." ePlus Technology, Inc. v. Aboud, 313 F.3d 166, 179 (4th
Cir. 2002).  It appears, however, that such exception has not been
adopted by Virginia courts.  See Foster v. Wintergreen Real Estate
Co., 81 Va. Cir. 353, 361 (Va. Cir. Ct. 2010, Nelson Cnty.) (declining
to apply such exception because "[e]ven though the personal stake
exception was announced by the Fourth Circuit Court of Appeals in
1974, it has not been adopted in Virginia").  Although not an
exception, per se, Virginia courts do, however, conduct a similar
analysis in order to determine whether the employee's challenged acts
were "within the scope of their employment," as only then, can it be
said that a single legal entity exists.  Fox, 234 Va. at 428; see
Softwise, Inc. v. Goodrich, 63 Va. Cir. 576, 578-79 (Va. Cir. Ct.
2004, Roanoke City) (rejecting the application of the "personal stake
exception" and noting that "[i]ntracorporate immunity therefore turns
on whether the employee accused of conspiracy was acting in the scope
of her employment when the challenged conduct occurred").  Even if
this Court assumes that Fourth Circuit law mandates that the personal
stake exception is legally applicable in this case, the instant facts
clearly demonstrate that such exception is not factually applicable as

Here, the Deputy Sheriffs' challenged acts (conducting the strip searches in April 2011) occurred at their regular place of employment, during their regular working hours, at the direction of their superior (the Sheriff), and were directly related to their employment duty to help oversee the Jail and ensure that improper, and sometimes dangerous, contraband did not find its way into inmates' hands.   Accordingly, the undisputed evidence demonstrates both that Defendants have properly invoked the intracorporate immunity doctrine and that even if this Court assumes the existence of a narrow "personal stake" exception, as discussed herein in footnote 19, such exception is simply not applicable based on the facts of this case.

Notwithstanding the Defendants' well-supported invocation of the longstanding intracorporate immunity doctrine, Plaintiffs ask this Court to adopt a "criminal acts" exception that would bar applicability of such doctrine to this case.   Plaintiffs' limited argument on such point is that the intracorporate immunity doctrine "is ignored when the underlying conduct that forms the basis of the conspiracy could be criminal in nature." Pls.' Opp'n to S.J. 25-26, ECF No. 34.   However, Plaintiffs fail to cite a single Virginia case, nor any federal civil case applying Virginia law that would support adopting such an

---

there is no evidence that any of the Defendants acted based on a "personal stake."

exception.[20]   This Court's independent research likewise failed to uncover any Virginia case, or any federal civil case from within the Fourth Circuit, that recognizes a "criminal acts" exception to the intracorporate conspiracy doctrine.   See Am. Chiropractic Ass'n v. Trigon Healthcare, Inc., 367 F.3d 212, 224 (4th Cir. 2004) (describing the independent personal stake exception as the "one narrow exception" to the intracorporate immunity doctrine).   The absence of a "criminal acts" exception in civil cases governed by Virginia law is sensible because a common law conspiracy under Virginia law requires proof that two or more persons either conspired to accomplish a "criminal purpose" or a lawful purpose by "criminal means."   Thus, if a

---

[20]   It appears well-established that the intracorporate immunity doctrine is not a shield to a criminal prosecution in federal court for conspiracy to commit a federal crime.   United States v. Pryba, 674 F. Supp. 1504, 1511 (E.D. Va. 1987); see United States v. Ames Sintering Co., 927 F.2d 232, 237 (6th Cir. 1990) (holding that a corporation can be criminally convicted for conspiring with its officers).   However, such fact fails to demonstrate the existence of a similar exception in civil cases.   Plaintiffs do cite one civil case, from the Eleventh Circuit, which held that the intracorporate immunity doctrine does not apply to civil claims alleging a criminal conspiracy. McAndrew v. Lockheed Martin Corp., 206 F.3d 1031, 1041 (11th Cir. 2000) (en banc).   The court in McAndrew, however, was clear that it was only addressing whether a criminal conspiracy exception applied to civil claims arising under 42 U.S.C. § 1985(2), which governs intimidation of parties, witnesses, or jurors in a federal proceeding.   Id. at 1040-41.   The narrowness of the Eleventh Circuit's opinion in McAndrew is best demonstrated by such court's acknowledgement in that same opinion that the criminal conspiracy exception does not extend to civil claims arising under 42 U.S.C. § 1985(3), the very next subsection of the same statute at issue in McAndrew.   Id. at 1037-38.   Here, Plaintiffs allege a common law civil conspiracy under Virginia law, and the Eleventh Circuit's opinion is neither controlling, nor persuasive in light of Virginia and Fourth Circuit case law.

plaintiff could defeat the intracorporate immunity doctrine merely by alleging acts that "could be criminal in nature," the exception would wholly swallow the rule.

For the reasons discussed above, the Court rejects Plaintiffs' invitation to recognize a "criminal acts" exception to the application of the intracorporate immunity doctrine as it applies to a Virginia common law civil conspiracy claim. Plaintiffs have failed to identify the existence of such exception within Virginia law, or within any federal decision from the Fourth Circuit. Plaintiffs have also failed to identify a compelling rationale for this Court to conclude that the Supreme Court of Virginia would recognize such exception if presented with similar facts.[21] Accordingly, Defendants' summary judgment motion is granted as to Plaintiffs' civil conspiracy

---

[21] Plaintiffs argue, in a footnote to their brief, that the intracorporate immunity doctrine should also not apply because Defendants' purportedly illegal acts were not "authorized acts," and thus fall outside of their normal employment duties. Such argument is rejected for the same reasons discussed above as there is simply no evidence before the Court on which a reasonable jury could conclude that Defendants' actions were outside the scope of their employment duties. See Sayles v. Piccadilly Cafeterias, Inc., 242 Va. 328, 332 (1991) (quoting Tri-State Coach Corp. v. Walsh, 188 Va. 299, 307 (1948)) (discussing the long-established rule that acts "fairly and naturally incident" to the employer's business that are done to further the employer's interests are within the scope of employment even if they are mistaken or ill-advised, as long the acts did not arise wholly from external or independent motives); see also United States v. Domestic Indus., Inc., 32 F. Supp. 2d 855, 861 (E.D. Va. 1999) (quoting Demartinez v. Drug Enforcement Admin., 111 F.3d 1148, 1156 (4th Cir. 1997)) ("Both the Fourth Circuit and the state courts of Virginia take a 'fairly broad view of the scope of employment.'").

claims based on the application of the intracorporate immunity doctrine.

## IV. CONCLUSION

As discussed in detail above, Defendants' summary judgment motion is **GRANTED** in part, and **DENIED**, in part.

Defendants' motion is **GRANTED** as to all official capacity claims seeking monetary damages because, as Plaintiffs appear to concede, Defendants are entitled to Eleventh Amendment immunity on such claims. Defendants' motion is **DENIED** as to the official capacity claims seeking prospective injunctive relief as, even though Eleventh Amendment immunity does not apply, material factual disputes exist with respect to such claims.

Defendants' motion is **DENIED** as to the individual capacity Section 1983 money damages claims alleging a Fourth Amendment violation because, even though Eleventh Amendment immunity does not apply, material factual disputes preclude both the resolution of Defendants' assertion of qualified immunity, and the ultimate merits of such claims.

Defendants' motion is **DENIED** as to the individual capacity Section 1983 claims seeking prospective injunctive relief for alleged Fourth Amendment violations because, even though Eleventh Amendment immunity and qualified immunity do not apply, material factual disputes exist with respect to such claims.

Defendants' motion is **GRANTED** to the extent Injunction Plaintiffs advance individual capacity Section 1983 claims seeking monetary damages for alleged First Amendment violations because even if Sheriff Watson committed one or more constitutional violations, he is shielded by qualified immunity because the controlling law was not "clearly established."

Defendants' motion is **DENIED** as to the individual capacity Section 1983 claims seeking prospective injunctive relief for alleged First Amendment violations because, even though Eleventh Amendment immunity and qualified immunity do not apply, material factual disputes exist with respect to such claims.

Defendants' motion is **DENIED** as to Plaintiffs' state-law claims for false imprisonment because such claims turn on the same disputed facts as the Section 1983 Fourth Amendment claims.

Defendants' motion is **GRANTED** as to Plaintiff Vines' battery claim, which is conceded by Plaintiff Vines. Defendants' motion is **DENIED** as to Plaintiff Braswell's battery claim because such claim turns on disputed facts.

Defendants' motion is **GRANTED** as to Plaintiffs' common law civil conspiracy claims because Defendants demonstrate that they are shielded by the intracorporate immunity doctrine.

Summarizing the above,[22] Defendants' summary judgment motion is GRANTED, in part, and DENIED, in part. Summary Judgment is GRANTED as to all official capacity claims seeking money damages, and is DENIED as to all official capacity claims seeking injunctive relief. Summary Judgment is GRANTED as to the individual capacity Section 1983 First Amendment claims to the extent they seek money damages, and is DENIED as to the remaining individual capacity Section 1983 claims. Summary Judgment is GRANTED as to Plaintiff Vines' battery claim, and is DENIED as to Plaintiff Braswell's battery claim. Summary Judgment is DENIED as to all Plaintiffs' False Imprisonment claims. Summary Judgment is GRANTED as to all Plaintiffs' civil conspiracy claims.

Based on the rulings above, the following claims survive Defendants' summary judgment motion and remain outstanding for resolution at trial: (1) Plaintiffs' Section 1983 official capacity and individual capacity claims seeking injunctive relief for alleged violations of their Fourth Amendment right to be free from unreasonable searches and First Amendment right to be free from retaliation for the exercise of their free speech rights; (2) Plaintiffs' Section 1983 individual capacity claims

---

[22] The Court's summary is included herein to allow for a clearer docket entry in this consolidated case. The Court notes that it does not reference individual count numbers in such summary to avoid confusion as several of the complaints include a scrivener's error in the numbering of the counts.

seeking monetary damages for alleged violations of their Fourth Amendment right to be free from unreasonable searches; (3) Plaintiffs' state-law claims seeking monetary damages against Defendants, individually, for false imprisonment; and (4) Plaintiff Braswell's state-law claim seeking monetary damages for battery against Sheriff's Deputy Elizabeth Baker, individually.

The Clerk is **REQUESTED** to send a copy of this Opinion and Order to all counsel of record.

It is so **ORDERED**.

/s/ Mark S. Davis
Mark S. Davis
UNITED STATES DISTRICT JUDGE

Norfolk, Virginia
April 1 , 2013