**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Norfolk Division**



FILED

MAY 2 4 2013

CLERK, U.S. DISTRICT COURT
NORFOLK, VA

NAN VOLLETTE, et al.,

            Plaintiffs,

v.                                     Civil Action No. 2:12cv231

BILL WATSON, et al.,

            Defendants.

## OPINION and ORDER

On April 21, 2011, Bill Watson, the elected Sheriff in
Portsmouth, Virginia ("Sheriff Watson"), ordered his deputies to
conduct strip searches of all civilian contractors that entered
the Portsmouth City Jail (the "Jail") the following day.
Sheriff Watson issued such blanket order based on information he
had received indicating that contractors were bringing
contraband into the Jail.   On April 22, 2011, all nine
Plaintiffs were among those contractors that underwent strip
searches.   One year later, Plaintiffs filed suit against Sheriff
Watson and his deputies in this Court, alleging that the strip
searches violated the constitutional prohibition on unreasonable
searches.   The next business day after suit was filed, Sheriff
Watson issued a second blanket order, this time revoking the
Jail security clearances of the six Plaintiffs that were still

working as contractors at the Jail.  A jury having decided the constitutionality of the strip searches, this Opinion addresses whether Sheriff Watson's revocation of the six Plaintiffs' security clearances was unconstitutional retaliation in violation of the First Amendment.  The Court concludes that it was.

## I. Introduction

This matter is before the Court following severance of the Section 1983 Fourth Amendment unreasonable search claims that were advanced by all nine Plaintiffs from the Section 1983 First Amendment retaliation claims that were advanced by six of these Plaintiffs.[1]  The six Plaintiffs alleging First Amendment retaliation (collectively "Injunction Plaintiffs")[2] seek permanent injunctive relief akin to "reinstatement" of a discharged employee.  As summarized below, the nine Plaintiffs' Fourth Amendment claims were based on Plaintiffs' assertions

---

[1] Defendants' severance motion was unopposed because the only viable type of relief on the First Amendment retaliation claims was equitable relief in the form of a permanent injunction.  Furthermore, the factual predicate for such retaliation claim was largely separate from the facts underlying the Fourth Amendment claims and associated state law claims to be tried by the jury.  The Court also notes that the Fourth Amendment unreasonable search protections, and the First Amendment free speech and right to petition protections, are made applicable to state actors such as Sheriff Watson by the Fourteenth Amendment.  Vollette v. Watson, 2:12cv231, 2012 WL 3026360, at *4 n.6 (E.D. Va. July 24, 2012) (unpublished).

[2] The following six individuals are the "Injunction Plaintiffs": Nan Vollette, Angelene Coleman, Yolanda Vines, HaShena Hockaday, Verita Braswell, and Emma Floyd-Sharp.

that they were wrongfully strip searched by Defendants in April of 2011. Such claims were tried before a jury, and at the conclusion of the trial, the jury returned a verdict in Defendants' favor. While the jury was deliberating, the Court conducted a separate bench trial on the severed First Amendment claims advanced by the Injunction Plaintiffs, who asserted that the filing of the instant lawsuit[3] resulted in unconstitutional retaliation in the workplace. At the conclusion of the bench trial, the Court ruled in favor of the six Injunction Plaintiffs on their First Amendment retaliation claims, and ordered that Sheriff Watson reinstate Injunction Plaintiffs' security clearances and update any relevant internal Jail records to reflect such reinstatement. Set forth below, the Court summarizes the procedural background of the case, including the jury trial and verdict, and then sets forth, in greater detail than recited on the record at the conclusion of the bench trial, the Court's findings of fact and conclusions of law as to the First Amendment claims.

## II. Factual and Procedural Background – Jury Trial

Each of the nine Plaintiffs in this case was previously an employee of a contractor providing services at the Portsmouth

---

[3] The instant lawsuit was initially filed as nine separate suits; however, for administrative ease, and with agreement of counsel, all nine separately filed civil cases were then consolidated into case number 2:12cv231. ECF No. 17.

Jail, which is overseen by defendant Sheriff Watson.[4] As employees of jail contractors, the Plaintiffs regularly worked in the Jail, but were directly employed by either "Aramark" (a food services company) or "Correct Care Solutions" (a medical services company).

Pursuant to written Jail policy, all employees and contractor workers are subject to "search" at any time.[5] According to trial testimony, contraband is a known problem at the Jail, and there was a list of prohibited items posted at the Jail that included weapons and illegal drugs, as well as everyday items such as cell phones, matches, etc. Several, but not all, of the Plaintiffs also signed a "Security Orientation" form prior to the strip searches, and such forms both list prohibited "contraband" items and expressly state that the worker signing such form is subject to "search" at any time.

_____

[4] Numerous Sheriff's Deputies that work under Sheriff Watson's supervision were also sued by Plaintiffs. However, the majority of the Deputies were voluntarily dismissed by Plaintiffs before the unreasonable search case was submitted to the jury. After such dismissal, the following three defendants remained in the jury case: Sheriff Watson, Master Deputy Elizabeth Baker (who strip searched eight Plaintiffs), and Deputy Candice Mabry (who strip searched one Plaintiff). As to the First Amendment retaliation claim that was tried before the Court, Sheriff Watson was the only named Defendant.

[5] There also may have been a sign posted on the door to the secure area of the Jail at the time of the challenged strip searches that stated that anyone entering the Jail's secure area is subject to "search." However, regardless of when such sign was posted, it appears from the trial testimony that all Plaintiffs knew they were subject to "search" at any time, but disputed whether they understood that to include a strip search.

4

According to the testimony at the jury trial, as of April 2011, Sheriff Watson and his internal affairs division had received numerous tips implicating contract workers in bringing contraband into the Jail. Almost all of such tips were received from anonymous informants. Sheriff Watson and various Sheriff's Deputies testified at the jury trial that on April 22, 2011, as a result of receiving the tips, all nine Plaintiffs, and two other contractors, were subjected to a strip search at the Portsmouth Jail. Although the parties disagreed as to whether the Plaintiffs were subjected to a "standard strip search," or a strip search that included a "visual body cavity search," the jury returned a special verdict concluding that all Plaintiffs were subjected to a "standard strip search."

During trial, defense counsel argued vigorously to the Court, outside of the presence of the jury, that the heightened security concerns at the Jail permit the Sheriff and his Deputies to conduct standard strip searches of Jail employees and contractors <u>without any degree</u> of articulable suspicion. Alternatively, defense counsel argued that even if the law requires that a strip search be based on reasonable articulable suspicion, there were not any constitutional violations in this case because the Plaintiffs all consented to be strip searched. Such purported consent was based on: (1) Plaintiffs' knowledge of the Jail's general search policies and signing of the

orientation form; and/or (2) the asserted fact that, on April 22, 2011, after being informed that all contractors were being strip searched, each Plaintiff voluntarily decided to submit to a strip search.

The Court rejected Defendants' assertion that they should be able to conduct standard strip searches of Jail employees and contractors without any degree of articulable suspicion,[6] and concluded that intrusive strip searches of Jail employees or contractors can only be performed based on "reasonable suspicion." That is, Jail authorities must possess an individualized and particularized articulable justification for believing that the individual to be strip searched was bringing contraband into the Jail. Leverette v. Bell, 247 F.3d 160, 168 (4th Cir. 2001). It is undisputed that such legal standard applies to "visual body cavity searches."[7] Id. This Court had little difficulty in concluding that the same legal standard also applies to a "standard strip search" that requires the

---

[6] Defendants relied primarily on the Supreme Court's recent decision in Florence v. Board of Chosen Freeholders of Cnty. of Burlington, 132 S. Ct. 1510 (2012), in support of such argument. The comparison to Florence, however, is inapposite as Florence analyzes the legal standard governing strip searches of jail detainees that have been arrested on suspicion of criminal activity, not the standard governing strip searches of correctional employees and contractors.

[7] The Fourth Circuit defined "visual body cavity search" in Leverette as a search that requires "the searched individual to expose her anal and vaginal cavities for visual inspection." Leverette, 247 F.3d at 166 n.3. The jury in this case was provided the same definition. Jury Instr. 26, ECF No. 97.

employee/contractor to remove each and every article of clothing and, while completely naked, face away from the person performing the search and "squat and cough" in order to expel any contraband hidden in body cavities.[8] See Braun v. Maynard, 652 F.3d 557, 558, 564 (4th Cir. 2011) (indicating that "intrusive prison employee searches require reasonable suspicion" and that strip searches "plainly are a demeaning form of treatment" which "should not be visited casually by an institution upon its own employees").[9]

---

[8] A "standard strip search" was defined in Leverette as a search "requiring the subject to disrobe, squat, and cough." Leverette, 247 F.3d at 165. The jury in this case was provided the same definition. Jury Instr. 25, ECF No. 97.

[9] The Fourth Circuit in Leverette adopted a "reasonable suspicion" standard for "visual body cavity searches," explaining that a "prison employee . . . does not forfeit all privacy rights when she accepts employment" at a prison. Leverette, 247 F.3d at 167-68. The Fourth Circuit went on to "emphasize that reasonable suspicion is the minimum requirement, and . . . that the more personal and invasive the search activities of the authorities become, the more particularized and individualized the articulated supporting information must be." Id. at 168. In adopting such standard, the Fourth Circuit drew support from "sister circuits' decisions applying the reasonable suspicion standard to searches of prison visitors," id. at 168, including Hunter v. Auger, 672 F.2d 668, 675 (8th Cir. 1982), Spear v. Sowders, 71 F.3d 626, 630 (6th Cir. 1995), Blackburn v. Snow, 771 F.2d 556, 562 (1st Cir. 1985) and Thorne v. Jones, 765 F.2d 1270, 1276 (5th Cir. 1985). In Hunter v. Auger, the Eighth Circuit first explained that determining whether a search is reasonable under the Fourth Amendment "requires that legitimate governmental interests in carrying out the search be balanced against the intrusion on personal rights that the search entails." Hunter, 672 F.2d at 673-74 (citing Delaware v. Prouse, 440 U.S. 648, at 654 (1979)). The court then catalogued the special dangers inherent in a prison environment, but also observed that while "the preservation of security and order within the prison is unquestionably a weighty state interest, prison officials are not unlimited in ferreting out contraband." Id. at 674. Notably, "one's anatomy is draped with constitutional protection," and "the state's interest must be balanced against the significant invasion of privacy

Although it was not necessary to resort to case law from outside of the Fourth Circuit to determine the proper legal standard, id. at 558, consideration of out of circuit cases that have squarely addressed the same issue further support this Court's holding, see Security and Law Enforcement Emps., Dist. Council 82, Am. Fed'n of State, Cnty. and Mun. Emps., AFL-CIO by Clay v. Carey, 737 F.2d 187, 204 (2d. Cir 1984); McDonell v. Hunter, 809 F.2d 1302, 1306 (8th Cir. 1987); see also Kirkpatrick v. City of Los Angeles, 803 F.2d 485, 487 (9th Cir. 1986) (applying reasonable suspicion standard to strip searches of police officers).

---

occasioned by a strip search," which is "an embarrassing and humiliating experience" even when conducted in a professional manner. Id. After "weighing the interest of correctional officials in preserving institutional security against the extensive intrusion on personal privacy resulting from a strip search," the Eighth Circuit adopted "reasonable suspicion" as the objective standard applicable to strip searches of prison visitors. Id.

In addition to Leverette and Hunter, the Fourth Circuit recently revisited this issue in Braun v. Maynard, where it concluded that "intrusive prison employee searches require reasonable suspicion." Braun, 652 F.3d at 558. Braun involved intrusive searches of correctional employees and contractors that were described as partial or full strip searches, with one employee claiming he underwent a "visual body cavity search." The Fourth Circuit applied Leverette's reasonable suspicion standard to all of the searches at issue in Braun regardless of the precise description of the type of intrusive strip search alleged by the various plaintiffs. Id. at 563-64. Although no compensable Fourth Amendment violations occurred in Braun, the Fourth Circuit did hold that, as of 2008, it was "clearly established" that intrusive searches of prison employees and contractors require "reasonable suspicion." Id. at 558. The Braun opinion concluded by acknowledging that strip searches are demeaning and recommended that before prison authorities subject their own workers to such treatment, they consider intermediate measures to detect and deter contraband. Id. at 564.

While the Court rejected Defendants' assertion that suspicionless strip searches of jail employees and contractors are constitutionally permissible, the Court agreed with defense counsel that the jury should be instructed on "consent." As indicated above, there was evidence adduced at trial by Defendants that Plaintiffs generally consented to being "searched" at any time, and specifically consented to being "strip searched" immediately before they underwent such searches on April 22, 2011. In light of Plaintiffs' contention that any such purported consent was involuntary because Plaintiffs' continued contract employment at the Jail was conditioned upon submitting to the allegedly unconstitutional searches, the Court also instructed the jury that consent is not voluntary when a public employer conditions continued public employment, or continued public contract work, on the waiver of a right protected by the United States Constitution ("the Constitution"). Jury Instr. 32, ECF No. 97; see Lefkowitz v. Turley, 414 U.S. 70, 82-83 (1973); Johnson v. Branch, 364 F.2d 177, 180 (4th Cir. 1966).

After being instructed on "reasonable suspicion," Jury Instr. 21, ECF No. 97, the asserted defense of "consent," Jury Instr. 31, ECF No. 97, and the involuntariness of "consent" if the threatened loss of public employment is used to coerce an employee or contractor, Jury Instr. 32, ECF No. 97, the jury

concluded that Defendants had reasonable suspicion sufficient to justify strip searches for seven of the nine Plaintiffs, but did not have reasonable suspicion as to two of the nine Plaintiffs. The jury further concluded that all nine Plaintiffs voluntarily consented to be strip searched. Based on such findings, as well as the defense verdicts on the associated state law claims, damages were not awarded by the jury as to any of the Plaintiffs. The Court accepted and entered the jury's unanimous findings.

### III. Findings of Fact – Bench Trial

As summarized above, the Court separately conducted a bench trial to address the six Injunction Plaintiffs' claims that Sheriff Watson retaliated against them by revoking their security clearances when they filed this lawsuit, in violation of the First Amendment to the Constitution. The Court's findings of fact are set forth immediately below.[10]

On April 27, 2012, approximately one year after the April 22, 2011 strip searches were performed, each of the nine Plaintiffs in this consolidated set of cases filed a separate federal complaint in a separately numbered civil case. Each of the suits initially advanced a Section 1983 Fourth Amendment

---

[10] Although reiterated herein, the Court has previously complied with Federal Rule of Civil Procedure 60(b) by stating its findings of fact and conclusions of law on the record at the conclusion of the bench trial.

unconstitutional search claim and associated state law claims.[11]
The complaints were filed on Friday, April 27, 2012. On Monday,
April 30, 2012, Sheriff Watson revoked the Jail security
clearances of the six Plaintiffs who were still working at the
Jail. Those six Plaintiffs, identified above as "Injunction
Plaintiffs," then amended their complaints to add a Section 1983
claim asserting that the revocation of their security clearances
was in retaliation for filing this lawsuit and was therefore a
violation of their First Amendment rights to free speech and to
petition for redress of grievances. The Injunction Plaintiffs'
newly added claim sought preliminary and permanent injunctive
relief to include reinstatement of their security clearances.[12]

---

[11] Section 1983 provides that "[e]very person who, under color of any
statute, ordinance, regulation, custom, or usage, of any State . . .
subjects . . . any citizen of the United States . . . to the
deprivation of any rights, privileges, or immunities secured by the
Constitution and laws, shall be liable to the party injured in an
action at law, suit in equity, or other proper proceeding for redress
. . . ." 42 U.S.C. § 1983. Section 1983, "is not 'a source of
substantive rights, but a method for vindicating federal rights
elsewhere conferred by those parts of the United States Constitution
and federal statutes that it describes.'" Lambert v. Williams, 223
F.3d 257, 260 (4th Cir. 2000) (quoting Baker v. McCollan, 443 U.S.
137, 144 (1979)).

[12] All of the Injunction Plaintiffs' amended complaints failed to
expressly request money damages as compensation for the alleged First
Amendment retaliation. However, to the extent that the amended
complaints could be read as seeking money damages for the claimed
retaliation, the Court ruled in its summary judgment opinion that
Sheriff Watson was immune from suit on such claims because it was not
"clearly established" that his actions would have violated the
Constitution based on the circumstances of this case as the Court
understood such facts at the summary judgment stage. Vollette v.
Watson, --F. Supp. 2d.--, 2013 WL 1314152, at *11-13 (E.D. Va. April
1, 2013), available at ECF No. 71, at 29-34.

After conducting an evidentiary hearing on May 16, 2012, this Court denied the request for an immediate preliminary injunction for the reasons set forth in the Injunction Opinion issued on July 24, 2012. Vollette v. Watson, 2:12cv231, 2012 WL 3026360 (E.D. Va. July 24, 2012) (unpublished), available at ECF No. 37. The Court revisited the issue of whether an injunction should issue at the conclusion of the bench trial.

At the bench trial, the Court heard testimony from all six Injunction Plaintiffs, as well as Sheriff Watson. The trial testimony demonstrated that the Injunction Plaintiffs initially filed suit both to: (1) seek redress for the harm they personally suffered from what they believed to be unconstitutional strip searches; and (2) to make sure that Sheriff Watson never again ordered such demeaning strip searches of his own employees or contractors without possessing the constitutionally required individualized reasonable suspicion. Stated simply, a substantial factor that motivated many of the Injunction Plaintiffs to file suit was to ensure that the events, as they alleged them, never happened again, to anyone. The Court therefore finds that, while the Injunction Plaintiffs were concerned about their own self-interest, they were also clearly concerned that others would be subjected to the same demeaning, and purportedly unconstitutional, strip searches. The form of the speech was public, both through a federally

12

filed lawsuit and Injunction Plaintiffs' contact with the media.[13] The content of Injunction Plaintiffs' speech alleges the widespread implementation of the type of physically intrusive search that, if constitutionally unfounded, could significantly impact the public's viewpoint regarding the elected Sheriff's judgment and the exercise of his broad powers.

Considering the facts relevant to the Sheriff's interest in maintaining the Portsmouth Jail in a safe and efficient manner, the Court finds that the Portsmouth Sheriffs' Office is a paramilitary organization with unique security concerns. The Court recognizes the undisputed fact that working in, and overseeing, a Jail involves very real dangers that exist on a daily basis. Any sheriff overseeing such a facility therefore

---

[13] It remains unclear from the trial testimony the exact timeline as to when Sheriff Watson first knew about Plaintiffs' lawsuits and when the media first publicly disseminated information about such suits. Defense counsel's theory was both that Plaintiffs affirmatively contacted the media, and that the media coverage was one of the factors the Sheriff considered in revoking Plaintiffs' security clearances. Injunction Plaintiffs denied reaching out to the media, but several testified that they responded to media inquiries. Regardless of whether Injunction Plaintiffs affirmatively contacted the media, or whether they merely responded to media inquiries once suit was filed, the fact that at least some of the Injunction Plaintiffs freely told their story to the media lends further credence to their testimony, suggesting that such Plaintiffs wanted the public to know that the elected Sheriff was purportedly taking brash actions in violation of the Constitution. Efforts to convey this message to the public further supports the "public" nature of the speech at issue, as contrasted with an internal workplace grievance about conditions of employment. See infra pp. 17-33.

has immense responsibility on his shoulders that should not be discounted.[14]

The Sheriff's testimony at the bench trial revealed that his memory is not entirely clear regarding what evidence motivated the strip searches in 2011, and what evidence motivated the revocation of security clearances in 2012. Based on such limited memory, and lack of any written documentation from 2012, there is limited, if any, objective justification for revoking the security clearances in 2012.[15]

In contrast to the above, Sheriff Watson more clearly recalled at the bench trial that the filings of the federal lawsuits themselves were a substantial factor, if not the factor, in his decision to revoke Injunction Plaintiffs' security clearances. When questioned on such topic, Sheriff Watson revealed that he lost confidence in the Injunction Plaintiffs because they had continued working at the Jail for a

---

[14] That said, as discussed below, the need to maintain security in such a setting cannot be a universal and unassailable answer to every allegation that there has been a violation of an individual's Constitutional rights.

[15] At the bench trial, Injunction Plaintiffs testified that they are not aware of any tip from an identified inmate (i.e. not an anonymous tip) that implicated them in any improper conduct at the Jail. Sheriff Watson was also not able to identify any inmate that purportedly provided information on any of the Injunction Plaintiffs, and again testified with broad strokes based on his lack of memory. Accordingly, the Sheriff was unable to support with facts his prior testimony at the preliminary injunction hearing that inmates were at risk of retaliation from one or more Injunction Plaintiff nurses who knew that such inmates had "snitched" on them.

year after the strip searches were performed and, unbeknownst to him, they were planning to sue him rather than approaching him with their concerns. Stated differently, Sheriff Watson's candid testimony revealed that he felt betrayed when he heard about Injunction Plaintiffs' lawsuits. Specifically, Sheriff Watson stated, under oath: "All I know is it was the lawsuit I think that pushed me over the edge."

The Court also finds that, based on the facts of this case, the revocation of Plaintiffs' security clearances constituted the loss of a valuable benefit. As revealed through testimony at both the preliminary injunction hearing and the bench trial, several Injunction Plaintiffs were left without any income for a period of time as a result of the loss of their Portsmouth Jail security clearances. Notably, there are a limited number of employment posts available through Injunction Plaintiffs' direct employer, and the loss of their Jail security clearances resulted in most, if not all, Injunction Plaintiffs having no income for some period of time. One or more Injunction Plaintiffs was later able to obtain substitute employment, but with less hours (and thus less pay); one found full-time substitute placement at a significantly reduced salary due to lack of an available similar position; and one had to struggle to start her own business as a result of the lack of any similar positions. There is no question, therefore, that factually,

revocation of Injunction Plaintiffs' security clearances amounted to the deprivation of a valuable government benefit.

The Court further finds that the issuance of a permanent injunction would not directly result in any increased security issues at the Portsmouth Jail. Sheriff Watson's own attorney asked Sheriff Watson at the bench trial whether restoring the security clearances of the Injunction Plaintiffs would create any problems with security at the Portsmouth Jail. The Sheriff clearly and candidly answered that "it's not a problem." He clarified that, as of that day, he only had one job opening for a nurse contractor, but repeated that "it's not a problem" to reinstate the Injunction Plaintiffs' previously suspended security clearances.

## IV. Conclusions of Law – Bench Trial

It is well established that a plaintiff seeking a permanent injunction is required to demonstrate the following:

> (1) that [she] has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

Legend Night Club v. Miller, 637 F.3d 291, 297 (4th Cir. 2011) (quoting eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 391 (2006) (hereinafter "eBay Inc.")). An injunction should never "be granted as a matter of course," as it is a "drastic and

16

extraordinary remedy" that is only appropriate after careful balancing of all competing interests. Monsanto Co. v. Geertson Seed Farms, 130 S. Ct. 2743, 2761 (2010).

### A. Prongs One and Two of the Permanent Injunction Standard: Irreparable Injury and Inadequate Remedy at Law

The analysis of the first two prongs of the permanent injunction standard frequently go hand-in-hand, as a court must determine whether the party seeking an injunction has demonstrated an "irreparable injury" (prong one) for which money damages, or other legal remedy, are inadequate (prong two). See, e.g., MercExchange, L.L.C. v. eBay, Inc., 500 F. Supp. 2d 556, 569 n.11, 582 (E.D. Va. 2007) (indicating that the "irreparable harm inquiry and remedy at law inquiry are essentially two sides of the same coin" and that "the requisite analysis for the second factor of the four-factor test inevitably overlaps with that of the first"). As discussed below, the Court analyzes the first two prongs in unison, and does so through the application of the multi-factor test concerning public employees, as set forth in Goldstein v. Chestnut Ridge Volunteer Fire Company, 218 F.3d 337 (4th Cir. 2000). After conducting such analysis, the Court finds that Injunction Plaintiffs have demonstrated irreparable harm and the absence of an adequate remedy at law.

The protections afforded by the First Amendment generally include "not only the affirmative right to speak, but also the

17

'right to be free from retaliation by a public official for the exercise of that right.'" Adams v. Trs. of the Univ. of N.C.-Wilmington, 640 F.3d 550, 560 (4th Cir. 2011) (quoting Suarez Corp. Indus. v. McGraw, 202 F.3d 676, 685 (4th Cir. 2000)).  It is well established in the Fourth Circuit that "[v]iolations of first amendment rights constitute per se irreparable injury." Johnson v. Bergland, 586 F.2d 993, 995 (4th Cir. 1978) (citing Elrod v. Burns, 427 U.S. 347, 373 (1976) (plurality opinion)); see Legend Night Club, 673 F.3d at 302 (quoting Elrod, 427 U.S. at 373) ("'[T]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'")).  Furthermore, "monetary damages are inadequate to compensate for the loss of First Amendment freedoms," particularly when there is "direct penalization" for the exercise of such rights, as opposed to an "incidental inhibition." Id. (citations omitted).

Although First Amendment violations are, by their nature, "irreparable," the protections afforded to a "public employee" are less than those afforded to an ordinary citizen because the government and the general public both have a strong interest in public agencies providing efficient public services.  Id. Accordingly, "[w]hile government employees do not lose their constitutional rights at work, the Supreme Court has repeatedly held that the government may impose certain restraints on its

employees' speech and take action against them that would be unconstitutional if applied to the general public." Id.; see Connick v. Myers, 461 U.S. 138, 142 (1983) (quoting Pickering v. Bd. of Educ., 391 U.S. 563, 568 (1968)) ("Our task, as we defined it in Pickering, is to seek 'a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.'") (alteration in original).

Here, Injunction Plaintiffs allege ongoing infringement of their First Amendment rights because they remain barred from working at the Portsmouth Jail as a result of the retaliatory revocation of their security clearances.[16]   Because Plaintiffs are "public employees," they face a higher burden than an ordinary citizen to prove retaliation in violation of the First Amendment.[17]    For the six Injunction Plaintiffs alleging

---

[16] Some of the Injunction Plaintiffs further assert that having a negative employment action that they must report on job applications (loss of Jail security clearance) is a type of harm that can only be remedied by an order reversing such improper retaliatory action. As the Court determines that the First Amendment violation is irreparable and cannot be remedied by money damages, the Court need not determine whether a harm to Plaintiffs' reputation, which some Injunction Plaintiffs' clearly suffered, is "irreparable" and/or whether such a harm can be remedied by money damages.

[17] The Supreme Court has held that there is not a "difference of constitutional magnitude between independent [government] contractors and [public] employees" in the context of First Amendment retaliation analysis. Bd. of Cnty. Comm'rs, Wabaunsee Cnty., Kan. v. Umbehr, 518 U.S. 668, 684 (1996) (internal quotation marks and citations omitted).

retaliation to meet their burden: (1) "the speech at issue must relate to matters of public interest"; (2) "the employee's interest in First Amendment expression must outweigh the employer's interest in efficient operation of the workplace"; (3) "the employee must establish retaliation of some kind-that [s]he was deprived of a valuable government benefit or adversely affected in a manner that, at the very least, would tend to chill h[er] exercise of First Amendment rights"; and (4) "the employee must establish a causal relationship between the protected expression and the retaliation." Goldstein, 218 F.3d at 351-52 (internal quotation marks and citations omitted). Accordingly, in order to determine whether Injunction Plaintiffs suffered a type of irreparable harm that cannot be remedied by money damages, the Court must examine each of the four prongs of the test set forth in Goldstein to determine whether Plaintiffs have demonstrated an ongoing First Amendment violation.

### 1. Speech a Matter of Public Concern

The first step in the multi-faceted Goldstein analysis requires the Court to determine whether the speech at issue (in this case, the lawsuit that allegedly caused the retaliation) was made "as a citizen upon a matter of public concern" or whether it was made "as an employee about a matter of personal interest." McVey v. Stacy, 157 F.3d 271, 277 (4th Cir. 1998); see Ridpath v. Bd. of Governors Marshall Univ., 447 F.3d 292,

20

316 n.26 (4th Cir. 2006) (indicating that classifying the speech as involving a "public concern" or a "personal interest" is the "threshold question"). If a court determines that a public employee's speech "does not touch upon a matter of public concern, the state, as employer, may regulate it without infringing any First Amendment protection." Urofsky v. Gilmore, 216 F.3d 401, 406 (4th Cir. 2000) (en banc); see Stroman v. Colleton Cnty. Sch. Dist., 981 F.2d 152, 156 (4th Cir. 1992) (explaining that "[p]ersonal grievances, complaints about conditions of employment, or expressions about other matters of personal interest do not constitute speech about matters of public concern that are protected by the First Amendment, but are matters more immediately concerned with the self-interest of the speaker as employee").

Whether speech addresses a matter of public concern versus a matter of personal interest "must be determined by the content, form, and context of a given statement, as revealed by the whole record." Connick, 461 U.S. at 147-48. A public employee's speech involves a matter of public concern if it is spoken as a citizen and addresses "an issue of social, political, or other interest to a community." Id.; see DiMeglio v. Haines, 45 F.3d 790, 805 (4th Cir. 1995) (quoting Terrell v. Univ. of Texas Sys. Police, 792 F.2d 1360 (5th Cir. 1986)) (defining the inquiry as "'whether the speech at issue in a

21

particular case was made primarily in the plaintiff's role as a citizen or primarily in h[er] role as employee'"). Such inquiry, however, does not turn on how "interesting" the topic of the speech is. See Baker v. McCall, 842 F. Supp. 2d 938, 950 (W.D. Va. 2012) (quoting DiMeglio, 45 F.3d at 805) (indicating that even if the topic of the disputed speech—a high school principal's desire to marry a subordinate employee—would arouse interest in the small town where it occurred, "'the mere fact that the topic of the employee's speech was one in which the public might or would have had a great interest is of little moment'").

Whether the speech at issue occurs inside or outside of the workplace is not determinative of its nature, as an individual can speak as a private citizen while at work, and can speak as a government employee while away from the workplace. Urofsky, 216 F.3d at 406. The forum in which the speech is made is, however, "relevant to the determination of whether the petition relates to a matter of public concern." Borough of Duryea, Pa. v. Guarnieri, 131 S. Ct. 2488, 2501 (2011). Notably, unlike a federally filed lawsuit alleging constitutional violations, "[a] petition filed with an employer using an internal grievance procedure in many cases will not seek to communicate to the public or to advance a political or social point of view beyond the employment context." Id.; see Guth v. Tazewell Cnty., 698

22

F.3d 580, 585 (7th Cir. 2012) ("The filing of a lawsuit can be an exercise of the First Amendment right of free speech if, as in 'cause' litigation, the suit articulates public concerns.").

In Campbell v. Galloway, 483 F.3d 258 (4th Cir. 2007), the Fourth Circuit discussed the lack of contours to the case specific test for determining whether speech touches on a matter of public concern. In doing so, the Fourth Circuit expressly declined to "articulate any sort of bright-line rule" as to whether sexual harassment claims are matters of public concern, suggesting that such a universal rule does not appear "consistent with the Supreme Court's directive that [lower courts] engage in a case-and fact-specific inquiry to determine" if a public employee's speech addresses a matter of public concern. Id. at 269. Both the Fourth Circuit and Supreme Court have expressly acknowledged that the flexible nature of such test necessarily results in a lack of clear precedential guidance. See id. at 270 (noting that Fourth Circuit precedent has "provided little concrete guidance on the question of when . . . a [sexual discrimination] complaint amounts to an issue of public concern"); City of San Diego, Cal. v. Roe, 543 U.S. 77, 83-84 (2004) (noting that "the boundaries of the public concern test are not well defined"). Therefore, whether the public would be "truly concerned" with a public employee's speech remains a "subtle, qualitative inquiry" that must be performed

23

in every case.   Goldstein, 218 F.3d at 352-53; see Mills v.
Steger, 64 Fed. App'x 864, 871 (4th Cir. 2003) (explaining that
"[o]ne of the critical factors in determining whether speech is
on public or private matters is whether it concerns matters of
public debate or whether it reflects merely personal pique and
internal employment issues").

More recently, the Supreme Court and the Fourth Circuit
have added some further clarity as to the importance of the
forum of the speech, indicating that internal employee
complaints implicating workplace duties or advancing on-the-job
favoritism claims rarely implicate a matter of public concern.
Guarnieri, 131 S. Ct. at 2501; Brooks v. Arthur, 685 F.3d 367,
373 (4th Cir. 2012).   This is particularly true in the case of
internal speech focusing solely on the alleged unfair workplace
treatment of a single individual. Brooks, 685 F.3d at 373.   In
Brooks, the Fourth Circuit stressed the private nature of
"individualized" internal workplace complaints that are
"significant chiefly to the parties involved," noting that
"[t]he First Amendment demands more." Id. at 375-76.

Notwithstanding such recent cases, the applicable legal
test remains unchanged; the ultimate inquiry requires
consideration of the "content, form, and context of a given
statement, as revealed by the whole record," Connick, 461 U.S.
at 147-48, with the ultimate question being "'whether the

"public" or the "community" is likely to be truly concerned with or interested in the particular expression, or whether it is more properly viewed as essentially a "private" matter between employer and employee.'" Goldstein, 218 F.3d at 352 (quoting Berger v. Battaglia, 779 F.2d 992, 999 (4th Cir. 1985)). The Fourth Circuit's most recent commentary on such test appears in the Brooks opinion:

> As to content, . . . Connick directed us to scrutinize the comments to assess whether they are intended "to evaluate the performance of the office"—which would merit constitutional protection—or merely "to gather ammunition for another round of controversy" with superiors-which would not. Id. at 148. The Connick Court was explicit on this point: "When employee speech concerning office policy arises from an employment dispute concerning the very application of that policy to the speaker, additional weight must be given to the supervisor's view" that the employee's speech addresses solely a private dispute. Id. at 153. At bottom Connick reflects the belief that many ordinary disputes in the public workplace should be settled or resolved without calling the heavy artillery of the Constitution into play.
>
> . . .
>
> [Considering the form and context], [a]s the Supreme Court has emphasized, "[t]he forum in which a petition is lodged will be relevant to the determination of whether the petition relates to a matter of public concern." Guarnieri, 131 S. Ct. at 2501. . . . The Court stressed that the right of a public employee "to participate as a citizen, through petitioning activity, in the democratic process . . . is not a right to transform everyday employment disputes into matters for constitutional litigation in the federal courts." Id. at 2501.

Brooks, 685 F.3d at 371-73.

Here, although a relatively close question, the Court finds that Injunction Plaintiffs' simultaneously-filed nine federal lawsuits, alleging unconstitutional strip searches orchestrated by an elected official, are sufficient to satisfy the first prong of the <u>Goldstein</u> test, as they implicate a matter of public concern. The Court reaches such conclusion after conducting the required "subtle, qualitative inquiry" into the case specific factual allegations. <u>Goldstein</u>, 218 F.3d at 352; <u>see</u> <u>Jackson v. Bair</u>, 851 F.2d 714, 717 (4th Cir. 1988) (indicating that the elements of a public employee's speech rights "are subtle and difficult [in] application, precisely because of the obviously conflicting interests and values involved in the public employment relationship"); <u>Stickley v. Sutherly</u>, 416 Fed. App'x 268, 272 (4th Cir. 2011) (noting that "the line marking when something becomes a matter of public concern is blurry, and thus the boundary confining a public official's behavior is hard to discern").

As this Court's finding is based on balancing competing factors, the Court first reviews the factors that favor Sheriff Watson's categorization of the instant suits as involving matters restricted to each Plaintiff's personal interest. A review of each Complaint <u>in isolation</u> suggests that each Injunction Plaintiff was pursuing relief based on her own self-interest because: (1) each Injunction Plaintiff originally filed

26

a separate suit; (2) each suit sought monetary damages to remedy personal suffering; (3) each suit alleged misconduct on a single occasion; and (4) the requested injunctive relief is phrased in a manner that limits such relief to Sheriff Watson's future treatment of the filing Plaintiff. See Love-Lane v. Martin, 355 F.3d 766, 776 (4th Cir. 2004) (indicating that complaints regarding employment conditions, or personal work grievances, are not matters of public concern); Brooks, 685 F.3d at 373 (classifying the internal workplace complaints at issue as "of a purely private nature" because such complaints did not seek to inform the public of a failure to discharge governmental responsibilities, did not seek to bring to light actual wrongdoing or a breach of the public trust, and if released to the public, would merely convey that a single employee is upset with his present conditions of employment). In addition to the above, none of the Plaintiffs expressly allege the existence of an unconstitutional Jail search policy, nor suggest that there was an impending risk of further unconstitutional searches of the named Plaintiff, any other Jail contractor or employee, or anyone else. Cf. Campbell, 483 F.3d at 270 (indicating that the plaintiff's complaints about sexual harassment, "which involve improper treatment of members of the public as well as [other] female officers, would be of genuine interest and concern to the public") (emphasis added).

27

Notwithstanding the above factors favoring Sheriff Watson's position, a consideration of the bench trial testimony and the entire record before the Court demonstrates that the factors favoring Plaintiffs outweigh those favoring the Sheriff, and thus, the speech at issue involves a matter of public concern. First, considering the "form" and "context" of the speech, the speech that allegedly caused the retaliation was <u>not</u> an internal grievance, but was instead a collection of nine publicly filed federal lawsuits alleging that an elected state official acted in violation of the United States Constitution.  Furthermore, to the extent that defense counsel sought to establish that Injunction Plaintiffs sought out the media and that Sheriff Watson's alleged retaliation was a reaction to news coverage as much as it was a reaction to the lawsuits themselves, such contention, if assumed true, further supports a finding that the speech touched a matter of public concern.  This is true not because the topic of the speech (strip searches) is "interesting" and would sell newspapers, but instead because it demonstrates that the Injunction Plaintiffs were seeking to <u>publicly criticize</u> an elected state official's (alleged) brazen disregard for the United States Constitution.  <u>Cf. Connick</u>, 461 U.S. at 148 (declining to categorize certain speech about the conduct of an elected official as speech "of public import" because such speech "did not seek to inform the public that the

[elected official's] office was not discharging its governmental responsibilities" and did not "seek to bring to light actual or potential wrongdoing or breach of public trust").

Accordingly, regardless of whether the Injunction Plaintiffs' disputed speech is viewed solely as the lawsuits themselves, or as the lawsuits and communications with the press, the form and content of the speech militate toward finding that such speech was both spoken as a citizen and involved a matter of public concern. See Brooks, 685 F.3d at 373 (contrasting a "letter to a local newspaper" with an internally filed, non-disseminated, workplace grievance); Cromer v. Brown, 88 F.3d 1315 (4th Cir. 1996) (finding that even an internal letter to the sheriff from employees raising broad allegations of racial discrimination within the sheriff's office was "an expression of concern about the ability of the sheriff's office to carry out its vital public mission effectively," and thus, was speech "as citizens, not merely as employees"). Notably, the purpose of an internal employee grievance is typically to address "the government in its capacity as the petitioners' employer, rather than its capacity as their sovereign." Guarnieri, 131 S. Ct. at 2506 (Scalia, J., concurring in part and dissenting in part). Here, as set forth in the findings of fact above, in addition to seeking personal relief, Plaintiffs' joint action of contemporaneously filing

29

nine suits on the same day plainly sought to ensure that <u>no one</u> was ever again required to submit to an alleged unconstitutional strip search at the Jail.

Although each Injunction Plaintiff's suit, if considered in a vacuum, could be characterized as a personal grievance, the nine suits were all filed at the same time, by the same counsel, and collectively reveal that <u>nine different Plaintiffs</u> all alleged the same unconstitutional conduct orchestrated by the same publicly elected state constitutional officer.   Although such suits do not allege the existence of a formal unconstitutional search policy, the collective allegations clearly suggest that Sheriff Watson's conduct was motivated by a policy or practice that did not individually analyze the level of suspicion to search each jail contractor, as is required by the Constitution.   See <u>Braun</u>, 652 F.3d at 558 (recognizing that, <u>in 2008</u>, it was "clearly established that intrusive prison employee searches require reasonable suspicion").   The nine contemporaneously filed federal Complaints thus collectively allege a far more sweeping failure to comply with the dictates of the Constitution than the complaint of a single employee. See <u>Campbell</u>, 483 F.3d 269-70 (suggesting that sexual harassment complaints are more likely to implicate a public concern when the allegations involve <u>repeat discrimination</u> impacting <u>numerous individuals</u>); <u>Brooks</u>, 685 F.3d at 373 (contrasting the facts

before that court with the facts in Cromer, and noting that the "public concern" speech in Cromer: (1) "addressed department-wide procedures"; (2) was made "outside an employee grievance channel"; and (3) "represented the concerns of a larger group of officers within the department"). Furthermore, as indicated above, the testimony at the bench trial demonstrated that a substantial factor that motivated many of the Injunction Plaintiffs to file suit was their desire to ensure that unconstitutional strip searches never happened again, to anyone, at the Portsmouth Jail.[18]

Next, considering the "content" of the Injunction Plaintiffs' disputed speech, the conduct complained of in the Injunction Plaintiffs' federal complaints plainly involves far more serious matters than ordinary workplace disputes like "favoritism" or "interpersonal discord." Goldstein, 218 F.3d at

---

[18] The Court's consideration of the nature of the speech at issue is guided in part by, but not controlled by, the apparent motives for the speech. Any contention that "an individual's personal motives for speaking may dispositively determine whether that individual's speech addresses a matter of public concern" appears in conflict with the Supreme Court's ruling in Connick and is "'contrary to the broader purposes of the First Amendment'" which is "'concerned not only with a speaker's interest in speaking, but also with the public's interest in receiving information.'" McVey v. Va. Highlands Airport Comm'n, 44 Fed. App'x 630, 638 (4th Cir. 2002) (quoting Chappel v. Montgomery Cnty. Fire Prot. Dist. No. 1, 131 F.3d 564, 574 (6th Cir. 1997)); see Sousa v. Roque, 578 F.3d 164, 174 (2d Cir. 2009) (indicating that, in light of Connick, a majority of Circuits hold that a plaintiff's motivation in seeking redress for workplace grievances is not dispositive of whether the subject of such complaint implicates a matter of public concern, and thus holding that "it does not follow that a person motivated by a personal grievance cannot be speaking on a matter of public concern").

352; see Guarnieri, 131 S. Ct. at 2501 (stressing that public employees do not have the right "to transform everyday employment disputes into matters for constitutional litigation in the federal courts") (emphasis added).  Rather, here the Injunction Plaintiffs' speech alleged that a publicly elected state constitutional officer, and his subordinates, knowingly violated the Constitution by forcing numerous jail contractors to either submit to a complete strip search, which required the person being searched to "squat and cough" while completely naked,[19] or lose her ability to continue to work at the Jail. See Campbell, 483 F.3d at 269 (suggesting that a sexual harassment complaint "by a single employee . . . might well constitute a matter of public interest-for example, where a high-ranking public official is the offender") (emphasis added).

Furthermore, the content of the Plaintiffs' speech implicates the public interest because it alleges the wide implementation of a type of intrusive and demeaning search that, if constitutionally unfounded, could significantly impact the public's viewpoint regarding the elected Sheriff's judgment and exercise of his broad powers. Cf. Connick, 461 U.S. at 148-49 (implying that speech implicates a "public concern" when it

_____

[19] The Complaints allege that during the strip searches the Defendants also conducted a "visual body cavity search"; however, the jury concluded that visual body cavity searches were not performed on any of the Plaintiffs.

seeks to "bring to light <u>actual or potential wrongdoing or breach of public trust</u>") (emphasis added). To better illustrate such point, the Constitution may be violated when, while in the field, a <u>low-ranking</u> law enforcement officer makes the erroneous, <u>but innocent</u>, <u>split-second decision</u> to pat-down <u>a single suspect</u> for weapons <u>over his or her clothes</u>, when such officer lacks reasonable suspicion to perform such pat-down. See <u>Terry v. Ohio</u>, 392 U.S. 1, 30-31 (1968). However, the public is far more likely to be offended by, and thus have a far more powerful legitimate interest in being apprised of, an allegedly <u>premeditated</u> and <u>knowingly unconstitutional</u> search orchestrated by an <u>elected state-constitutional officer</u> that required <u>at least nine</u> Jail contractors to remove all of their clothing, all of their undergarments, and <u>to either squat and cough while completely naked</u>, or to undergo an even more intrusive visual search of their private areas.

The Court further notes that the filing of the nine lawsuits instantly generated front page news, perhaps not only because the "topic" of the suits was intriguing, but because the citizenry was legitimately concerned about Sheriff Watson's alleged misuse of his broad powers. See <u>Maciariello v. Sumner</u>, 973 F.2d 295, 300 (4th Cir. 1992) (agreeing with the district court that "an allegation of evidence tampering by a high-ranking police officer is a matter in which the public should be

33

interested"); <u>Sexton v. Martin</u>, 210 F.3d 905, 910 (8th Cir. 2000) (quoting <u>Brockell v. Norton</u>, 732 F.2d 664, 668 (8th Cir. 1984)) (explaining that the "'public has a vital interest in the integrity of those commissioned to enforce the law'"); <u>Brawner v. City of Richardson, Tex.</u>, 855 F.2d 187, 191-92 (5th Cir. 1988) (noting that "[t]he disclosure of misbehavior by public officials is a matter of public interest and therefore deserves constitutional protection, <u>especially when it concerns the operation of a police department</u>") (emphasis added). The community is thus "likely to be truly concerned with or interested in the particular expression" at issue in this case. <u>Goldstein</u>, 218 F.3d at 352.[20]

Although the Court carefully weighed all of the relevant facts in analyzing the disputed speech, most compelling in this case are the following: (1) that the speech involved was the public filing of a federal lawsuit, as contrasted with an

_____

[20] Controlling case law demonstrates that speech highlighting lenient security policies at a prison, or inadequately trained emergency personnel, clearly implicate a matter of public concern because such government failures create a direct threat to public safety.  <u>See</u> <u>Jackson</u>, 851 F.2d at 716, 720 (speech highlighting lenient security policies at a prison); <u>Goldstein</u>, 218 F.3d at 355 (speech highlighting lack of training for emergency personal).  Here, the Sheriff's alleged failure to uphold the Constitution does not fit neatly into the category of cases involving direct threats to public safety because his actions were based on alleged overzealous, as opposed to lenient, internal Jail procedures.  However, the public nevertheless has an interest in being informed when an elected, high-ranking jail official allegedly abuses his power.  Absent reporting from public employees or contractors, <u>individuals in the unique position to</u> witness misconduct that is otherwise shielded from public view, a jail official's abuse of power could continue unchecked.

internal employee grievance; (2) that the disputed speech
discussed conduct that was not a mere violation of workplace
protocol, but was instead allegedly a premeditated and knowing
violation of the United States Constitution; (3) that <u>nine</u> Jail
contractors simultaneously spoke out to challenge the same
allegedly unconstitutional practice; (4) that the disputed
speech challenged the broad use of demeaning full-body strip
searches against individuals that had not been convicted of a
crime, had not been arrested on suspicion of having committed a
crime, and according to the complaints, had not behaved
improperly in any way that would have provided even the lowest
level of objective suspicion; and (5) the speech at issue
alleged that a state constitutional officer, <u>directly elected by
the public</u> and responsible for keeping the peace and maintaining
inmates at a high-security Jail, was acting in a manner that, at
a minimum, called his judgment into question.  See Jackson, 851
F.2d at 720 ("Form and context may of course in some cases give
special color to speech, tipping it one way or the other on the
public concern-private grievance spectrum, . . . <u>[b]ut content,
subject-matter, is always the central aspect</u>.") (emphasis
added).

This Court's conclusion, that the speech causing the
retaliation implicates a matter of public concern, was reached
only after careful consideration of the competing factors

discussed above.   In the end, the content of the speech is more compelling than the speakers' express or implicit intent, and the Court thus concludes that the Injunction Plaintiffs have demonstrated that their speech implicated a matter of "public concern."[21]

## 2. Balancing of Interests

If a public employee's speech implicates a matter of public concern, the next step in the Goldstein analysis is to consider whether such employee has demonstrated that her "interest in First Amendment expression" outweighs the public employer's "interest in efficient operation of the workplace."  Goldstein, 218 F.3d at 352.   Such balancing, "commonly referred to as 'Pickering balancing,'" Ridpath, 447 F.3d at 317, requires the Court to determine "'whether the degree of public interest in the employee's statement was . . . outweighed by the employer's responsibility to manage its internal affairs and provide "effective and efficient" service to the public,'"  Goldstein,

---

[21] Although the Court makes a finding that the speech at issue relates to a matter of public concern, it notes that the first prong of Goldstein might be satisfied if speech only "arguably" relates to a matter of public concern.  See Stroman, 981 F.2d at 158 ("When speech arguably relates to a matter of public concern, we prefer to apply the approach taken in Connick and weigh whatever public interest commentary may be contained in the [speech] against the state's dual interest as a provider of public service and employer of persons hired to provide that service.") (emphasis added); cf. Connick, 461 U.S. at 146 (indicating that a court need not consider the reasons for an employee's discharge if the "employee's expression cannot be fairly considered as relating to any matter of political, social, or other concern to the community") (emphasis added).

218 F.3d at 354 (quoting Daniels v. Quinn, 801 F.2d 687, 690 (4th Cir. 1986)) (emphasis added). The relevant factors to such inquiry include whether the disputed speech:

> (1) "impairs discipline by superiors"; (2) impairs "harmony among co-workers"; (3) "has a detrimental impact on close working relationships"; (4) impedes the performance of the public employee's duties; (5) interferes with the operation of the agency; (6) undermines the mission of the agency; (7) is communicated to the public or to co-workers in private; (8) conflicts with the "responsibilities of the employee within the agency"; and (9) makes use of the "authority and public accountability the employee's role entails."

McVey, 157 F.3d at 278 (quoting Rankin, 483 U.S. at 388-91). Additionally, the Fourth Circuit recently noted in Ridpath: "A majority of the McVey panel observed that both [the Fourth Circuit] and the Supreme Court have also included the value of the employee's speech to the public in the Pickering balance." Ridpath, 447 F.3d at 317 n.28; see Connick, 461 U.S. at 152 ("We caution that a stronger showing may be necessary if the employee's speech more substantially involved matters of public concern."); Goldstein, 218 F.3d at 355 (recognizing that matters "of the highest public concern" are to be given "the highest level of First Amendment Protection"); Daniels, 801 F.2d at 690 (indicating that courts should compare the "the degree of public interest" in the speech at issue with the employers' need to manage its affairs and provide efficient public services) (emphasis added).

37

The Fourth Circuit has expressly recognized the inherent difficulty in performing such balancing, and the need for reasoned, case-specific consideration of all relevant factors, stating:

> The balancing element in particular requires great subleties [sic] of judgment in weighing the conflicting values and interests at stake. This is so because both "public concern" and "public employer interests" are relative notions, varying in kind and degree in different situations. For this reason this balancing inquiry must take into account the particulars of each in the case at hand. Connick, 461 U.S. at 150 ("particularized balancing" required, although "difficult"). For while speech that "touche[s] upon matters of public concern in only a most limited sense . . . does not require [a public employer to] tolerate action which he reasonably believe[s] would disrupt the office, undermine his authority, and destroy close working relationships," 461 U.S. 154, other speech concededly disruptive of these interests might nevertheless be protected precisely because it directly touches upon matters of grave public concern. See, e.g., Pickering (open criticism of public employer's allocation of public funds and method of informing public of revenue needs). Furthermore, where the public employer's retaliatory action is taken in response to merely threatened rather than actual disruption of employer interests, the reasonableness of the employer's perception must be weighed in the balance. For though protection of the right does not require the public employer always to await actual disruption before acting, see Jurgensen v. Fairfax County, 745 F.2d 868, 879 (4th Cir. 1984), it does require that action taken in response to a mere potential for disruption be objectively justifiable under the circumstances, see id. ("damage to morale and efficiency [must be] reasonably . . . apprehended"). Otherwise, the right would be no stronger than the timidity or nervousness or impatience of the particular employer, in which case it would be effectively no right.

Jackson, 851 F.2d at 717-18 (alterations in original).

As stated on the record at the bench trial, this Court does not discount the weight to be afforded the special nature of the public employer in this case, as Sheriff Watson operates a paramilitary organization responsible for overseeing hundreds of inmates at a high-security Jail. Tellingly, "courts must give weight to the nature of the employee's job in assessing the possible effect of his action on employee morale, discipline or efficiency. In so doing, it must be recognized that such effect may vary with the job occupied by the employee." Jurgensen v. Fairfax Cnty., Va., 745 F.2d 868, 880 (4th Cir. 1984). The free speech rights of public employees in paramilitary organizations "must . . . be evaluated with the special character of the organization in mind." Id. However, while acknowledging such special character manifestly recognizes that "the free speech rights of an employee in a [sheriff's office] are more limited than [the speech rights] of a teacher, this is not to say that [employees in a sheriff's office] have no free speech rights." Id. Rather, such special status means that "the character" of employment at a sheriff's office is an "element in the balance of interests in his or her individual case, to be considered in determining the agency's interest in regulating his speech." Id. (internal quotation marks and citation omitted); compare Jackson, 851 F.2d at 722 ("The district court rightly considered that employment in the prison context presents special

39

considerations favoring the public employer in the balancing process."), and Maciariello, 973 F.2d at 300 ("Police are at the restricted end of the spectrum because they are 'paramilitary'— discipline is demanded, and freedom must be correspondingly denied."), with Cromer, 88 F.3d at 1327 (recognizing that, to be effective, a police department must have the respect of the community and its officers and that "the public has a keen interest in seeing that police officers are free to speak up against any broad-based discrimination in their agencies"), and Goldstein, 218 F.3d at 355 (rejecting the district court's approach as impermissibly permitting "fire companies, police officers and other entities carrying out crucial public functions" to "quash complaints affecting public safety under the general aegis of 'camaraderie' and the avoidance of disruptions").

Here, it is undisputed that Sheriff Watson revoked Injunction Plaintiffs' security clearances the next business day after the lawsuits were filed, and that neither the suits themselves, nor any press coverage, had at that time caused any morale issues, security concerns, or other disruptions in the Jail. Accordingly, taking into consideration the special importance associated with the safe and efficient operation of a high security jail, because the Sheriff acted preemptively to avoid disruption in the workplace, he must be able to provide

"objectively justifiable" reasons for such pre-emptive action; otherwise, as noted above, free speech rights would "be no stronger than the timidity or nervousness or impatience of the particular employer," and thus, would be no right at all. Jackson, 851 F.2d at 718.

Sheriff Watson's testimony at the bench trial revealed that the Sheriff is unable to distinguish the evidence that motivated the strip searches in 2011 from the evidence that motivated the revocation of security clearances in 2012. Specifically, Sheriff Watson testified that he recalled a precise conversation with Lieutenant Mike Cook from the Internal Affairs Division of the Portsmouth Sheriff's Office in which Lieutenant Cook relayed contraband complaints about most of the Injunction Plaintiffs. The Sheriff testified that such conversation took place in 2012, shortly before Injunction Plaintiffs' security clearances were revoked. Lieutenant Cook, however, testified that no such conversation occurred in or around April of 2012. Upon careful reflection, it appears to the Court that the Sheriff's testimony at the bench trial was likely conflating evidence that he relied on to justify the strip searches themselves, with evidence that purportedly justified the revocation of Injunction Plaintiffs' security clearances.

In addition to Sheriff Watson's inability to recall from memory the relevant motivators, he had no written documents from

41

2012—even handwritten notes—that explain <u>any reason</u> for revoking the security clearances of the six Injunction Plaintiffs. Accordingly, there does not appear to be any reliable objective justification supporting the preemptive action of revoking Injunction Plaintiffs' security clearances immediately upon the filing of the instant suit.

Notably, this Court's preliminary injunction ruling resolved the <u>Pickering</u> balancing in favor of Sheriff Watson primarily because, at the Preliminary Injunction hearing, while under oath, Sheriff Watson articulated a threat to inmates from Injunction Plaintiffs should the litigation process reveal the identity of inmates who had provided information against the Injunction Plaintiffs. Injunction Tr. at 57, ECF No. 20. Furthermore, it appeared that Sheriff Watson had specific inmates in mind because he testified that some of the at risk inmates had been housed at the jail long-term, and that some had left and returned. <u>Id.</u> at 58. Plaintiffs, at the time, failed to effectively challenge the factual underpinning of such articulated concern. However, as the case continued, Injunction Plaintiffs effectively demonstrated that such concern regarding risk to inmates was mere speculation because, even after months of trial preparation, Sheriff Watson was not able to identify which inmates purportedly provided inculpatory information on any of the Injunction Plaintiffs, let alone identify an inmate

42

that both provided such information and was housed at the Jail at the time the security clearances were revoked.[22]   The evidence from the bench trial further revealed that, when pressed, Sheriff Watson could only testify with broad strokes regarding his concerns as of 2012.   Furthermore, the Sheriff was largely unable to differentiate between the different Injunction Plaintiffs, and any differing objective justifications he may have had for revoking their clearances.   Accordingly, Sheriffs Watson's lack of record keeping and inability to recall specific justifications for his actions resulted in his inability to credibly demonstrate any valid basis for the across-the-board revocation of the Injunction Plaintiffs' security clearances.

   In contrast to the vague and at times somewhat inconsistent testimony discussed above,[23] Sheriff Watson more clearly recalled

---

[22] There also was no evidence of any kind suggesting that any of the Injunction Plaintiffs, medical professionals with no record of mistreating their patients, would risk their medical credentials by withholding critical medication or providing the wrong medication out of mere spite in the event they discovered that an inmate had accurately reported, or falsely concocted, an allegation against them.

[23] As the Court stated at the bench trial, the Court has no reason to question the Sheriff's efforts to testify accurately about these matters, and does not discount the sheer quantity of information he must handle in his position as Sheriff, nor the lengthy period of time directly at issue in this case (2010 through 2012).   However, the mind's inherent inability to recall specific details several years later is precisely the reason that employment records are typically maintained by well-run private businesses and public employers, particularly when it comes to termination decisions or other "adverse" employment actions.   Here, the injunction Plaintiffs were contractors and not direct employees at the Jail; however, it was still surprising that there were no written records of any kind associated with the en mass revocation of six contractors' security clearances.

that the Plaintiffs' filing of the federal lawsuits themselves was a substantial factor, if not the factor, in his decision to revoke Injunction Plaintiffs' security clearances.   When questioned on such topic, the Sheriff revealed that he was frustrated with Plaintiffs because they had continued working at the Jail for a year after the strip searches had been performed and, unbeknownst to him, they were planning to sue him during that time.   Sheriff Watson's candid testimony on this issue revealed that he felt betrayed, like he was stabbed in the back, when he heard about Injunction Plaintiffs' lawsuits, and it was the suits themselves that directly caused him to revoke the Injunction Plaintiffs' security clearances.[24]   The Court thus finds that such candid statements are an admission that adverse employment action was taken against the Injunction Plaintiffs in response to their exercise of their First Amendment constitutional rights to free speech and to petition the government for redress of grievances.[25]

---

[24] Such admission is bolstered by the fact that Injunction Plaintiffs each worked at the Jail for over a year after they were strip searched, purportedly without incident, yet immediately after they filed suit, all six lost their security clearances.

[25] As stated on the record, the Court has little doubt that Sheriff Watson subjectively believed that he was within his rights to revoke the Injunction Plaintiffs' security clearances based on the need to maintain security at the Jail.   Such subjective belief, however, is not a substitute for an objective justification for taking the preemptive action of revoking the Injunction Plaintiffs' security clearances before any actual issues arose at the Jail.   As the Sheriff

Accordingly, even though this Court recognizes the heightened security concerns in the Sheriff's paramilitary organization, if Sheriff Watson's vague testimony was deemed sufficient to justify his action, there "would be effectively no right" to free expression for any employee or contractor working in any Jail setting. Jackson, 851 F.2d at 718.[26]  Therefore, notwithstanding Sheriff Watson's undeniable duty to operate a safe and secure Jail, and the need to promote efficiency within such Jail, the Court finds that the Sheriff's articulated reasons for the en mass preemptive revocation of the Injunction

---

candidly admitted, although he gave a lot of thought to the matter before revoking the Injunction Plaintiffs' security clearances, he did not seek any legal advice. Sheriff Watson's testimony further suggested that he did not consult his own internal affairs division, or any seasoned employees with a Human Resources background, before making his decision.

[26] The defense's attempted invocation of "morale" as an objective justification warranting the revocation of the Injunction Plaintiffs' security clearances is likewise unsuccessful, as no credible explanation for such speculative predictions was provided. See Goldstein, 218 F.3d at 355 (recognizing that if the unsubstantiated "general aegis of 'camaraderie' and the avoidance of disruptions" in a police department or other emergency personnel department was deemed sufficient to trump the free speech rights of department employees reporting on public safety issues, all speech, regardless of its import to the public, could be effectively silenced within such departments). Specifically, Sheriff Watson testified at trial that the Injunction Plaintiffs outwardly acted like they did not have to follow the Jail rules regarding contraband and that this created a morale issue with respect to Jail employees. However, in light of the Sheriff's prior sworn statement that contraband issues ended after the strip searches, it appears that such conduct, if it occurred at all, occurred prior to the strip searches, not during the year between the strip searches and the filing of the suits. In any case, even if such conduct did occur after the strip searches, Sheriff Watson was unable to articulate why purported morale issues were tolerable up until the time suit was filed, but after suit was filed, immediately became such a concern that he felt compelled to revoke Injunction Plaintiffs' security clearances in the name of "morale."

Plaintiffs' security clearances were either speculative and/or predicated on facts for which the Sheriff's recollection was insufficient to warrant giving any weight to such facts in the balancing analysis.   The Court thus finds that the <u>Pickering</u> balancing favors the Injunction Plaintiffs.

### 3. Loss of a Valuable Benefit

Having determined that Plaintiffs' speech implicated a matter of public concern and that the <u>Pickering</u> balancing favors Plaintiffs' free speech rights, the next consideration is whether Injunction Plaintiffs have demonstrated that they were "deprived of a valuable government benefit or adversely affected in a manner that, at the very least, would tend to chill [their] exercise of First Amendment rights." <u>Goldstein</u>, 218 F.3d at 356.   The Court's analysis of such prong need not be protracted because despite defense counsels' continued efforts to highlight that, due to their status as contractors, Injunction Plaintiffs were not technically "terminated" by Sheriff Watson when he revoked their security clearances, the revocation of such clearances was clearly both the loss of a valuable government benefit and something that would chill First Amendment speech.

Injunction Plaintiffs testified that losing their security clearances resulted in, at a minimum, a temporary loss of work hours and income.   In fact, more than a year after they lost their security clearances, several Injunction Plaintiffs still

46

have not found substitute work that replaces the hours and/or pay level of their job placement at the Portsmouth Jail. It is thus plain that Injunction Plaintiffs were "stripped of the powers [and] rights" held by public employees and contractors cleared to work at the Portsmouth Jail. Id. Defense counsel's contention that a contractor who loses all her hours and all her income has not suffered an adverse employment action merely because she remains "employed" with her outside contractor (at no salary) defies credulity. Although the revocation of Injunction Plaintiffs security clearances need not be the effective equivalent of termination to constitute an adverse employment action, id., on these facts, the loss of such clearance was the equivalent. Accordingly, Injunction Plaintiffs not only demonstrate the loss of a valuable government benefit, but also clearly demonstrate that they were adversely affected in a manner that would chill the exercise of First Amendment rights.

### 4. Speech a "Substantial Factor"

The final factor in the Goldstein analysis is whether Injunction Plaintiffs demonstrated that their speech was "a substantial factor" in Sheriff Watson's decision to revoke their security clearances. Id. As discussed at length above, Sheriff Watson candidly admitted at the bench trial that he felt betrayed by the suits and that such suits "pushed [him] over the

47

edge." His testimony, as a whole, clearly demonstrated that the suits were a "substantial factor," if not the driving factor, in revoking Injunction Plaintiffs' security clearances. Accordingly, Injunction Plaintiffs plainly satisfy the final prong in the analysis.

### 5. Summary of Goldstein Analysis

As discussed in detail above, Injunction Plaintiffs have successfully demonstrated that, notwithstanding their status as public employees, the filing of their lawsuits in federal court constituted protected First Amendment speech. They have further demonstrated that the Pickering balancing weighs in their favor and that they lost a valuable government benefit. Finally, Injunction Plaintiffs demonstrated that Sheriff Watson's order revoking their security clearances—an order that remained in place at the time of the bench trial—was retaliatory in that it was motivated by the exercise of Injunction Plaintiffs' First Amendment rights.

Through demonstrating the loss of their First Amendment freedoms, Plaintiffs have proven that they suffered an "irreparable injury." See Legend Night Club, 673 F.3d at 302 (quoting Elrod, 427 U.S. at 373) ("'[T]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'")). The Sheriff's "direct penalization" of Injunction Plaintiffs for the

48

exercise of their First Amendment rights is unquestionably the type of harm that chills the exercise of free speech. Id. Accordingly, such harm is "the sort that c[an] not be remedied absent an injunction," which makes monetary damages "inadequate to compensate" Injunction Plaintiffs for the loss of their constitutional rights. Id. Injunction Plaintiffs have therefore satisfied the first two prongs of the permanent injunction standard.

## B. Prong Three of the Permanent Injunction Standard: Balancing the Hardships

The third prong of the permanent injunction standard requires the Court to consider "'the balance of hardships between the plaintiff and defendant.'" Id. at 297 (quoting eBay Inc., 547 U.S. at 391). Here, based on the testimony at the bench trial, the balance of hardships plainly weighs in favor of Injunction Plaintiffs, and thus supports granting such Plaintiffs' request for injunctive relief. Notably, Injunction Plaintiffs continue to suffer from the effects of the unconstitutional retaliation, as they remain barred from employment at the Portsmouth Jail. Furthermore, some Injunction Plaintiffs continue to suffer ill-effects from the unconstitutional order, in that it has required them to attempt to explain to prospective employers why they lost their security clearance at the Jail. As discussed herein, the Sheriff's order

barring Injunction Plaintiffs from working at the Jail is not based on actual misconduct, but instead was issued because such Plaintiffs exercised their constitutional rights to free speech.

In contrast to Injunction Plaintiffs' ongoing harm, a harm that also extends to chill the speech of all contractors and employees working at the Jail, there is no evidence before the Court that entering an injunction in this case would cause any hardship on Sheriff Watson. See id. at 302-03 (indicating that a state is not harmed from an injunction preventing it from enforcing an unconstitutional practice). To the contrary, the Sheriff testified at trial that "it's not a problem" to restore the Injunction Plaintiffs' security clearances and that doing so would not create any problems with security at the Portsmouth Jail. It is further undisputed that the process of restoring Injunction Plaintiffs' security clearances only requires that Sheriff Watson write a very brief letter to Injunction Plaintiffs' direct employer. Accordingly, unlike a typical case involving a jail or prison, the "reinstatement" question in this case does not implicate the well-established concern regarding the propriety of a court ruling in a manner that substitutes the judgment of the court for that of a warden or sheriff in matters of security at a correction facility. See Florence v. Bd. of Chosen Freeholders of Cnty. of Burlington, 132 S. Ct. 1510, 1517 (2012) (indicating that establishing security polices at a

jail or prison is something "peculiarly within the province and professional expertise of corrections officials" and that "courts should ordinarily defer to their expert judgment in such matters") (internal quotation marks and citations omitted). Rather, the unique facts of this case conclusively demonstrate that entering an injunction that orders reinstatement of the six Injunction Plaintiffs' security clearances would, by the Sheriff's own words, have no ill effects on security at the Jail. This prong of the permanent injunction standard therefore weighs in favor of entering an injunction.

### C. Prong Four of the Permanent Injunction Standard: Public Interest

The fourth prong of the permanent injunction standard requires a plaintiff to demonstrate that the "'public interest would not be disserved by a permanent injunction.'" <u>Legend Night Club</u>, 637 F.3d at 297 (quoting <u>eBay Inc.</u>, 547 U.S. at 391). Here, not only would the public interest not be "disserved" by entry of a permanent injunction, the public interest would be enhanced by such an injunction. As indicated above, this is not a case where the Court is substituting its security assessment for that of a jail official. Furthermore, it is important for the public to know that they can exercise their First Amendment rights without fear of <u>unconstitutional</u> retaliation. <u>See id.</u> at 303 (quoting <u>Joelner v. Vill. of Wash.</u>

Park, 378 F.3d 613, 620 (7th Cir. 2004)) (indicating that "it is always in the public interest to protect First Amendment liberties"); Giovani Carandola, Ltd. v. Bason, 303 F.3d 507, 521 (4th Cir. 2002) (recognizing that "upholding constitutional rights surely serves the public interest").

The Court acknowledges that this is not an easy area of the law, and there will always be competing interests when it comes to public employees' speech rights. But here, as the record developed at trial, it became evident that Sheriff Watson engaged in unconstitutional retaliation. On these facts, the public interest is thus clearly served by the remedy of an injunction, particularly when such injunction is limited to reversing the retaliatory order.

### D. Injunction Holding

As set forth above, the Court finds that Injunction Plaintiffs sufficiently demonstrated that each of the four prongs of the permanent injunction test, as set forth by the Supreme Court in eBay Inc. and the Fourth Circuit in Legend Night Club, warrant entry of a permanent injunction in this case. Subsumed within such analysis is the Court's finding that Injunction Plaintiffs, as public employees, demonstrated a violation of their First Amendment rights based on the four-part legal standard set forth by the Fourth Circuit in Goldstein.

As ordered from the bench at the conclusion of the bench trial, the injunctive relief awarded to Injunction Plaintiffs requires Sheriff Watson to take two steps to remedy the unconstitutional retaliatory revocation of Injunction Plaintiffs' security clearances. First, Sheriff Watson must write a letter to Injunction Plaintiffs' direct employer indicating that the Injunction Plaintiffs' security clearances are reinstated. Second, to the extent that Sheriff Watson or the Jail have any written records indicating that Injunction Plaintiffs' security clearances are revoked, such records should be modified to reflect the reinstatement of all six Injunction Plaintiffs' security clearances. The Court notes that the Injunction entered in this case does not require Sheriff Watson to take any steps that would place any inmate, any Jail employee or contractor, or any member of the public in danger, as, by the Sheriff's own admission, reinstatement of such security clearances would not create any security concern at the Portsmouth Jail.

### V. Conclusion

For the reasons set forth on the record, and in detail above, a permanent injunction was entered in favor of all six Injunction Plaintiffs at the conclusion of the bench trial. Consistent with the Court's ruling from the bench, Sheriff Watson is hereby **ORDERED** to reinstate the Injunction Plaintiffs'

security clearances, and to modify any Jail records, to the extent they exist, to reflect the Injunction Plaintiffs' reinstatement.

Judgment having already been entered on the docket on April 25, 2013, <u>see</u> ECF No. 117, the Clerk is **REQUESTED** to file this Opinion and Order, and to provide a copy to all counsel of record.

**IT IS SO ORDERED.**

/s/ 

_____
Mark S. Davis
UNITED STATES DISTRICT JUDGE

Norfolk, Virginia
May 24 , 2013

54